## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

EARL CROSBY, et al.

          Plaintiffs,

    v.

TWITTER, INC., GOOGLE INC., and
FACEBOOK, INC.

          Defendants.

Case No. 2:16-CV-14406-DML-DRG

Judge: Honorable David M. Lawson

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' JOINT MOTION TO
## DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

Defendants Twitter, Inc., Google Inc., and Facebook, Inc. (collectively "Defendants"), by and through their counsel, hereby move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss all claims in the Plaintiffs' Complaint (Dkt. No. 1). In support of the foregoing Motion, Defendants state as follows:

1.    Defendants base this Motion upon the accompanying memorandum of law, any argument of counsel, and such other materials as the Court may consider.

2.    As required by Local Rule 7.1(a), counsel for Defendant Google, on behalf of all Defendants, sought concurrence from counsel for Plaintiffs on March 9, 2017, via telephone. During this call, counsel for Defendant Google explained the nature of this Motion and its legal basis and requested, but did not obtain, concurrence in the relief sought.

Dated:  March 10, 2017                          Respectfully submitted,

*s/* with the consent of Kristin A. Linsley     *s/ Seth P. Waxman*
KRISTIN A. LINSLEY                              SETH P. WAXMAN
klinsely@gibsondunn.com                         seth.waxman@wilmerhale.com
JEANA BISNAR MAUTE                             PATRICK J. CAROME
jbisnarmaute@gibsondunn.com                     patrick.carome@wilmerhale.com
SHELI R. CHABON                                WILMER CUTLER PICKERING
schabon@gibsondunn.com                            HALE AND DORR LLP
GIBSON, DUNN & CRUTCHER LLP                     1875 Pennsylvania Avenue, NW
555 Mission Street, Suite 3000                  Washington, D.C. 20006
San Francisco, CA  94105-0921                   Telephone:  (202) 663-6800
Telephone:  (415) 393-8200                      Facsimile:  (202) 663-6363
Facsimile:   (415) 393-8306

THOMAS W. CRANMER (P25252)                      LEONARD M. NIEHOFF (P36695)
cranmer@millercanfield.com                      lniehoff@honigman.com
DAVID D. O'BRIEN (P65532)                       J. MICHAEL HUGET (P39150)
obrien@millercanfield.com                       mhuget@honigman.com
MILLER, CANFIELD, PADDOCK &                     HONIGMAN, MILLER, SCHWARZ &
   STONE, PLC                                      COHN, LLP
840 West Long Lake Road, Suite 200              130 South First Street, 4th Floor
Troy, MI 48098                                  Ann Arbor, MI 48104
(248) 267-3381                                  (734) 418-4246

*Attorneys for Defendant*                        *Attorneys for Defendant*
**FACEBOOK, INC.**                               **TWITTER, INC.**

*s/*with the consent of Brian M. Willen
BRIAN M. WILLEN (P75110)
bwillen@wsgr.com
WILSON SONSINI
   GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 999-5800

*Attorneys for Defendant*
**GOOGLE INC.**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

EARL CROSBY, et al.

       Plaintiffs,

    v.

TWITTER, INC., GOOGLE INC., and
FACEBOOK, INC.

       Defendants.

Case No. 2:16-CV-14406-DML-DRG

Judge: Honorable David M. Lawson

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

## STATEMENT OF THE ISSUES PRESENTED

1.      Whether the federal immunity for online intermediaries created by Section 230 of the Communications Decency Act, 47 U.S.C. § 230, bars this action, which seeks to impose liability under 18 U.S.C. § 2333(a) based on allegations that Defendants failed to block or remove content that third parties allegedly transmitted via Defendants' interactive computer services.

2.      Whether the Complaint fails to state a claim under 18 U.S.C. § 2333(a) because the Complaint fails to allege facts that would establish that any Defendant (a) proximately caused the deaths of Tevin Eugene Crosby, Juan Ramon Guerrero, Jr., or Jaiver Jorge Reyes; or (b) engaged in an act of "international terrorism" as defined in 18 U.S.C. § 2331(1).

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

### Issue 1

1.  *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016)

2.  *Fields v. Twitter, Inc.*, No. 16-CV-00213, 2016 WL 6822065 (N.D. Cal. Nov. 18, 2016)

3.  *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398 (6th Cir. 2014)

4.  *Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014)

5.  *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 639 (2017)

6.  *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)

### Issue 2

1.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

2.  *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118 (2d Cir. 2013)

3.  *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)

# **TABLE OF CONTENTS**

Page

STATEMENT OF THE ISSUES PRESENTED ........................................................ i

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ........................... ii

TABLE OF AUTHORITIES ................................................................ v

STATEMENT OF FACTS ................................................................ 5

LEGAL STANDARDS ON A MOTION TO DISMISS ...................................... 10

ARGUMENT .............................................................................. 11

I.    Section 230 Requires Dismissal Of Plaintiffs' Claims ................................ 11

      A.   Section 230 Gives Interactive Service Providers
           Immunity From Civil Liability For Content Created By
           Third-Party Users ............................................................ 11

      B.   Section 230 Immunizes Twitter, Google, And Facebook
           Against Plaintiffs' Claims .................................................. 13

           1.   Defendants Provide "Interactive Computer
                Services" .............................................................. 14

           2.   The Allegedly Harmful Content At The Core Of
                Plaintiffs' Claims Was Provided By Third Parties ................ 14

           3.   Plaintiffs' Claims Seek To Treat Defendants As
                Publishers ............................................................ 17

II.   The Complaint Fails To State A Claim Under Section 2333(a) .................. 22

      A.   The Complaint Fails To Allege Proximate Causation ...................... 22

      B.   The Complaint Fails To Allege Facts Plausibly
           Establishing That Any Defendant Committed An "Act Of
           International Terrorism" .................................................... 28

1.    The Complaint Fails To Allege Facts Plausibly
      Establishing A Violation Of The Criminal
      "Material Support" Laws ......................................................... 30

2.    The Complaint Fails To Establish That Defendants
      Committed "Violent" Or "Dangerous" Acts That
      "Appear[ed] To Be Intended" To Achieve A
      Specified Terrorist Purpose ...................................................... 34

3.    The Orlando Attack Was Not "*International*
      Terrorism*" Within The Meaning of Section 2333 ................... 38

CONCLUSION ........................................................................................ 40

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abecassis v. Wyatt*, 704 F. Supp. 2d 623 (S.D. Tex. 2010) ..............................31, 32

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)..........................................23

*Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450 (E.D.N.Y.
 2011) ..........................................................................................................................16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................10, 24, 28, 31

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ...........................................21

*Boim v. Holy Land Foundation for Relief & Development*, 549 F.3d
 685 (7th Cir. 2008) ...............................................................................................23, 35

*Burnett v. Al Baraka Investment & Development Corp.*, 274 F. Supp.
 2d 86 (D.D.C. 2003) ...................................................................................................34

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ......................12

*Corley v. United States*, 556 U.S. 303 (2009)...........................................................38

*Couch v. Cate*, 379 F. App'x 560 (9th Cir. 2010) ...................................................24

*Crandon v. United States*, 494 U.S. 152 (1990) .......................................................30

*D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014)............................................10

*Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016),
 *cert. denied*, 137 S. Ct. 622 (2017)............................................................9, 10

*Fair Housing Council of San Fernando Valley v. Roommates.com,
 LLC*, 521 F.3d 1157 (9th Cir. 2008)............................................12, 16, 17, 18

*Fields v. Twitter, Inc.*, 200 F. Supp. 3d 369 (N.D. Cal. 2016) ........................*passim*

*Fields v. Twitter, Inc.*, No. 16-CV-00213, 2016 WL 6822065 (N.D.
 Cal. Nov. 18, 2016)..........................................................................................*passim*

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012) .............................28

*Goddard v. Google, Inc.*, No. C 08-2738, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ..........................................................................15

*Guinn v. Jeffco Combined Courts*, 537 F. App'x 790 (10th Cir. 2013) ...................6

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ..............................................37

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) ........................23, 24, 28

*Herrick v. Grindr, LLC*, No. 17-CV-932, 2017 WL 744605 (S.D.N.Y Feb. 24, 2017) ..........................................................................................17

*Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685 (S.D. Miss. 2014) ...............................................................................................................15

*Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010) ...........................30, 32, 34

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) .............23, 24

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), *aff'd*, 714 F.3d 118 (2d Cir. 2013) ..............................10, 36

*In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118 (2d Cir. 2013) ...............................................................................22, 23, 27, 29

*Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) ...................................................................................*passim*

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) ..........................10, 13, 18

*Lancaster v. Alphabet Inc.*, No. 15-CV-05299, 2016 WL 3648608 (N.D. Cal. July 8, 2016).................................................................................14

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015), *appeal pending*, 2d Cir. No. 16-2134 ................................................23, 28, 37

*M.A. ex rel. P.K. v. Village Voice Media Holdings*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011)...................................................................................15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ..............................................................................................13

*O'Kroley v. Fastcase, Inc.*, 831 F.3d 352 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 639 (2017)...................................................................2, 12, 17, 18

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ....................................................19

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)................................22, 23, 27, 29

*Sam Han v. University of Dayton*, 541 F. App'x 622 (6th Cir. 2013)....................10

*Sanford v. Detroit Public School*, No. 14-11771, 2014 WL 1922722,
  (E.D. Mich. May 14, 2014) ............................................................................6

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088
  (N.D. Cal. 2015) ...........................................................................................14

*Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 221-22
  (S.D.N.Y. 2003)............................................................................................39

*Stansell v. BGP, Inc.*, No. 09-CV-2501, 2011 WL 1296881 (M.D. Fla.
  Mar. 31, 2011) .......................................................................................35, 36

*Staples v. United States*, 511 U.S. 600 (1994)........................................................30

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ...............27

*Stutts v. De Dietrich Group*, No. 03-CV-4058, 2006 U.S. Dist. LEXIS
  47638 (E.D.N.Y. June 30, 2006) .......................................................31, 34, 37

*Westlake Legal Group v. Yelp, Inc.*, 599 F. App'x 481 (4th Cir.), *cert.
  denied*, 136 S. Ct. 541 (2015).......................................................................17

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ................................12

## STATUTES AND RULES

18 U.S.C.
  § 2331 ...................................................................................*passim*
  § 2333 ...................................................................................*passim*
  § 2339A.................................................................................*passim*
  § 2339B.................................................................................*passim*

47 U.S.C. § 230 .......................................................................*passim*

Clayton Act, 15 U.S.C. § 15 .......................................................23

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222
  (2016)........................................................................29, 37, 38

RICO 18 U.S.C. § 1964 ........................................................................................23

Sherman Act, 26 Stat. 209 (1890)......................................................................23

Fed. R. Civ. P. 12(b)(6)......................................................................................10

## OTHER AUTHORITIES

Facebook Community Standards, https://www.facebook.com
/communitystandards (last visisted Mar. 10, 2017) .......................................8

The Twitter Rules, https://support.twitter.com/articles/18311 (last
visited Mar. 10, 2017)....................................................................................8

YouTube Community Guidelines, https://www.youtube.com/yt/policy
andsafety/communityguidelines.html (last visited Mar. 10,
2017) ................................................................................................................8

Plaintiffs' Complaint seeks to hold Defendants Twitter, Google, and Facebook liable for the deaths of Tevin Eugene Crosby, Juan Ramon Guerrero, Jr., and Javier Jorge-Reyes—three victims of the horrific shooting by Omar Mateen at the Pulse Night Club in Orlando, Florida in June 2016.  The Complaint alleges that Mateen committed this heinous attack after encountering jihadist content on the Internet.  Plaintiffs do not claim that any Defendant created any of that content or even that Mateen found it on Defendants' services.  Rather, Plaintiffs' theory appears to be that (1) Defendants provided "material support" to ISIS because their broadly available online platforms, which have billions of users worldwide, allegedly were used by ISIS and its sympathizers to promote their views and activities; (2) this "material support" allegedly allowed ISIS to grow and gain strength; and (3) the resulting power of ISIS somehow caused Mateen's self-radicalization, eventually resulting in the Orlando shooting and the death of Plaintiffs' decedents.  Plaintiffs assert that this attenuated chain of causation renders Defendants liable for treble damages under the civil remedy provision of the federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a) ("§ 2333(a)").

Defendants deeply sympathize with Plaintiffs' losses and are committed to combating the spread of terrorist content online.  Simply stated, there is no place on Defendants' sites for those who seek to promote terrorist activity or disseminate terrorist content.  But there is no legal basis for holding Defendants liable for the

1

heinous acts at issue here, as another district court recently held in dismissing nearly identical claims against Twitter involving a separate terrorist attack. *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016) ("*Fields I*"); No. 16-CV-00213, 2016 WL 6822065 (N.D. Cal. Nov. 18, 2016) ("*Fields II*").  Plaintiffs' claims fail as a matter of law for two fundamental reasons.

*First*, Plaintiffs' attempt to hold Defendants liable for the alleged effects of third-party content shared on their platforms is barred by § 230 of the Communications Decency Act, 47 U.S.C. § 230 ("§ 230").  Courts throughout the country, including the Sixth Circuit, have consistently held that § 230 immunizes online service providers from liability for disseminating or failing to remove objectionable content created by their users.  *E.g.*, *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406–08 (6th Cir. 2014); *Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18–19 (1st Cir. 2016).  By seeking to hold providers liable for engaging or not engaging in "'traditional editorial functions,'" *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016), such claims violate the command of § 230 that an interactive computer service may not "be treated as the publisher … of any information provided by" someone else.  47 U.S.C. § 230(c)(1).  Here, Plaintiffs' theory is that third-party content published on Defendants' services contributed to or caused the Orlando attack.  Accepting that theory would impose liability on Defendants for "deciding whether to publish"

2

other people's information—precisely the result that § 230(c)(1) forbids. *Jones*, 755 F.3d at 416; *accord Fields II*, 2016 WL 6822065, at *5.

*Second*, independently of § 230, the Complaint fails to allege facts necessary to satisfy essential elements of a claim under § 2333(a), which requires, among other things, that a plaintiff establish (1) injury "by reason of" (2) an "act of international terrorism" committed by the defendant. 18 U.S.C. § 2333(a). Both elements are absent here. The first requires a showing of proximate cause, but, as in *Fields*, Plaintiffs allege no facts indicating that the Orlando attack "was in any way impacted, helped by, or the result of ISIS's presence on the social network[s]." *Fields II*, 2016 WL 6822065, at *9. Any alleged "causal connection[]" between the attack and any use of Defendants' broadly available platforms by alleged ISIS affiliates is "too speculative [and] attenuated to raise a plausible inference of proximate causation." *Id.* at *10 n.3.

Nor does the Complaint allege facts supporting a plausible conclusion that any Defendant committed an act of "international terrorism," a term carefully defined by § 2331(1) of the statute. As an initial matter, § 2331(1)(A) requires that the defendant's conduct have violated a federal or state criminal law. Plaintiffs contend that Defendants provided "material support" for terrorism or to a terrorist organization in violation of 18 U.S.C. §§ 2339A and 2339B. But even if a violation of these criminal statutes were sufficient under § 2333(a), which it is not,

Plaintiffs have not alleged the essential elements of "material support"—including that the defendant had actual and specific knowledge that it was aiding a particular type of terrorist activity or a designated foreign terrorist organization.  Plaintiffs' suggestion that Defendants generally knew that some of the billions of people using their platforms might be affiliated with or sympathetic to ISIS is insufficient to establish material support for terrorism.

Plaintiffs also fail to allege conduct that would satisfy other elements of the "international terrorism" definition.  Plaintiffs' allegations, if true, would establish only that Defendants made their online platforms broadly available and that their efforts to police those platforms were not as successful as Plaintiffs would have liked.  Such ordinary business conduct does not constitute a "violent act[]" or act "dangerous to human life" that "appear[s] to [have been] intended" "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1)(A), (B).

Finally, this case, which arises from an attack on U.S. soil by a U.S. citizen with only U.S. victims, does not involve "international" terrorism.  The ATA specifically distinguishes "international" terrorism from "domestic" terrorism, and creates a civil cause of action for only the former.  18 U.S.C. § 2331(1), (5); *id.* § 2333.  The Orlando attack plainly did not "occur primarily outside the territorial

jurisdiction of the United States," nor did it "transcend national boundaries" in the manner in which it was accomplished, the persons it was intended to intimidate, or the locale in which its perpetrator operated. *Id*. § 2331(1)(C). It was an act of domestic terrorism, and so cannot give rise to civil claims under § 2333.

## STATEMENT OF FACTS

On June 12, 2016, Plaintiffs' decedents were killed during a mass shooting at the Pulse Night Club in Orlando, carried out by Omar Mateen. Compl. ¶¶ 1, 138, 140, 142. Although ISIS "claimed responsibility for the shootings," Plaintiffs do not allege that Mateen had ever "been directly in contact with ISIS." *Id.* ¶¶ 144, 155. Instead, they describe Mateen as an independent actor who became self-radicalized by viewing "jihadist" content on "the Internet and social media." *Id.* ¶¶ 147–49, 153–55. The United States has named ISIS as a Foreign Terrorist Organization under § 219 of the Immigration and Nationality Act. *Id.* ¶ 33.

Defendants Twitter, Google (through its YouTube service), and Facebook each operate a global Internet platform for public self-expression and conversation that is free of charge and broadly available. *See* Compl. ¶¶ 1, 102. Each day, users of these platforms send and share hundreds of millions of posts, Tweets, videos, and messages touching on a broad range of topics—from political commentary to a favorite sports team to the birth of a child. *See id.* ¶ 102.

Plaintiffs allege that some of Defendants' billions of accountholders are

affiliated with or sympathetic to ISIS and have used Defendants' platforms to transmit content promoting ISIS's activities and agenda.[1]

As for Twitter, Plaintiffs allege that ISIS members or sympathizers used Twitter to send messages to recruit terrorists, raise funds, and spread propaganda. Compl. ¶¶ 35–40, 46–48, 54–64.  Plaintiffs assert, for example, that ISIS or "ISIS supporters" tweeted images of executions, *id.* ¶¶ 55–61, and guidelines about how to join ISIS, *id.* ¶ 37.  Plaintiffs admit that Twitter (like the other Defendants) has a rule against threatening or promoting terrorism, *id.* ¶ 110, *see* note 2, *infra*, and has repeatedly shut down accounts opened by claimed "pro-ISIS" users, *id.* ¶ 106. Although Plaintiffs generically allege that Mateen "was self-radicalized on the Internet," they do not assert that any of that alleged self-radicalization occurred over Twitter or even that Mateen ever used Twitter.

As for YouTube/Google, Plaintiffs refer to a small number of videos that

---

[1] Defendants treat Plaintiffs' allegations as true solely for purposes of this motion, but object to Plaintiffs' impermissible use of "group pleading."  The Complaint repeatedly refers collectively to "Defendants" for allegations relating to only one of them.  "Basic pleading requirements" under Fed. R. Civ. P. 8(a) require that the plaintiff "attribute factual allegations to particular defendants."  *Sanford v. Detroit Pub. Sch.*, No. 14-11771, 2014 WL 1922722, at *6 (E.D. Mich. May 14, 2014) (dismissing claims against certain defendants where complaint referred only to "Defendants" and did not allege specific wrongs committed by those defendants). A complaint must allege facts showing the "personal involvement" of each defendant with the alleged violation.  *Id.*; *accord Guinn v. Jeffco Combined Courts*, 537 F. App'x 790, 794 (10th Cir. 2013).

allegedly appeared on YouTube, Compl. ¶¶ 38, 50, 64, 85, 130, one of which they acknowledge YouTube removed in 2014, *id.* ¶ 38. Plaintiffs allege that, through these videos, ISIS used YouTube to recruit terrorists. *Id.* ¶¶ 38, 85. Plaintiffs also cite a series of news articles referencing alleged "ISIS videos" posted to YouTube. *Id.* ¶¶ 83–93.

As for Facebook, Plaintiffs do not allege facts concerning any actual content posted by ISIS sympathizers relating to or supporting the Orlando shooting. Instead, they identify a handful of alleged ISIS *sympathizers* who allegedly posted on Facebook about other matters, Compl. ¶¶ 78–80, such as a "fan page" of an ISIS group that "adoringly quote[d]" an ISIS leader, *id.* ¶ 76. Plaintiffs allege that "ISIS *supporters*" directed users to Facebook pages with ISIS propaganda, while acknowledging that Facebook was "continuously" taking down these pages for content violations. *Id.* ¶ 77. Plaintiffs also cite two instances in which Mateen used Facebook, *id.* ¶ 149, though they do not allege—nor could they allege—that any such use caused the Orlando shooting.

As Plaintiffs readily concede, all the online content referenced in the Complaint was created entirely by third parties—specifically, by alleged terrorists or their supporters—and not by Defendants. Compl. ¶¶ 53–64. Plaintiffs nonetheless seek to hold Defendants liable for the claimed consequences of this content, on two equally flawed theories.

7

*First*, Plaintiffs assert that Defendants "knowingly and recklessly" allowed ISIS to share this content, Compl. ¶ 1, and allegedly failed to take "meaningful action to stop" ISIS by "censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up," *id*. ¶¶ 65, 103, 106; *see also id.* ¶¶ 76–77, 84.  Each of the Defendant's rules, cited in the Complaint, *id.* ¶¶ 103, 110, 128, unequivocally ban content that encourages violence of any kind, including terrorism.[2]  Plaintiffs nonetheless allege that Defendants did not do enough to enforce these rules.  According to Plaintiffs, instead of reviewing and removing content and blocking accounts when notified of a violation, *id.* ¶¶ 84, 103, Defendants should have "proactively" "delete[d]"

---

[2] Twitter has always banned "threats" and use of the platform "for any unlawful purposes or in furtherance of illegal activities" and, since April 2015, has made its ban on terrorist content more explicit by expressly prohibiting "threats of violence … including threatening or promoting terrorism."  The Twitter Rules, https: //support.twitter.com/articles/18311 (last visited Mar. 10, 2017).  YouTube removes "videos that encourage others to do things that might cause them to get badly hurt," content "inciting others to commit violent acts," and promotions of "violence against individuals based on race or ethnic origin, religion, … [or] nationality."  YouTube Community Guidelines, https://www.youtube.com/yt/ policyandsafety/communityguidelines.html (last visited Mar. 10, 2017).  Facebook prohibits organizations engaged in "terrorist activity" from its site and "remove[s] content that expresses support for groups" involved in such activity.  Content "[s]upporting or praising leaders of those same organizations, or condoning their violent activities" is not allowed.  Facebook Comm. Standards, https://www .facebook.com/communitystandards (last visited Mar. 10, 2017).   These rules are incorporated by reference into the Complaint because the rules are "referred to in the complaint," ¶¶ 103, 110, 128, and central to the claim.  *See Gardner v. Quicken Loans, Inc.*, 567 F. App'x 362, 364–65 (6th Cir. 2014).

accounts "as soon as they [were] created," *id.* ¶ 103, 108, and "monitor[ed] [the] content" sent by hundreds of millions of users each day, *id.* ¶ 103.

*Second*, Plaintiffs allege that Defendants earn revenue from advertisements placed on their platforms, including ads allegedly displayed on the same screen as "ISIS postings," Compl. ¶¶ 124–36, and that Defendants allegedly "create unique content by combining the ISIS postings with advertisements selected by Defendants," *id.* ¶ 8. Plaintiffs also allege that Google allows revenue earned in connection with some YouTube videos to be shared with the users who upload them—an alleged practice that Plaintiffs speculate resulted in the "shar[ing of] some of those revenues with ISIS." *Id.* ¶¶ 127–32.

Based on these allegations, Plaintiffs seek treble damages under 18 U.S.C. § 2333(a). Compl. ¶ 174. Count I asserts that Defendants "purposefully, knowingly or with willful blindness" provided "services and support" to ISIS; that those "services and support … constitute[d] material support to the preparation and carrying out of acts of international terrorism"; that Defendants thereby violated 18 U.S.C. § 2339A, a criminal statute; that such material support "was a proximate cause" of the deaths at issue; and that, having violated § 2339A, Defendants are civilly liable to Plaintiffs under § 2333(a). *Id.* ¶¶ 166–69. Count II repeats these allegations under 18 U.S.C. § 2339B, asserting that Defendants provided material support to ISIS, a designated Foreign Terrorist Organization. *Id.* ¶¶ 170–73.

## LEGAL STANDARDS ON A MOTION TO DISMISS

To avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court need not accept as true "inferences [that] are unsupported by facts alleged in the complaint," *Sam Han v. University of Dayton*, 541 F. App'x 622, 627 (6th Cir. 2013), or "legal conclusions masquerading as factual allegations," *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Section 230 requires dismissal where its application "is evident from the face of the complaint." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014). The Sixth Circuit has stated that, because § 230 "'is an *immunity from suit* rather than a mere defense to liability,'" district courts should resolve the immunity question at an "earl[y] stage of [the] litigation." *Jones*, 755 F.3d at 417.

Given "'the extreme nature of the charge of terrorism,'" the Court in an action under § 2333(a) must strictly enforce the pleading rules. *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 831 (S.D.N.Y. 2005) ("*Burnet II*"), *aff'd*, 714 F.3d 118 (2d Cir. 2013). In such actions, "'fairness requires extra-careful scrutiny of Plaintiffs' allegations.'" *Id.*

## ARGUMENT

Two independent legal grounds require dismissal. *First*, § 230 categorically bars claims that, as here, seek to hold providers of online service like Defendants liable for injuries allegedly resulting from the transmission or availability of third-party content through their services. *Second*, Plaintiffs fail to plead facts sufficient to establish key elements of primary liability under § 2333(a): (1) that Defendants' conduct proximately caused the deaths of plaintiffs' family members; and (2) that Defendants' conduct constituted an "act of international terrorism," as required by § 2333(a) and as defined by § 2331(1).

## I. Section 230 Requires Dismissal Of Plaintiffs' Claims

Section 230 provides immunity to interactive computer service providers for making available third-party content or for the providers' "editorial functions" in regard to such content. Plaintiffs' claims run headlong into this immunity. They seek to hold Defendants liable for deaths resulting from the Orlando shooting because individuals affiliated with or supporting ISIS allegedly disseminated content through Defendants' online platforms. Congress has ruled out liability based on this theory.

### A. Section 230 Gives Interactive Service Providers Immunity From Civil Liability For Content Created By Third-Party Users

The broad scope of § 230 is apparent on its face: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any

11

information provided by another information content provider." As the Sixth
Circuit has explained, this provision "immunizes providers of interactive computer
services against liability arising from content created by third parties." *Jones*, 755
F.3d at 406. Section 230(c)(1) bars any claim that seeks to hold an online service
provider liable for third-party content, including any claim that would fault the
provider for whether or how it exercised "'traditional editorial functions'" with
respect to such material. *O'Kroley*, 831 F.3d at 355. This immunity covers any
claim based on decisions about "'whether to publish, withdraw, postpone or alter
content.'" *Jones*, 755 F.3d at 407.

　　　Section 230 immunity serves three purposes: (1) "'maintain[ing] the robust
nature of Internet communication'"; (2) "protect[ing] against the 'heckler's veto'
that would chill speech"; and (3) "encourag[ing] interactive computer service
providers to self-regulate." *Jones*, 755 F.3d at 407–08. Given the importance of
these interests and the broad language of § 230, courts across the country "have
treated § 230(c) immunity as quite robust." *Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119, 1123 (9th Cir. 2003). It has been applied to a wide variety of
speech, including material that is unlawfully discriminatory, *Fair Hous. Council of
San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1173–74 (9th Cir.
2008), false and defamatory, *Zeran v. American Online*, 129 F.3d 327, 330 (4th
Cir. 1997), a vile and lawless advertisement posted by sex traffickers,

12

*Backpage.com*, 817 F.3d at 21, or an abhorrent and explicit incitement to violence by a terrorist group, *Klayman*, 753 F.3d at 1356–57.  Courts have emphasized that § 230 immunity attaches and should be resolved "at the earliest possible stage of the case."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009); *accord Jones*, 755 F.3d at 417.

Two recent decisions in the *Fields* case in the Northern District of California support this result.  Plaintiffs there alleged in nearly identical terms that Twitter had provided "material support" to ISIS and that this support had proximately caused plaintiffs' injuries.  As here, the *Fields* plaintiffs alleged that Twitter should be liable for those injuries under § 2333(a).  The court held that § 230 barred the claims because they sought to hold Twitter liable for performance of a quintessential publisher function—making third-party content available on its service.  *See Fields I*, 200 F. Supp. 3d at 970–74; *Fields II*, 2016 WL 6822065, at *5–7, *10–11.  This case should come out the same way.

**B.     Section 230 Immunizes Twitter, Google, And Facebook Against Plaintiffs' Claims**

Section 230 mandates dismissal when (1) the defendant is a "provider … of an interactive computer service"; (2) the allegedly harmful content was "provided by another information content provider" and not the defendant; and (3) the suit seeks to hold the defendant liable as a "publisher or speaker" of that content.  47 U.S.C. § 230(c)(1); *see Jones*, 755 F.3d at 409.  Each of these elements is met here.

### 1.    Defendants Provide "Interactive Computer Services"

An "interactive computer service" includes "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). Defendants' online platforms satisfy this definition because users access their servers to share information with others. *See* Compl. ¶ 1 (Defendants' platforms are "social networks"); *Fields I*, 200 F. Supp. 3d at 969 (no dispute that Twitter is an interactive computer service); *Lancaster v. Alphabet Inc.*, No. 15-CV-05299, 2016 WL 3648608, at *3 (N.D. Cal. July 8, 2016) (YouTube is an interactive computer service); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015) (same for Facebook). Plaintiffs do not dispute that this element is met.

### 2.    The Allegedly Harmful Content At The Core Of Plaintiffs' Claims Was Provided By Third Parties

The second element—that "another information content provider" provided the challenged content—also is satisfied here. An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Plaintiffs concede that third parties, not Defendants, created *all* of the allegedly terrorist-related information that is claimed to have been posted on their services. Compl. ¶ 163.

14

This conclusion is unaffected by Plaintiffs' allegation that Defendants derived ad revenue from displaying third-party content.  Compl. ¶¶ 124, 132–136. Plaintiffs concede that Defendants do not create the content of the ads.  *Id*. ¶ 163. And the "fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interactive service provider 'creates' or 'develops' that content."  *Goddard v. Google, Inc.*, No. C 08-2738, 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008) (rejecting argument that § 230 did not apply because Google received ad revenue from user-generated content); *accord Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685, 690 n.9 (S.D. Miss. 2014) (website operator's receipt of profits has no bearing on § 230 immunity).

No other interpretation of § 230 would make sense.  Most online services that disseminate user-created content are able to operate only by generating revenue from their platforms.  To hold that such a service loses § 230 immunity if it displays ads alongside user-generated content would erroneously "create a for-profit exception to § 230's broad grant of immunity."  *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1050 (E.D. Mo. 2011).  That approach would improperly "elide[] the crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable."  *Jones*, 755 F.3d at 414; *accord*

15

*Roommates.com*, 521 F.3d at 1161, 1174–75 (affirming immunity with respect to user-supplied content, even though the website profited "by collecting revenue from advertisers and subscribers").

Plaintiffs also are incorrect that Defendants, by allegedly displaying ads on the same screen as allegedly offensive postings, somehow created new, composite content that rendered them "information content providers." Compl. ¶¶ 125–26, 160–65. The Sixth Circuit has made clear that a service provider does not "create" or "develop" information merely by "augmenting the content generally" or by "commenting on that statement *post hoc*." *Jones*, 755 F.3d at 410, 415. Instead, the provider's conduct falls outside § 230 only where it "materially contribut[ed]" to *the alleged unlawfulness* of the content. *Id.* at 410. Here, the advertisements did not materially contribute to the illegality of any ISIS-related content, and Plaintiffs unsurprisingly do not (and could not) assert that by allegedly displaying ads near the challenged postings, Defendants "change[d] the meaning and purpose" of those postings. *Ascentive v. Opinion Corp.*, 842 F. Supp. 2d 450, 474 (E.D.N.Y. 2011).

Nor does it matter that Defendants allegedly "target[ed] advertisements based on viewers and content" through the use of "proprietary algorithms," Compl. ¶¶ 125–26, 161, because that still would not mean that Defendants "materially contributed" to the alleged unlawfulness of the postings. The Sixth Circuit and other courts have made clear that the use of tools that filter or arrange third-party

16

content does not constitute "creation" or "development" of information under § 230.  *See O'Kroley*, 831 F.3d at 355 (Google's automated algorithmic editing of search result snippets); *Westlake Legal Grp. v. Yelp, Inc*., 599 F. App'x 481, 485 (4th Cir. 2015) (Yelp's automated filter system for reviews); *Herrick v. Grindr, LLC*, No. 17-CV-932, 2017 WL 744605, at *4 (S.D.N.Y Feb. 24, 2017) (that Grindr's services were "weaponized" by a user "does not make Grindr the creator").  Plaintiffs' own allegations confirm that Defendants' neutral algorithms act on content provided by others.  Compl. ¶ 125.  As a matter of law, the use of such algorithms—like other neutral tools by which online services promote online content and encourage users to post—"do not constitute a material contribution" to the unlawful or harmful character of any content at issue.  *Jones*, 755 F.3d at 416; *see also Roommates.com*, 521 F.3d at 1169 (neutral tools do not affect § 230 immunity even if used to "carry out what may be unlawful or illicit" activities).

### 3.    Plaintiffs' Claims Seek To Treat Defendants As Publishers

Finally, Plaintiffs seek to hold Defendants liable as the "publisher or speaker" of allegedly harmful third-party content within the meaning of § 230. Plaintiffs allege that Defendants are liable for the Orlando shooting deaths because Defendants "knowingly and recklessly" allowed ISIS or its sympathizers to "spread[] extremist propaganda, raise[] funds, and attract[] new recruits," Compl. ¶ 1, and then allegedly failed to take "meaningful action to stop" such use by

17

"censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or

blocking ISIS-related accounts from "springing right back up," *id.* ¶¶ 65, 83, 103,

106.  These alleged acts—which amount to allowing content to be published or

failing to censor it—are "traditional editorial functions," *Jones*, 755 F.3d at 416,

and therefore are "precisely the kind of activity for which Congress intended to

grant absolution with the passage of section 230."  *Roommates.com*, 521 F.3d at

1171–72 (provider not liable for "failing to detect and remove" unlawful content);

*O'Kroley*, 831 F.3d at 355 (service's act of not removing search results even after

receiving complaints is a traditional editorial function); *Klayman*, 753 F.3d at

1355, 1358–59 (rejecting claims against Facebook for allegedly allowing on its

platform, and "refus[ing]" to take down "Intifada" pages that allegedly "called for

Muslims to rise up and kill the Jewish people").

Plaintiffs cannot avoid this conclusion by asserting—contrary to every other

allegation in the Complaint—that their claims rest solely on Defendants'

"provision of the infrastructure which provides material support to ISIS" and not

on the "content of ISIS' social media postings."  Compl. ¶ 8.  The plaintiffs in

*Fields* made a nearly identical argument—that their case turned on Twitter's

"provision of accounts" to ISIS and not on the content of ISIS-related Tweets or

Twitter's failure to block or remove such Tweets.  Judge Orrick rejected the

argument, and his reasoning fully applies to the "infrastructure" theory here.  *See*

18

*Fields I*, 200 F. Supp. 3d at 970–74; *Fields II*, 2016 WL 6822065, at *5–7.

The first and most fundamental problem with Plaintiffs' approach is that imposing liability on online services for providing infrastructure is precisely what § 230 forbids.  Indeed, that is simply another way of trying to hold Defendants liable for a protected publishing decision: "the decision to permit third parties to post content." *Fields I*, 200 F. Supp. 3d at 972.  As the court explained in *Fields I*, a decision about who may or may not use the communication infrastructure offered by an online intermediary is no less a decision about what content may be posted as any decision to withdraw or alter content directly.  *See id*. at 972–73; *cf. Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) (restrictions based on the speaker's identity often are "'simply a means to control content'").  Judge Orrick reinforced this point in *Fields II*: "prohibit[ing] ISIS members and affiliates from acquiring accounts … [is] a policy that necessarily targets the content, ideas, and affiliations of particular account holders."  2016 WL 6822065, at *6.  The only difference between an infrastructure-provision theory and an express content-removal theory is that the former would hold Defendants "liable for granting permission to post … instead of for allowing postings that have already occurred." *Fields I*, 200 F. Supp. 3d at 972.  Both theories of liability are barred by § 230.  *Id*.

Although Defendants would be immune even if Plaintiffs' claims did turn only on the provision of communication infrastructure, the Complaint makes clear

19

that, as in *Fields*, Plaintiffs actually seek to hold Defendants liable for the content of the third-party information made available through their services.  Like the *Fields* complaint from which it was largely copied, the Complaint here is "riddled with detailed descriptions of ISIS-related messages, images, and videos."  *Fields I*, 200 F. Supp. 3d at 971; *see also Fields II*, 2016 WL 6822065, at *7.  Its core premise is that ISIS or its supporters used Defendants' sites to spread hateful messages and that Defendants should have done more to remove such material. *See Fields II*, 2016 WL 6822065 at *7.  That is plainly a content-based theory.

Indeed, Plaintiffs allege no basis *other* than the content of specific postings for asserting that Defendants' platforms supported ISIS and thereby caused the Orlando shooting.  If Plaintiffs' claims were premised only on the theory that Defendants provided "infrastructure" to ISIS, and not on any theory that Defendants failed to prevent ISIS from *using* that infrastructure to transmit messages and videos aimed at spreading and fomenting its extremist agenda, Plaintiffs could not possibly claim that Defendants "ha[ve] been instrumental to the rise of ISIS"—let alone that Defendants "enabled [ISIS] to carry out" the Orlando attack.  Compl. ¶ 1.  Plaintiffs' "material support" theory necessarily depends on the premise that Defendants are responsible for the alleged consequences of information transmitted via their services.  The effort to impose liability for "deciding whether to publish" content is at the heart of what § 230(c)(1) forbids.

20

*Jones*, 755 F.3d at 407; *accord Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) (immunity covers "'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online.'").

Finally, this conclusion is unaffected by Plaintiffs' suggestions that Defendants could and should have used various strategies to block ISIS accounts. Compl. ¶¶ 107–21.  The objective of such strategies plainly would have been to *exclude* objectionable content, so faulting Defendants for not employing them runs again afoul of § 230.  Moreover, Plaintiffs' notion that these strategies would not have required Defendants to monitor or review third-party content is incorrect.  For example, Plaintiffs fault Defendants for allegedly not developing and employing an automated mechanism to block new accounts with the same "name root" (but incremental "numerical suffix[es]") as accounts that Defendants previously removed due to a suspected ISIS connection.  *Id*. ¶¶ 106, 116–17.  But the only way to discover that a particular "name root" is associated with suspect content would be *based on suspect content* posted by a prior account having the same root.  *E.g.*, *id.* ¶ 115 ("The day after the attacks, he is now DriftOne0151 and he posts pictures of those individuals who conducted the [ISIS] attacks.").  The same is true of Plaintiffs' proposed strategy of blocking new accounts that immediately seek and receive large numbers of followers.  *Id.* ¶¶ 118–20.  This strategy, too, relies on third-party content to decide whether an account is suspicious—namely, a

21

Tweet containing a request such as, "Please F0ll0w & Retweet This Post!," *id.*
¶ 111 fig. 6, ¶ 112 fig. 7, ¶ 113 fig. 8, and/or the responses of other users, *id.* ¶ 119.
In sum, Plaintiffs seek to impose liability based on Defendants' handling of third-
party content, and that effort is barred by § 230.

## II.   The Complaint Fails To State A Claim Under Section 2333(a)

The Complaint also fails to state a claim under 18 U.S.C. § 2333(a)—the
sole legal basis for both of Plaintiffs' causes of action.  Section 2333(a) creates a
private right of action for "[a]ny national of the United States injured in his or her
person, property, or business by reason of an act of international terrorism."  *Id.*
By its terms, this provision requires a plaintiff to plead and prove (1) that he or she
was injured "by reason of"—i.e., that the injury was proximately caused by—
(2) an "act of international terrorism" committed by the defendant.  *Id.*  The
Complaint does not allege facts sufficient to establish either of these elements.

### A.   The Complaint Fails To Allege Proximate Causation

Section 2333(a)'s "by reason of" language requires a plaintiff to allege facts
showing "that defendant's actions proximately caused their injuries."  *In re
Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123–25 (2d Cir. 2013) ("*Al
Rajhi*") (affirming 12(b)(6) dismissal for failure plausibly to allege proximate
cause); *accord Rothstein v. UBS AG*, 708 F.3d 82, 95–98 (2d Cir. 2013).  Congress
borrowed this proximate cause language from the civil remedy provisions of the

22

Sherman Act, 26 Stat. 209 (1890), the Clayton Act, 15 U.S.C. § 15(a), and RICO, 18 U.S.C. § 1964(c). *See Rothstein*, 708 F.3d at 95. Because Congress "used the same words," we "assume it intended them to have the same meaning"—namely, that a plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

Courts have strictly applied this requirement at the pleading stage, holding that "conclusory allegations" of causation are not enough. *Rothstein*, 708 F.3d at 95, 97; *Al Rajhi*, 714 F.3d at 124–25. A plaintiff must allege facts that plausibly establish that a defendant's alleged conduct "led directly" to the plaintiffs' injuries. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). A causation theory that "stretche[s] the causal chain" linking defendant's alleged conduct to plaintiff's injury "well beyond the first step" cannot satisfy this "direct relationship requirement." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10–11 (2010).[3]

---

[3] Rather than using the *Holmes* test, some out-of-circuit courts have read § 2333(a) to allow a looser causal connection. *E.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 697 (7th Cir. 2008) (en banc) (applying a more "relaxed" causation standard, at least in cases involving monetary donations funneled knowingly to a terrorist group); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015) (requiring plaintiff to establish that defendant's acts were "a substantial factor in causing plaintiffs' injuries" and that "such injuries were a foreseeable result of those acts"), *appeal pending*, 2d Cir. No. 16-2134. Those approaches ignore the express requirement that the injury be "by reason of" the

Here, the alleged causal "connection" is "tenuous at best" and fails as a

matter of law. *See Fields I*, 200 F. Supp. 3d at 974; *see also Fields II*, 2016 WL

6822065, at *9. As an initial matter, Plaintiffs' threadbare recital that Defendants'

alleged "provision of material support to ISIS was a proximate cause of the injury

inflicted on Plaintiffs," Compl. ¶¶ 168, 172, is "not entitled to be assumed true,"

and cannot establish a plausible claim for relief. *Iqbal*, 556 U.S. at 681. Nor is it

enough for Plaintiff to assert, without factual support, that Defendants' services

were used by ISIS to fund, recruit for, and carry out the Orlando shooting, *see*

Compl. ¶¶ 151–59. "[M]ere conclusory statements[] do not suffice." *Iqbal*, 556

U.S. at 678.

The *facts* alleged in the Complaint do not come close to establishing a

plausible "direct relationship" between any Defendant's conduct and Mateen's

attack. *See Hemi Grp.*, 559 U.S. at 10–11. As in *Fields*, Plaintiffs do not allege

facts suggesting that ISIS "recruited or communicated" with Mateen over

---

defendant's actions—language that, as shown above, had an established meaning
when § 2333(a) was enacted. *See Holmes*, 503 U.S. at 267. Under a statutory "by
reason of" test, there must be a "direct … connection" between the defendant's
conduct and the Plaintiffs' injury; "foreseeability" will not suffice. *See Hemi Grp.*,
559 U.S. at 12; *Couch v. Cate*, 379 F. App'x 560, 565 (9th Cir. 2010). In any
event, as the *Fields* court held in rejecting similar claims*,* the causal "connection"
alleged here is "tenuous at best" and so insufficient "[e]ven under … [a]
'substantial factor' test." *Fields I*, 200 F. Supp. 3d at 974; *see also Fields II*, 2016
WL 6822065, at *9.

Defendants' platforms, that ISIS or Mateen used the platforms "to plan, carry out, or raise funds for the attack," or that Mateen "viewed ISIS-related content" on Twitter or YouTube or even had an account on those platforms. *Fields I*, 200 F. Supp. 3d at 967; *Fields II*, 2016 WL 6822065, at *1. And although Plaintiffs allege that Mateen twice used Facebook, Compl. ¶ 149, they plead no facts suggesting that he, or ISIS, used Facebook to carry out the attack—much less that Facebook knowingly provided material support that contributed to the attack.

Instead, Plaintiffs pile speculation upon speculation: (1) Twitter, Facebook, and/or Google allegedly "knowingly permit[ted]" ISIS and/or its sympathizers to create accounts on their platforms, and then allegedly failed to take "meaningful action to stop" ISIS-related activity by in every instance "censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up," Compl. ¶¶ 1, 65, 103, 106; (2) these supposed failures allegedly enabled ISIS to convey, via Defendants' platforms, posts or messages designed to recruit new members, *id.* ¶¶ 34–44, raise money, *id.* ¶¶ 45–50, and spread propaganda, *id.* ¶¶ 51–64; (3) recipients of those messages allegedly responded by joining ISIS and contributing funds, *id.* ¶¶ 40–42, 47–48; (4) those recruits, funds, and publicity allegedly helped ISIS grow into a larger terrorist organization, *id.* ¶¶ 1–2; (5) this growth enabled someone to post some sort of "jihadist" content (Plaintiffs do not say how, who, or what) to "the Internet

and social media," *id.* ¶¶ 147–49, 153–55; (6) viewing that unspecified content somehow caused Mateen to become self-radicalized, *id.*; and (7) Mateen was thereby inspired to commit his heinous crimes, *id.* ¶ 154.  Plaintiffs do not even allege these facts as to each Defendant.  *See* note 1, *supra*.

Such a chain of causation is "too speculative [and] attenuated to raise a plausible inference of proximate causation."  *Fields I*, 200 F. Supp. 3d at 974 n.4; *Fields II*, 2016 WL 6822065, at *10 n.3.  For example, although the Complaint alleges that "Google has placed ads on ISIS postings," Compl. ¶ 130, it alleges no facts purporting to link any revenue from such ads to any terrorist act, much less to the Orlando shooting.  The Complaint cites one YouTube video next to which ads supposedly appeared, *id.*, but offers no facts about the revenue connected with that video, with whom it was shared, who posted the video or any basis for linking that user to ISIS, or how any claimed revenue was connected to Mateen's victims' deaths.  Nothing in the Complaint supports the suggestion that the Orlando shooting was proximately caused by Google's hypothetical sharing of ad revenue from a single video posted by an unidentified user.

Courts, including in *Fields*, repeatedly have rejected similarly circuitous efforts to link businesses offering widely available services to acts of terrorism under § 2333(a).  The Second Circuit rejected a suggestion that "providing routine banking services to organizations and individuals said to be affiliated with al

26

Qaeda … proximately caused the September 11, 2001 attacks or plaintiffs' injuries." *Al Rajhi*, 714 F.3d at 124.  That court reached the same conclusion about allegations that UBS provided cash to a state sponsor of terrorism that would be used to cause and facilitate terrorist acts, *Rothstein*, 708 F.3d at 97, and about allegations that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations," *Al Rajhi*, 714 F.3d at 124.

In fact, the causation story here is even weaker than in those cases. Although the heart of Plaintiffs' theory is that Defendants provided material support *to ISIS*, the Complaint does nothing to establish that *ISIS* was responsible for the murders committed by Mateen.  To the contrary, Plaintiffs describe Mateen as an independent actor who became self-radicalized by viewing "jihadist" content on "the Internet and social media" and who "decided only recently before the attack to embrace [the] Islamic State."  Compl. ¶¶ 147–49, 153–55.  They do not allege that Mateen had ever "been directly in contact with ISIS," *id.* ¶ 155, or that ISIS itself (as opposed to others who share its ideology) even created the "jihadist" content that allegedly radicalized Mateen, *id.* ¶¶ 147–49, 153–55.  And although ISIS allegedly claimed credit for the attacks, *id.* ¶¶ 144–45, courts view such statements skeptically given the "perverse" incentives for terrorists to claim credit for attacks they do not commit.  *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d

27

414, 433 (E.D.N.Y. 2013); *see also Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 569 (E.D.N.Y. 2012). Indeed, the Complaint incorporates the FBI's statement that it found no link between Mateen and ISIS. Compl. ¶¶ 148–49 nn.29–30, 153 n.31. This further rules out any plausible showing of causation here. *See Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 330 (E.D.N.Y. 2015) (if Hamas itself did not fund the attack in which plaintiffs were injured, then defendant's act of allegedly funding Hamas "could not have been a substantial factor in causing that attack").

Accepting Plaintiffs' causation theory would have staggering consequences, exposing every online platform to possible liability for terrorist violence anywhere in the world, at any time, simply because the terrorists who committed the attack may have been loosely affiliated with some among the platforms' billions of users. *See Fields II*, 2016 WL 6822065, at *9 ("Under such an expansive proximate cause theory, any plaintiff could hold [Defendants] liable for any ISIS-related injury without alleging any connection between a particular terrorist act and [Defendants'] provision of accounts."). A theory that "stretche[s] the causal chain" this far "beyond the first step" cannot satisfy the "direct relationship requirement" of § 2333(a). *Hemi Grp.*, 559 U.S. at 10–11.

## B. The Complaint Fails To Allege Facts Plausibly Establishing That Any Defendant Committed An "Act Of International Terrorism"

Yet another defect requiring dismissal is Plaintiffs' failure to allege any "factual content" that "plausibly suggest[s]," *Iqbal*, 556 U.S. at 683, that any

Defendant actually committed an "act of international terrorism," as § 2333(a)
requires.  Two months before Plaintiff filed the Complaint, Congress amended 18
U.S.C. § 2333 to create a new subsection (d), which creates a limited cause of
action for aiding and abetting and conspiracy liability.  *See* Justice Against
Sponsors of Terrorism Act, Pub. L. No. 114-222 (enacted Sept. 28, 2016)
("JASTA").  The Complaint nonetheless purports to assert claims not under
subsection (d), but under subsection (a), Compl. at 48–49, which creates only
*primary* liability.  *See generally Al Rajhi*, 714 F.3d at 123 (addressing pre-JASTA
statute); *accord Rothstein*, 708 F.3d at 97–98.  Because the claim here is for direct
(not secondary) liability, Plaintiffs must plausibly allege that Defendants
*themselves* committed an act of "international terrorism," as defined in § 2331(1).
They cannot do so.

Under § 2331(1), a defendant's conduct constitutes an act of "international
terrorism" only if three independent elements are satisfied:  The conduct must
(1) "involve violent acts or acts dangerous to human life that are a violation of the
criminal laws of the United States or of any State"; (2) "appear to be intended" to
achieve certain specified terrorist purposes—i.e., "to intimidate or coerce a civilian
population," "to influence the policy of a government by intimidation or coercion,"
or "to affect the conduct of a government by mass destruction, assassination, or
kidnapping"; and (3) occur primarily outside the territorial jurisdiction of the

29

United States or transcend national boundaries.  18 U.S.C. § 2331(1)(A)–(C).

Plaintiffs' sole effort to satisfy these elements is a citation of two federal criminal

statutes that prohibit the provision of "material support" to certain acts of terrorism

or to designated terrorist organizations, 18 U.S.C. §§ 2339A and 2339B.

Plaintiffs' theory appears to be that providing broadly available online platforms

that allegedly were used by some members or supporters of a terrorist organization,

violates §§ 2339A and 2339B, and that violating those criminal statutes in turn

automatically satisfies §§ 2333(a) and 2331(1).  This theory fails for at least three

independent reasons.

### 1.   The Complaint Fails To Allege Facts Plausibly Establishing A Violation Of The Criminal "Material Support" Laws

As an initial matter, Plaintiffs have not alleged, and cannot allege, facts

sufficient to show that Defendants provided "material support" to ISIS or to

terrorist acts within the meaning of §§ 2339A and 2339B.  Because the material

support provisions are criminal statutes with severe penalties, courts have read

them, consistent with their text, to impose strict *mens rea* requirements.  *See*

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010); *see also Staples v.*

*United States*, 511 U.S. 600, 616 (1994) (the "penalty imposed under a statute has

been a significant consideration in determining" how to apply the *mens rea*

requirement); *Crandon v. United States*, 494 U.S. 152, 168 (1990) (rule of lenity

requires any ambiguity in the scope of a criminal statute to "be resolved in

[defendants'] favor," even where the criminal statute is invoked in a civil context).

The Complaint does not meet those requirements. Plaintiffs offer no plausible allegation that Defendants actually knew of a particular instance in which their services were being used by ISIS or to support terrorism and yet failed to stop it. Instead, the knowledge allegations, insofar as they go beyond bare conclusions, are entirely general. No case has found liability under the "material support" statutes based on anything like the generalized knowledge allegations here. *See Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 665–66 (S.D. Tex. 2010) (dismissing § 2333(a) claims due to insufficient scienter allegations); *accord Stutts v. De Dietrich Grp.*, No. 03-CV-4058, 2006 U.S. Dist. LEXIS 47638, *11–15 (E.D.N.Y. June 30, 2006).

Section 2339A, on which Count I relies, requires proof that the defendant provided material support "knowing or intending that [it] be used in preparation for, or in carrying out [a violation of specific federal terrorism statutes]." 18 U.S.C. § 2339A(a). The Complaint does not meet this element. Even if Paragraph 167—which alleges that Defendants "purposefully, knowingly or with willful blindness" provided services and support to ISIS—could be read as an attempt to do so, it is a mere threadbare recital of the scienter element, one that is not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 678. And Plaintiffs' admission that Defendants prohibit terrorist content and remove it when it comes to their

31

attention, *e.g.*, Compl. ¶¶ 38, 77, 123, negates any inference of *mens rea*.

Section 2339B, on which Count II relies, requires proof that the defendant "knowingly" provided material support to a designated foreign terrorist organization or an organization that has engaged or engages in terrorism. 18 U.S.C. § 2339B(a)(1). The Supreme Court has read this to require support provided "under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Holder*, 561 U.S. at 26. Nothing like that is alleged here. Even if providing free online communications services to the general public could constitute "material support" in the first place—which it does not— the Complaint does not plausibly allege that any Defendant *knowingly* provided such services to ISIS. "The only relevant allegations are either wholly conclusory or inadequate." *Abecassis*, 704 F. Supp. 2d at 665. The Complaint nowhere alleges that any Defendant knew of (and failed to block) specific accounts used by ISIS, or knowingly allowed the creation of accounts for which ISIS was responsible. Rather, the Complaint is entirely general—referring only to reports that ISIS members or supporters used Defendants' online services to recruit and train ISIS operatives, and that Defendants could have done more to block such usage. Compl. ¶¶ 65–123.

In particular, Plaintiffs' allegation that Google shared ad revenue with content providers, Compl. ¶¶ 125–32, fails to allege the knowledge needed to

satisfy § 2339B.  The Complaint cites a YouTube video that supposedly had

advertising associated with it, but does not suggest that Google knew of any

alleged connection between the video (or its poster) and ISIS.  The Complaint does

not even say who uploaded the video or through what YouTube account.  Plaintiffs

do not allege that YouTube users disclose whether they are ISIS members in

registering to upload videos or for revenue sharing, or that Google was given

information linking ISIS to the person responsible for uploading and monetizing

the video.  Indeed, the Complaint does not offer any facts to support its conclusory

assertion, *id*. ¶ 131, that the video was posted by ISIS (rather than an ISIS

sympathizer, or an innocent party), much less that any person who allegedly

received revenue from any ads shown with the video was part of ISIS.  Plaintiffs

thus do not establish even the first link—that money went from Google to ISIS.

They certainly do not support the further leap that Google *knowingly* shared

revenue with ISIS.

Plaintiffs' knowledge allegations relating to their provision-of-infrastructure

theory also fail.  Defendants offer online services used by billions of people around

the globe.  Plaintiffs do not, and cannot, allege that Defendants know the actual

identity of all such users, much less their affiliations.  The suggestion that

Defendants should have known from public reports that an unidentified and tiny

fraction of their users may have ISIS ties does not establish the scienter required by

33

§§ 2339A and 2339B.  To find violations of those criminal statutes on that basis—

particularly as applied to Defendants' provision of neutral means for users to share

information, ideas, and other content—would stretch them beyond reason and raise

serious First Amendment concerns.[4]  Indeed, Plaintiffs' theory would threaten

liability not only for myriad online intermediaries, but for scores of other types of

service providers, including wireless carriers and utilities, merely because terrorists

or terrorist sympathizers use their generally available services.  There is no case

supporting such a radical expansion of the material support laws.  *Accord Burnett*

*v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003)

("*Burnett I*"); *Stutts*, 2006 U.S. Dist. LEXIS 47638, at *11, *14–15 (providing

banking services to manufacturers who allegedly sold chemicals and equipment to

Iraq does not create liability under § 2333(a)).

> ### 2. The Complaint Fails To Establish That Defendants Committed "Violent" Or "Dangerous" Acts That "Appear[ed] To Be Intended" To Achieve A Specified Terrorist Purpose

Even if there were plausible allegations that Defendants had provided

---

[4] The Supreme Court has made clear that, where liability under 18 U.S.C.
§§ 2339A and 2339B would implicate protected speech, it must survive strict
scrutiny under the First Amendment—including a requirement that the speech bear
a direct, non-speculative relationship to terrorist purposes, and that the defendant
actually coordinate or act in concert with the terrorist group. *Holder*, 561 U.S. at
23–25, 31–32.  The Complaint does not come close to meeting these elements.
Among other things, it does not allege any direct or purposeful support of, or
coordination with, ISIS supporters.

"material support," that would not be enough for a claim under § 2333.  That

provision requires an "act of international terrorism," which is a defined term

under § 2331(1).  That definition requires that the defendant committed "violent"

or "dangerous" acts that "appear[ed] to be intended" to achieve specifically defined

terrorist purposes, namely "to intimidate or coerce a civilian population," "to

influence the policy of a government by intimidation or coercion," or "to affect the

conduct of a government by mass destruction, assassination, or kidnapping."

18 U.S.C. § 2331(1)(A), (B).  The Complaint alleges no such acts by Defendants.

    The intent element of § 2331(1) requires facts that "would … lead an

objective observer to conclude" that the defendant intended to accomplish one of

the specified terrorist ends.  *Stansell v. BGP, Inc.*, No. 09-CV-2501, 2011 WL

1296881, at *9 (M.D. Fla. Mar. 31, 2011).  This requirement is not met where, as

here, the defendant merely offers general services to a broad range of users.  In

*Boim*, the Seventh Circuit noted that the Red Cross and Doctors Without Borders

"provide [medical] assistance without regard to the circumstances giving rise to the

need for it."  549 F.3d at 699.  Although those organizations "might know in

advance" that they will "provid[e] … assistance to [individual] terrorists," an

objective observer would conclude that providing such aid was intended to achieve

a humanitarian, not a terrorist purpose.  *Id.*  Likewise, in *Burnett II*, the court

dismissed a complaint that relied on the mistaken proposition "'that a bank is liable

35

for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.'"  349 F. Supp. 2d at 832–33.  An objective observer would conclude that the bank intended to offer beneficial services to the public at large, not to further terrorism. Indeed, even where (unlike here) the alleged "material support" is targeted to a terrorist organization, courts have found the requisite intent lacking when context would "lead an objective observer to conclude" that the defendant had another objective.  *Stansell*, 2011 WL 1296881, at *9.

Here, an objective observer would conclude that Defendants intended to offer their platforms to the general public.  Defendants make their services widely available to individuals all over the world, who use them to exchange information, express themselves, and communicate about issues great and small.  *E.g.*, Compl. ¶¶ 3, 35, 51, 60, 76, 129.  The Complaint nowhere asserts that Defendants provided specialized products or services specifically designed for ISIS or its members.  No reasonable observer could conclude that the actions of Defendants were meant "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1)(B).

Nor can Plaintiffs show that Defendants' conduct "involve[d] violent acts or acts dangerous to human life," as § 2331(1)(A) *also* requires.  Defendants' online

36

services are not violent or dangerous, and do not become so simply because a terrorist (or anyone else among their many users) might use them improperly. Although some courts have suggested that any "material support" under § 2339A can meet the "violent act or acts dangerous to human life" element, *e.g.*, *Linde*, 97 F. Supp. 3d at 322–23, that contravenes § 2331(1), under which it is the *defendant's* acts—not those of the person who allegedly received "material support"—that must constitute "acts of international terrorism." *E.g.*, *Stutts*, 2006 U.S. Dist. LEXIS 47638, at *11–12. A contrary conclusion would read the specific definition in § 2331(1) out of the statute.

Congress's recent amendment of 18 U.S.C. § 2333 in JASTA confirms this point. JASTA rationalized and clarified secondary liability under the statute by adding an express provision for aiding and abetting and conspiracy, *see* 18 U.S.C. § 2333(d), thereby incorporating a coherent and "widely recognized … legal framework for how such liability should function." JASTA § 1(5), citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). With respect to defendants whose *own conduct* did not involve a "violent" or "dangerous" act that "appear[ed] to be intended" to achieve any of the specified terrorist purposes, the only provision of § 2333, as amended, that could conceivably support secondary liability is subsection (d). To permit subsection (a) to serve as a basis for imposing secondary liability—that is, liability without any showing that Defendants

37

*themselves* committed an act of "international terrorism" as defined in § 2331(1)—

would improperly render subsection (d) superfluous.  *See Corley v. United States*,

556 U.S. 303, 314–15 (2009).  It also would disregard JASTA's enacted preamble,

which states that subsection (d) was "necessary to recognize the substantive causes

of action for aiding and abetting and conspiracy liability."  JASTA § 1(4).  And

because Plaintiffs have neither asserted a claim under § 2333(d) nor pled facts that

could plausibly establish a claim under § 2333(a) or § 2333(d), the Complaint must

be dismissed.

### 3.    The Orlando Attack Was Not "*International* Terrorism" Within The Meaning of Section 2333

Finally, Plaintiffs' effort to invoke Section 2333 fails because this case does

not involve an act of "*international* terrorism."  That term is defined by the

statute—in express distinction to "*domestic* terrorism," 18 U.S.C. § 2331(5)—as an

act "occurring primarily outside the territorial jurisdiction of the United States," or

"transcending national boundaries in terms of the means by which [it is]

accomplished, the persons [it] appears intended to intimidate or coerce, or the

locale in which [its] perpetrators operate or seek asylum."  18 U.S.C. § 2331(1)(C).

Plaintiffs do not allege (even generally) that Defendants' conduct meets this test,

and even with respect to Mateen's attack—which Plaintiffs label "international

terrorism," Compl. ¶ 167—they offer nothing to support this characterization.

Nor could they.  Indeed, the facts Plaintiffs do allege make clear that the

definition of "international terrorism" cannot be satisfied here.  Plaintiffs allege that the attack was carried out in Orlando, Florida, and that all of the victims of the attack were U.S. citizens.  Compl. ¶¶ 9, 13, 18.  And news reports incorporated by reference in the Complaint confirm that the perpetrator of the attack, Omar Mateen, *id.* ¶¶ 138, 140, 142, was a natural-born U.S. Citizen, *id.* ¶¶ 144–145 nn.26–27.  Nor do Plaintiffs allege that Mateen's actions were directed by any international terrorist group, that he traveled overseas to train for or plan the attack, or that there was any other relevant international connection.  To the contrary, the Complaint alleges that Mateen was a "lone wol[f]" who had no contact with any international organizations identified in the Complaint.  *Id.* ¶¶ 147, 153, 155.  No court has ever suggested that an attack carried out by a U.S. citizen in the United States amounts to "international terrorism" under § 2331.  *See Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 221–22 (S.D.N.Y. 2003) (warning that "an expansive interpretation of 'international terrorism' might render 'domestic terrorism' superfluous").

In short, because all the relevant activities "occur[ed] primarily within the territorial jurisdiction of the United States," the Orlando shooting was an act of "domestic terrorism."  18 U.S.C. § 2331(5)(C).  It cannot support a claim under § 2333, which is expressly limited to injuries caused "by reason of an act of international terrorism."  18 U.S.C. § 2333.

# CONCLUSION

For all the reasons given above, Plaintiffs' Complaint should be dismissed with prejudice.

Dated:  March 10, 2017

Respectfully submitted,

s/ with the consent of Kristin A. Linsley
KRISTIN A. LINSLEY
klinsely@gibsondunn.com
JEANA BISNAR MAUTE
jbisnarmaute@gibsondunn.com
SHELI R. CHABON
schabon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Telephone:  (415) 393-8200
Facsimile:   (415) 393-8306

THOMAS W. CRANMER (P25252)
cranmer@millercanfield.com
DAVID D. O'BRIEN (P65532)
obrien@millercanfield.com
MILLER, CANFIELD, PADDOCK &
   STONE, PLC
840 West Long Lake Road, Suite 200
Troy, MI 48098
(248) 267-3381

***Attorneys for Defendant***
**FACEBOOK, INC.**

s/*Seth P. Waxman*
SETH P. WAXMAN
seth.waxman@wilmerhale.com
PATRICK J. CAROME
patrick.carome@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6800
Facsimile:  (202) 663-6363

LEONARD M. NIEHOFF (P36695)
lniehoff@honigman.com
J. MICHAEL HUGET (P39150)
mhuget@honigman.com
HONIGMAN, MILLER, SCHWARZ &
   COHN, LLP
130 South First Street, 4th Floor
Ann Arbor, MI 48104
(734) 418-4246

***Attorneys for Defendant***
**TWITTER, INC.**

s/ with the consent of Brian M. Willen
BRIAN M. WILLEN (P75110)
bwillen@wsgr.com
WILSON SONSINI
   GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 999-5800

***Attorneys for Defendant***
**GOOGLE INC.**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2017, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By: <u>  *s/ Seth P. Waxman*     </u>
          Seth P. Waxman