## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

EARL CROSBY, et al.

        Plaintiffs,

   v.

TWITTER, INC., GOOGLE INC.,
FACEBOOK, INC.

        Defendants.

Case No. 2:16-CV-14406-DML-DRG

Judge: Honorable David M. Lawson

## DEFENDANTS' JOINT MOTION TO DISMISS
## THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

Defendants Twitter, Inc., Google Inc., and Facebook, Inc. (collectively "Defendants"), by and through their counsel, hereby move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss all claims in the Plaintiffs' First Amended Complaint (Dkt. No. 33).  In support of the foregoing motion, Defendants state as follows:

1.  Defendants base this motion upon the accompanying memorandum of law, any argument of counsel, and such other materials as the Court may consider.

2.  As required by Local Rule 7.1(a), counsel for Defendant Twitter, Inc., on behalf of all Defendants, sought concurrence from counsel for Plaintiffs on April 28, 2017, via telephone.  During this call, counsel for Defendant Twitter, Inc.

explained the nature of this motion and its legal basis and requested, but did not

obtain, concurrence in the relief sought.

Dated:  April 28, 2017                    Respectfully submitted,

_s/_ with the consent of Kristin A. Linsley      _s/ Patrick J. Carome_
KRISTIN A. LINSLEY                        SETH P. WAXMAN
klinsely@gibsondunn.com                   seth.waxman@wilmerhale.com
JEANA BISNAR MAUTE                        PATRICK J. CAROME
jbisnarmaute@gibsondunn.com               patrick.carome@wilmerhale.com
SHELI R. CHABON                           WILMER CUTLER PICKERING
schabon@gibsondunn.com                      HALE AND DORR LLP
GIBSON, DUNN & CRUTCHER LLP               1875 Pennsylvania Avenue, NW
555 Mission Street, Suite 3000            Washington, D.C. 20006
San Francisco, CA  94105-0921            Telephone:  (202) 663-6000
Telephone:  (415) 393-8200                Facsimile:  (202) 663-6363
Facsimile:   (415) 393-8306

THOMAS W. CRANMER (P25252)                LEONARD M. NIEHOFF (P36695)
cranmer@millercanfield.com                lniehoff@honigman.com
DAVID D. O'BRIEN (P65532)                 J. MICHAEL HUGET (P39150)
obrien@millercanfield.com                 mhuget@honigman.com
MILLER, CANFIELD, PADDOCK &               HONIGMAN, MILLER, SCHWARZ &
  STONE, PLC                                COHN, LLP
840 West Long Lake Road, Suite 200        130 South First Street, 4th Floor
Troy, MI 48098                            Ann Arbor, MI 48104
(248) 267-3381                            (734) 418-4246

**_Attorneys for Defendant_**                    **_Attorneys for Defendant_**
**FACEBOOK, INC.**                            **TWITTER, INC.**

_s/_ with the consent of Brian M. Willen
BRIAN M. WILLEN (P75110)
bwillen@wsgr.com
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 999-5800

**_Attorney for Defendant_**
**GOOGLE INC.**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

EARL CROSBY, et al.

         Plaintiffs,

   v.

TWITTER, INC., GOOGLE INC.,
FACEBOOK, INC.

        Defendants.

Case No. 2:16-CV-14406-DML-DRG

Judge: Honorable David M. Lawson

# MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

## STATEMENT OF THE ISSUES PRESENTED

1.     Whether the immunity for online intermediaries created by Section
230 of the Communications Decency Act, 47 U.S.C. § 230, bars this action, which
seeks to impose liability based on allegations that Defendants failed to block or
remove content that third parties allegedly transmitted via Defendants' interactive
computer services.

2.     Whether the Amended Complaint fails to state a claim under the civil
remedy provision of the Anti-Terrorism Act, 18 U.S.C. § 2333(a), (d) ("ATA"),
(Counts I-IV) because it fails to allege facts that would establish that any
Defendant (a) knowingly provided substantial assistance to, or conspired with,
Omar Mateen, the "person who committed" the terrorist act at issue (Counts I-II);
(b) proximately caused the injuries alleged in the Amended Complaint (Counts III-
IV); or (c) itself committed an act of "international terrorism" as defined in 18
U.S.C. § 2331(1) (Counts III-IV).

3.     Whether the Amended Complaint fails to state a claim for negligent
infliction of emotional distress (Count V) and wrongful death (Counts VI) because
the Amended Complaint fails to allege facts that would establish proximate
causation.

i

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

### Issue 1

1.    *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016)

2.    *Fields v. Twitter, Inc.*, No. 16-CV-00213, 2016 WL 6822065 (N.D. Cal. Nov. 18, 2016)

3.    *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398 (6th Cir. 2014)

4.    *Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014)

5.    *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 639 (2017)

6.    *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)

### Issue 2

1.    *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016)

2.    *Fields v. Twitter, Inc.*, No. 16-CV-00213, 2016 WL 6822065 (N.D. Cal. Nov. 18, 2016)

3.    *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)

4.    *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

5.    *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118 (2d Cir. 2013)

6.    *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)

### Issue 3

1.    *Stewart v. Gilliam*, 271 So. 2d 466 (Fla. Dist. Ct. App. 1972)

2.    Fla. Stat. § 768.19

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................1

STATEMENT OF FACTS ............................................................5

LEGAL STANDARDS ON A MOTION TO DISMISS .......................................11

ARGUMENT ............................................................................12

I.    Section 230 Requires Dismissal Of All Of Plaintiffs' Claims ......................12

    A.    Section 230 Immunizes Interactive Service Providers From Liability For Third-Party Content ....................................12

    B.    Section 230(c)(1) Bars Plaintiffs' Claims ...........................14

        1.    Defendants Provide "Interactive Computer Services" .............14

        2.    Third Parties Provided The Allegedly Harmful Content Supporting Plaintiffs' Claims.....................................15

        3.    Plaintiffs' Claims Seek To Treat Defendants As Publishers........................................................18

II.    All Of Plaintiffs' Claims Also Fail On Their Own Terms ...........................23

    A.    Plaintiffs' Secondary Liability Claims Fail (Counts I–II) ................23

        1.    Plaintiffs Fail To Allege Facts Establishing That ISIS Committed, Planned, Or Authorized The Orlando Attack........................................................24

        2.    Plaintiffs Fail To Allege That Defendants Aided And Abetted, Or Conspired With, The "*Person Who Committed*" The Act Of International Terrorism ....................25

        3.    The Amended Complaint Fails To Allege Facts Establishing That Defendants Aided And Abetted Mateen (Count I)......................................................26

            a)    The Amended Complaint fails to plead the requisite knowledge or intent .........................27

            b)    The Amended Complaint does not allege facts constituting substantial assistance .................28

iii

4.      Plaintiffs Fail To Allege A Conspiracy Claim (Count II) ........29

5.      The Orlando Attack Was Not "*International* Terrorism"
        Within The Meaning Of Section 2333......................................30

B.   The Amended Complaint Fails To State A Claim For
     Direct Liability Under The ATA (Counts III and IV) ......................33

1.      Plaintiffs Fail To Establish Proximate Cause ..........................34

2.      Plaintiffs Fail To Allege That Defendants Themselves
        Committed An "Act of International Terrorism" ....................39

a)      Plaintiffs cannot allege a violation of the
        criminal "material support" laws....................................40

b)      Plaintiffs fail to establish that Defendants
        committed "violent" or "dangerous" acts
        that "appear[ed] to be intended" to
        achieve a specified terrorist purpose ............................45

C.   Plaintiffs' State Law Claims Fail (Counts V and VI) ........................48

CONCLUSION ....................................................................49

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abecassis v. Wyatt*, 704 F. Supp. 2d 623 (S.D. Tex. 2010) ....................................42

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519
    (6th Cir. 2000) ..........................................................................29

*Al Haramain Islamic Found. v. Dep't of Treasury*, 686 F.3d 965
    (9th Cir. 2012) ..........................................................................44

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)...........................................34

*Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ....................44

*Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450
    (E.D.N.Y. 2011)........................................................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................11, 27, 35, 41

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ....................................19, 22

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685
    (7th Cir. 2008) (en banc) ........................................................35, 45

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86
    (D.D.C. 2003) ................................................................44, 45, 46

*Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D. Cal. 2016) ..................19

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ......................13

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)..................................................................26

*Corley v. U.S.*, 556 U.S. 303 (2009) ......................................................................47

*Cornelius v. DeLuca*, 2009 WL 2568044 (E.D. Mo. Aug. 18, 2009) ....................20

*Couch v. Cate*, 379 F. App'x 560 (9th Cir. 2010) ..................................................35

*Crandon v. United States*, 494 U.S. 152 (1990) ...................................................41

*D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014)...............................................11

*DiMeo v. Max*, 248 F. App'x 280 (3d Cir. 2007) ....................................................19

*Doe v. Bates*, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006) .................................20

*Doe v. Friendfinder Network, Inc.*, 540 F. Supp.2d 288 (D.N.H. 2008)................19

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
     521 F.3d 1157 (9th Cir. 2008) ........................................................13, 16, 18

*Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016) ........................*passim*

*Fields v. Twitter, Inc.*, No. 16-CV-00213, 2016 WL 6822065
     (N.D. Cal. Nov. 18, 2016)  ......................................................................*passim*

*Gardner v. Quicken Loans, Inc.*, 567 F. App'x 362 (6th Cir. 2014) ........................9

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012) ............................38

*Gilliam v. Stewart*, 291 So.2d 593 (Fla. 1974) .....................................................49

*Goddard v. Google, Inc.*, No. C 08-2738, 2008 WL 5245490
     (N.D. Cal. Dec. 17, 2008)...................................................................16, 19

*Guinn v. Jeffco Combined Courts*, 537 F. App'x 790 (10th Cir. 2013) ...................6

*GW Equity LLC v. Xcentric Ventures LLC*, 2009 WL 62173
     (N.D. Tx. Jan. 9, 2009) ...............................................................................20

*Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983) .............26, 27, 28, 29, 30

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010) ..................................35, 39

*Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685
     (S.D. Miss. 2014)........................................................................................16

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ..........................41, 42, 44

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992)...................................34, 35

vi

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
   515 U.S. 557 (1995)....................................................................................44

*In re Complaint of Sheen*, 709 F. Supp. 1123 (S.D. Fla. 1989)................................49

*In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765
   (S.D.N.Y. 2005), *aff'd*, 714 F.3d 118 (2d Cir. 2013)..............................11, 46

*In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118
    (2d Cir. 2013) .............................................................................3, 34, 35, 37

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896
    (6th Cir. 2009) .............................................................................................11

*Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016),
   cert. denied, 137 S. Ct. 622 (2017)............................................................2, 13

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398
    (6th Cir. 2014) .....................................................................................*passim*

*Kabbaj v. Google, Inc.*, 2014 WL 1369864 (D. Del. Apr. 7, 2014).......................19

*Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580 (E.D. Mich. 2015).........................6

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) .........................11, 13, 18

*Lancaster v. Alphabet Inc.*, No. 15-CV-05299, 2016 WL 3648608
   (N.D. Cal. July 8, 2016).................................................................................15

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015),
   *appeal docketed*, No. 16-2134 (2d Cir. June 23, 2016)....................35, 38, 47

*M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*,
   809 F. Supp. 2d 1041 (E.D. Mo. 2011) ...................................................16, 19

*Manchanda v. Google*, 2016 WL 6806250 (S.D.N.Y. Nov. 16, 2016)...................19

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) ...................................44

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250
   (4th Cir. 2009) .............................................................................................13

vii

*O'Kroley v. Fastcase, Inc.*, 831 F.3d 352 (6th Cir. 2016), *cert. denied*,
137 S. Ct. 639 (2017) ..................................................................2, 13, 17, 18

*Obado v. Magedson*, 2014 WL 3778261 (D.N.J. July 31, 2014) ...........................19

*Obado v. Magedson*, 612 F. App'x 90 (3d Cir. 2015) ............................................19

*Pavlovich v. Nat'l City Bank*, 435 F.3d 560 (6th Cir. 2006) ..................................27

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ..................................................20

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ......................................34, 35, 37

*Sanford v. Detroit Pub. Sch.*, No. 14-11771, 2014 WL 1922722
(E.D. Mich. May 14, 2014) ............................................................................6

*Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319 (D.N.J. 2015) ................................19

*Shepard v. United States*, 544 U.S. 13 (2005) .......................................................44

*Shrader v. Beann*, 503 F. App'x 650 (10th Cir. 2012) ...........................................19

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088
(N.D. Cal. 2015) ...........................................................................................15

*Simmons v. Danhauer & Assocs., LLC*, 2010 WL 4238856
(D.S.C. Oct. 21, 2010) ..................................................................................20

*Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217
(S.D.N.Y. 2003) .............................................................................................32

*Stansell v. BGP, Inc.*, No. 09-CV-2501, 2011 WL 1296881
(M.D. Fla. Mar. 31, 2011) ......................................................................45, 46

*Staples v. United States*, 511 U.S. 600 (1994) .......................................................41

*Stewart v. Gilliam*, 271 So. 2d 466 (Fla. Dist. Ct. App. 1972) ..............................48

*Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ...............38

*Stutts v. De Dietrich Grp.*, No. 03-CV-4058, 2006 WL 1867060
(E.D.N.Y. June 30, 2006) .......................................................................44, 47

viii

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ...........................................44

*U.S. v. Hill*, 55 F.3d 1197 (6th Cir. 1995) ............................................................27

*United States v. Robelin*, 983 F.2d 1070, 1993 WL 6828
     (6th Cir. Jan. 14, 1993) ..............................................................................29

*United States v. Schaffer*, 586 F.3d 414 (6th Cir. 2009).........................................29

*United States v. Twitty*, 44 F.3d 410 (6th Cir. 1995) ............................................44

*Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481 (4th Cir. 2015).....................17

*Witkoff v. Topix, LLC*, 2015 WL 5297912 (Cal. Ct. App.
     Sept. 10, 2015).................................................................................14, 19, 20

*Zeran v. American Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ...............................13

## STATUTES AND OTHER AUTHORITIES

18 U.S.C. § 2331 ..........................................................................................*passim*

18 U.S.C. § 2333 ..........................................................................................*passim*

18 U.S.C. § 2339A ........................................................................................*passim*

18 U.S.C. § 2339B ........................................................................................*passim*

47 U.S.C. § 230 ...........................................................................................*passim*

Fla. Stat. § 768.19 ............................................................................................48

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222 .......23, 24, 26, 47

H.R. Rep. No. 102-1040 (1992)..........................................................................33

## INTRODUCTION

Plaintiffs seek to hold Defendants Twitter, Google, and Facebook liable for deaths and injuries resulting from the horrific shooting by Omar Mateen at the Pulse Night Club in Orlando, Florida in June 2016.  The Amended Complaint, like the original Complaint, alleges that Mateen committed this attack after viewing jihadist content on the Internet.  Plaintiffs do not claim that any Defendant created that content or was aware of any alleged use by Mateen of their services, much less had an objective to assist him in committing his crimes.  Rather, Plaintiffs' theory appears to be that (1) Defendants aided and abetted, conspired with, or provided "material support" to ISIS because Defendants' broadly available online platforms, with billions of users worldwide, allegedly were used by ISIS and its sympathizers to promote their views and activities; (2) this "material support" allegedly allowed ISIS to grow and gain strength; (3) ISIS's resulting strength caused Mateen's self-radicalization; and (4) after being radicalized, Mateen committed the Orlando shooting, an alleged "act of international terrorism."  Plaintiffs assert that this strained chain of causation renders Defendants liable for damages under the civil remedy provision of the ATA, 18 U.S.C. § 2333(a), (d), as well as for state law torts of negligent infliction of emotional distress and wrongful death.

Defendants deeply sympathize with Plaintiffs' losses and are committed to combating the spread of terrorist content online.  There is no place on Defendants'

1

sites for those who seek to promote terrorist activity.  But Defendants are not liable for the heinous acts at issue here.  *See Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016) ("*Fields I*"); No. 16-CV-00213, 2016 WL 6822065 (N.D. Cal. Nov. 18, 2016) ("*Fields II*") (dismissing nearly identical ATA claims against Twitter allegedly arising from another terrorist attack).  Plaintiffs' claims fail as a matter of law for two fundamental reasons.

*First*, all of Plaintiffs' claims are premised on an effort to hold Defendants liable for the alleged effects of third-party content posted on their online platforms. Such claims are barred by § 230 of the Communications Decency Act, 47 U.S.C. § 230 ("§ 230").  Courts throughout the country, including the Sixth Circuit, have held that § 230(c)(1) immunizes online service providers from liability for performing "traditional editorial functions" relating to third-party content, *O'Kroley v. Fastcase, Inc*., 831 F.3d 352, 355 (6th Cir. 2016), such as disseminating or failing to remove objectionable content created by their users, *e.g.*, *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406–08 (6th Cir. 2014); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18–19 (1st Cir. 2016). Here, Plaintiffs' claims all turn on the theory that third-party content published on Defendants' services contributed to or caused the Orlando attack.  Accepting that theory would impose liability on Defendants for "deciding whether to publish"

2

other people's information—precisely the result that § 230 forbids.  *Jones*, 755

F.3d at 416; *accord Fields II*, 2016 WL 6822065, at \*5.

*Second*, Plaintiffs fail to allege facts necessary for the essential elements of

their claims.  Counts I and II assert claims for aiding and abetting and conspiracy

under § 2333(d) of the ATA.  These claims require Plaintiffs to prove, among other

elements, that Defendants aided and abetted or conspired with "the person who

committed" the alleged "act of international terrorism" that injured Plaintiffs.

Here, that person was Omar Mateen, and there are no plausible allegations that

Defendants knowingly provided substantial assistance to Mateen or entered into an

agreement with him (or with anyone else, including ISIS).  Nor was the Orlando

shooting an act of "international terrorism" as defined in the statute.  It was a

classic instance of "domestic terrorism": an attack on U.S. soil by a U.S. citizen

against U.S. victims.  Section 2333(d) does not apply to such events.

Counts III and IV assert claims for direct liability under § 2333(a) of the

ATA, which requires, among other things, that a plaintiff establish injury "by

reason of"—or proximately caused by—a criminal act of international terrorism

committed by the defendant.  18 U.S.C. § 2333(a); *In re Terrorist Attacks on Sept.

11, 2001*, 714 F.3d 118, 123–25 (2d Cir. 2013).  None of these elements is present

here.  First, as in *Fields*, any alleged link between the Orlando attack and

Defendants' making their platforms available to the public is "too speculative [and]

3

attenuated to raise a plausible inference of proximate causation." *Fields II*, 2016 WL 6822065, at *10 n.3.  This same lack of causation also dooms Plaintiffs' state law claims for negligent infliction of emotional distress (Count V) and wrongful death (Count VI).

Counts III and IV also fail to state a claim because the Amended Complaint does not establish that Defendants *themselves* committed an "act of international terrorism," as required for any claim under § 2333(a).  Plaintiffs rely on the criminal "material support" statutes (18 U.S.C. §§ 2339A and 2339B), but a violation of those laws does not itself constitute an "act of international terrorism" under § 2333(a) and, in any event, Plaintiffs have not alleged the essential elements of "material support," including that Defendants had actual and specific knowledge that they were materially supporting a particular terrorist act or a designated foreign terrorist organization.  Nor have Plaintiffs alleged that Defendants committed any "violent" or "dangerous" act that "appear[s] to [have been] intended" to achieve a specified terrorist purpose, as the statute requires.  18 U.S.C. § 2331(1)(A), (B).  Plaintiffs' allegations, if true, would establish only that Defendants made their platforms broadly available and that their efforts to police those platforms against use by terrorist groups were not perfectly successful.  But that is no basis for liability.

4

Because no further amendment can cure these defects in Plaintiffs' claims, the Court should dismiss this action with prejudice.

## STATEMENT OF FACTS

On June 12, 2016, a U.S. citizen, Omar Mateen, killed 49 people in a horrific mass shooting at the Pulse Night Club in Orlando, Florida. Am. Compl. ¶¶ 1, 173. Among those killed or injured were certain of the Plaintiffs and their relatives. *Id.* ¶¶ 148, 150, 152–153, 155–156, 158, 160, 162–63, 165–68, 170–171. Although ISIS "claimed responsibility for the shootings" after the fact, Plaintiffs do not allege that Mateen had ever "been directly in contact with ISIS" or that the attack was planned or actually committed by ISIS. *Id.* ¶¶ 174, 195. Instead, Plaintiffs describe Mateen as an independent actor who became self-radicalized after viewing "jihadist" content on "the Internet and social media." *Id.* ¶¶ 177–78, 193–95.

Defendants Twitter, Google (through its YouTube service), and Facebook each operates a global Internet platform for public self-expression and conversation that is free of charge and broadly available. Am. Compl. ¶¶ 1, 112. Each day, users of these platforms send and share hundreds of millions of posts, Tweets, videos, and messages touching on a broad range of topics—from political commentary to a favorite sports team to the birth of a child. *Id.* ¶ 112.

5

Plaintiffs allege that Defendants' billions of accountholders include some persons who are affiliated with or sympathetic to ISIS and who have used Defendants' platforms to transmit content promoting ISIS's activities and agenda.[1]

As for Twitter, Plaintiffs allege that ISIS members or sympathizers used Twitter's online platform to send messages to recruit terrorists, raise funds, and spread propaganda. Am. Compl. ¶¶ 45–50, 56–58, 64–73. Plaintiffs assert that ISIS or "ISIS supporters" tweeted images of executions and guidelines about how to join ISIS. *Id.* ¶¶ 47, 65–71. Plaintiffs admit that Twitter (like the other Defendants) has a rule against threatening or promoting terrorism (*id.* ¶ 120, *see* note 2, *infra*), and repeatedly has shut down accounts opened by claimed "pro-ISIS" users (*id.* ¶ 116). They generically allege that Mateen "was self-radicalized on the Internet," but never link that self-radicalization to Twitter specifically. *Id.* ¶ 193. Although the Amended Complaint asserts that Mateen "utilized ISIS talking points made available from Twitter," its sole cited source for that allegation

---

[1] Defendants treat Plaintiffs' allegations as true for purposes of this motion, but object to Plaintiffs' impermissible "group pleading," by which the Amended Complaint refers collectively to "Defendants" for allegations relating to only one of them. "Basic pleading requirements" under Fed. R. Civ. P. 8(a) require that the plaintiff "attribute factual allegations to particular defendants." *Sanford v. Detroit Pub. Sch.*, No. 14-11771, 2014 WL 1922722, at *6 (E.D. Mich. May 14, 2014) (dismissing claims against certain defendants where complaint did not allege specific wrongs committed by those defendants, referring only to "Defendants"). Each defendant "is entitled to an individualized analysis of … its own … liability." *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 601–602 (E.D. Mich. 2015); *accord Guinn v. Jeffco Combined Courts*, 537 F. App'x 790, 794 (10th Cir. 2013).

6

does not even mention Twitter and it nowhere alleges that Mateen himself obtained such talking points on Twitter or even that Mateen ever used Twitter.   *Id.* ¶ 181.

As for YouTube/Google, Plaintiffs refer to a handful of videos that allegedly appeared on YouTube, one of which they admit YouTube removed in 2014.  Am. Compl. ¶¶ 48, 60, 74, 95, 140.  Plaintiffs allege that ISIS used these videos to recruit terrorists.  *Id.*  They also cite news articles referencing alleged "ISIS videos" posted to YouTube.  *Id.* ¶¶ 93–103.  Plaintiffs do not allege that any of these videos were brought to YouTube's attention and not removed, or that any of these videos had any direct link to the Orlando attack.  While Plaintiffs allude to a report from "DOJ staff," who supposedly "uncovered that [sic] during the arrest of Omar Mateen's spouse, Noor Salman, that Mateen specifically utilized ISIS YouTube videos' to be recruited and radicalized" (*id.* ¶ 179), they do not provide any details supporting that allegation.  They point to no specific videos that Mateen supposedly watched and do not describe in any way the purported connection between YouTube's actions and Mateen's crime.

As for Facebook, Plaintiffs likewise allege no facts concerning any act by Facebook that contributed to or otherwise assisted in the Orlando attack.  They point to a handful of claimed instances in which ISIS sympathizers allegedly posted on Facebook about other matters (Am. Compl. ¶¶ 88–90), such as a "fan page" of an ISIS group that "adoringly quote[d]" an ISIS leader (*id.* ¶ 86).  They

7

allege that "ISIS supporters" directed users to Facebook pages with ISIS propaganda, while admitting that Facebook was "continuously" taking down these pages for content violations. *Id.* ¶ 87. Plaintiffs also allege that Mateen posted on Facebook during the Orlando attack (*id.* ¶¶ 91, 180), but they do not and cannot allege that this use in any way caused or contributed to the shooting itself.

As Plaintiffs concede, all the alleged jihadist content posted on Defendants' platforms was created entirely by, and posted solely at the direction of, third parties—alleged terrorists or their supporters—and not by Defendants. Am. Compl. ¶¶ 63–74. Plaintiffs nonetheless seek to hold Defendants liable for the claimed consequences of the publication of this content, by making two different kinds of allegations.

*First*, Plaintiffs assert that Defendants "knowingly and recklessly" allowed ISIS to share this content and allegedly failed to take "meaningful action to stop" ISIS by "censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up." Am. Compl. ¶¶ 1, 75, 113, 116; *see also id.* ¶¶ 86–87, 94. Each Defendant's rules unequivocally bans content that encourages violence of any kind, including

terrorism.[2]  Plaintiffs nonetheless allege that Defendants did not do enough to

enforce these rules, and that, instead of reviewing and removing content and

blocking accounts when notified of a violation (*id.* ¶¶ 94, 113), Defendants should

have "proactively" "delete[d]" accounts "as soon as they [were] created" (*id.*

¶ 113, 118), and "monitor[ed] [the] content" sent by hundreds of millions of users

each day (*id.* ¶ 113).

 *Second*, Plaintiffs allege that Defendants earn revenue from advertisements

placed on their platforms, including ads allegedly displayed on the same screen as

"ISIS postings" (Am. Compl. ¶¶ 134–46), and that Defendants allegedly "create

unique content by combining the ISIS postings with advertisements selected by

---

[2] Twitter has always banned "threats" and use of its platform "for any unlawful purposes or in furtherance of illegal activities" and, since April 2015, has made its ban on terrorist content more explicit by expressly prohibiting "threats of violence … including threatening or promoting terrorism."  The Twitter Rules, https://support.twitter.com/articles/18311 (last visited Apr. 28, 2017).  YouTube removes "videos that encourage others to do things that might cause them to get badly hurt," content "inciting others to commit violent acts," and promotions of "violence against individuals or groups based on race or ethnic origin, religion, … [or] nationality."  YouTube Community Guidelines, https://www.youtube.com/yt/policyandsafety/communityguidelines.html (last visited Apr. 28, 2017).  Facebook prohibits organizations engaged in "terrorist activity" from its site and "remove[s] content that expresses support for groups" involved in such activity.  Content "[s]upporting or praising leaders of those same organizations, or condoning their violent activities" is not allowed.  Facebook Community Standards, https://www.facebook.com/communitystandards (last visited Apr. 28, 2017).  These rules are incorporated by reference into the Amended Complaint because the rules are "referred to in the complaint" (¶¶ 113, 120, 138), and central to the claim.  *See Gardner v. Quicken Loans, Inc.*, 567 F. App'x 362, 364–65 (6th Cir. 2014).

Defendants" (*id.* ¶ 8).  Plaintiffs also allege that Google allows revenue earned in connection with some YouTube videos to be shared with the users who upload them—an alleged practice that Plaintiffs speculate resulted in the "shar[ing of] some of those revenues with ISIS" in connection with one video.  *Id.* ¶¶ 137–42.

Based on these allegations, Plaintiffs seek treble damages under the ATA and recovery under state law.  Counts I and II seek to hold Defendants secondarily liable under § 2333(d) on the theory that Defendants "knowingly provided substantial assistance and encouragement to ISIS" (Am. Compl. ¶¶ 215-25 (Count I)), and "conspired with ISIS" (*id.* ¶¶ 226–30 (Count II)).  Count III seeks to hold Defendants directly liable under § 2333(a) on the theory that Defendants provided "material support" to ISIS in violation of 18 U.S.C. § 2339A, and that, "but for" this material support, "the attack that injured the Plaintiffs would have been substantially more difficult to implement."  *Id.* ¶¶ 231–36.  Count IV also asserts direct liability under § 2333(a) on a material support theory, relying on 18 U.S.C. § 2339B.  *Id.* ¶¶ 237–44.

Plaintiffs also assert two new state law claims.  Count V, for negligent infliction of emotional distress, asserts that Defendants "engaged in negligent behavior by providing services to ISIS" and that Plaintiffs suffered severe emotional distress as a result.  Am. Compl. ¶¶ 245–48.  Count VI, for wrongful

death, alleges that "[t]he conduct of each Defendant was a direct, foreseeable and proximate cause" of the deaths of Plaintiffs' decedents.  *Id.* ¶¶ 249–54.

## LEGAL STANDARDS ON A MOTION TO DISMISS

Rule 12(b)(6) requires dismissal where a complaint fails to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court need not credit "unwarranted factual inferences," *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009), or "legal conclusions masquerading as factual allegations," *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Section 230 requires dismissal where its application "is evident from the face of the complaint."  *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014).  In the Sixth Circuit, as elsewhere, § 230 creates "'an immunity from suit rather than a mere defense to liability,'" and district courts should resolve the immunity question at an "earl[y] stage of [the] litigation."  *Jones*, 755 F.3d at 417.

Given the extreme nature of a claim of terrorism, the court in an action under the ATA, as a matter of fairness, should give "extra-careful scrutiny" to the plaintiff's allegations.  *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 831 (S.D.N.Y. 2005) ("*Burnett II*"), *aff'd*, 714 F.3d 118 (2d Cir. 2013).

# ARGUMENT

Plaintiffs' Amended Complaint should be dismissed for two independent reasons. *First*, § 230 categorically bars claims that, as here, seek to hold providers of online services liable for injuries allegedly resulting from the transmission or availability of third-party content. *Second*, for each of their claims, Plaintiffs fail to plead facts necessary to satisfy the essential elements of the claim.

## I.   Section 230 Requires Dismissal Of All Of Plaintiffs' Claims

Section 230 provides immunity to interactive computer service providers for making third-party content available via their services and for their "editorial functions" regarding such content. This sweeping federal immunity bars all of Plaintiffs' claims, which seek to attach liability to Defendants based on content allegedly posted on their platforms by ISIS or its sympathizers.

### A.   Section 230 Immunizes Interactive Service Providers From Liability For Third-Party Content

The broad scope of § 230 is apparent on its face: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). As the Sixth Circuit has held, this provision "immunizes providers of interactive computer services against liability arising from content created by third parties." *Jones*, 755 F.3d at 406. That includes any claim that seeks to assign liability to service providers based on whether or how they exercise "traditional

12

editorial functions," *O'Kroley*, 831 F.3d at 355, such as decisions about "'whether to publish, withdraw, postpone or alter content,'" *Jones*, 755 F.3d at 407.  Courts have emphasized that § 230 immunity attaches and should be resolved "at the earliest possible stage of the case." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009); *accord Jones*, 755 F.3d at 417.

Section 230 immunity serves three purposes: (1) "'maintain[ing] the robust nature of Internet communication'"; (2) "protect[ing] against the 'heckler's veto' that would chill free speech"; and (3) "encourag[ing] interactive computer service providers to self-regulate." *Jones*, 755 F.3d at 407–08.  Given these important interests and the broad statutory language, courts across the country "have treated § 230(c) immunity as quite robust." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).  Section 230 has been applied to a broad swath of content, including material alleged to be discriminatory, *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1173–74 (9th Cir. 2008); false and defamatory speech, *Zeran v. American Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); a vile and lawless advertisement posted by sex traffickers, *Backpage.com*, 817 F.3d at 21; an abhorrent and explicit incitement to violence by a terrorist group, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356–57 (D.C. Cir. 2014); an intentional infliction of emotional distress, *Jones*, 755 F.3d at 398; and

the alleged cause of a wrongful death, *Witkoff v. Topix, LLC*, 2015 WL 5297912 (Cal. Ct. App. Sept. 10, 2015).

Two recent decisions in *Fields*, a nearly identical case filed in the Northern District of California, show why § 230 bars the claims here.  The plaintiffs in *Fields* alleged that Twitter had provided "material support" to ISIS by permitting ISIS members and sympathizers to use its services and that this support had proximately caused plaintiffs' injuries.  The court held that § 230 barred the claims because they sought to hold Twitter liable for a quintessential publisher function— making third-party content available on Twitter's service.  *See Fields I, Inc.*, 200 F. Supp. 3d at 970–74; *Fields II*, 2016 WL 6822065, at *5–7, *10–11.  *Fields* is correct and its reasoning applies with equal force to Plaintiffs' claims in this case.

### B.      Section 230(c)(1) Bars Plaintiffs' Claims

Section 230 mandates dismissal when (1) the defendant is a "provider … of an interactive computer service"; (2) the allegedly harmful content was "provided by another information content provider" and not the defendant; and (3) the suit seeks to hold the defendant liable as a "publisher or speaker" of that content.  47 U.S.C. § 230(c)(1); *see Jones*, 755 F.3d at 409.  Each of these elements is met here.

### 1.      Defendants Provide "Interactive Computer Services"

An "interactive computer service" includes "any information service, system, or access software provider that provides or enables computer access by

multiple users to a computer server."  47 U.S.C. § 230(f)(2).  It is undisputed that

Defendants' online platforms satisfy this definition because users access their

servers to share information with others.  Am. Compl. ¶ 1 (Defendants' platforms

are "social networks"); *accord Fields I*, 200 F. Supp. 3d at 969 (no dispute that

Twitter is an interactive computer service); *Lancaster v. Alphabet Inc.*, No. 15-CV-

05299, 2016 WL 3648608, at *3 (N.D. Cal. July 8, 2016) (YouTube is an

interactive computer service); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144

F. Supp. 3d 1088, 1093 (N.D. Cal. 2015) (same for Facebook).

### 2.     Third Parties Provided The Allegedly Harmful Content Supporting Plaintiffs' Claims

The second element—that "another information content provider" provided

the content at issue—also is met here.  An "information content provider" is "any

person or entity that is responsible, in whole or in part, for the creation or

development of information provided through the Internet or any other interactive

computer service."  47 U.S.C. § 230(f)(3).  Plaintiffs concede that third parties, not

Defendants, created *all* of the alleged jihadist content that Plaintiffs claim was

posted on Defendants' services.  Am. Compl. ¶ 203.

This conclusion is unaffected by Plaintiffs' allegation that Defendants

derived ad revenue from displaying third-party content.  Am. Compl. ¶¶ 134, 142–

46.  Plaintiffs concede that Defendants do not create the content of the ads (*id.*

¶ 203) and that concession forecloses any argument based on the ads.  The "fact

that a website elicits online content for profit is immaterial." *Goddard v. Google, Inc.*, No. C 08-2738, 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008) (rejecting argument that § 230 did not apply because Google received ad revenue from user-generated content); *accord Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685, 690 n.9 (S.D. Miss. 2014) (same for Amazon). There is no "for-profit exception to § 230's broad grant of immunity." *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1050 (E.D. Mo. 2011); *accord Roommates*, 521 F.3d at 1161, 1174–75 (affirming immunity for user-supplied content, even though website derived "revenue from advertisers and subscribers").

No other interpretation would make sense. Stripping providers of immunity merely because they make money in connection with third-party content would improperly "elid[e] the crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable." *Jones*, 755 F.3d at 414. It would also render § 230 a dead letter, as most service providers are able to operate only by generating revenue through advertising displayed alongside user-created content.

Plaintiffs also are incorrect insofar as they claim that Defendants, by displaying ads on the same page as third-party content, created new, composite content that turns Defendants into "information content providers." Am. Compl.

16

¶¶ 134–136, 200–205.  This argument is barred by Sixth Circuit precedent, which makes clear that service providers do not "create" or "develop" information merely by "augmenting the content generally" or by "commenting on that statement *post hoc*."  *Jones*, 755 F.3d at 410, 415.  Instead, the provider's conduct falls outside § 230 only where it "materially contribut[ed]" to *the alleged unlawfulness* of the content.  *Id.* at 410.  Here, Plaintiffs do not (and cannot) allege that Defendants, by allegedly displaying ads near the challenged postings, either materially contributed to the illegality of, or "change[d] the meaning and purpose" of, any ISIS-related content.  *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 474 (E.D.N.Y. 2011).

Nor does it matter that Defendants allegedly "target[ed] advertisements based on viewers and content" using "proprietary algorithms."  Am. Compl. ¶¶ 135–36, 201.  The technical processes by which those ads were placed do not change the application of § 230.  The Sixth Circuit and other courts have held that the use of tools that filter or arrange third-party content does not involve the "creation" or "development" of information under § 230.  *See O'Kroley*, 831 F.3d at 355 (Google's automated algorithmic editing of search result snippets); *Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th Cir. 2015) (Yelp's automated filter system for reviews).  Such neutral activity does "not constitute a material contribution" to the unlawful nature of any alleged content.  *Jones*, 755 F.3d at

17

416; *see also Roommates*, 521 F.3d at 1169 (neutral tools do not affect § 230 immunity even if used to "carry out what may be unlawful or illicit" activities).

### 3.     Plaintiffs' Claims Seek To Treat Defendants As Publishers

Finally, Plaintiffs' claims seek to hold Defendants liable as the "publisher or speaker" of allegedly harmful third-party content within the meaning of § 230. Plaintiffs allege that Defendants are liable for the Orlando shooting because they "knowingly and recklessly" allowed ISIS or its sympathizers to "sprea[d] extremist propaganda, rais[e] funds, and attract[] new recruits," and then allegedly failed to take "meaningful action to stop" such use by "censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up."  Am. Compl. ¶¶ 1, 75, 113, 116.  These alleged acts—which amount to allowing content to be published or failing to censor it— are "traditional editorial functions," *Jones*, 755 F.3d at 416, and therefore are "precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230."  *Roommates*, 521 F.3d at 1171–72 (provider not liable for "failing to detect and remove" unlawful content); *O'Kroley*, 831 F.3d at 355 (service's act of not removing search results even after receiving complaints is a traditional editorial function); *Klayman*, 753 F.3d at 1355, 1358–59 (rejecting claims against Facebook for allegedly "refus[ing]" to take down "Intifada" pages that "called for Muslims to rise up and kill the Jewish people").

18

Because this same core theory underlies each of Plaintiffs' claims, § 230 mandates dismissal of the entire Amended Complaint.  A plaintiff cannot avoid § 230 simply by placing a different "labe[l]" on "an action that is quintessentially that of a publisher."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009). For that reason, courts have dismissed exactly the sort of claims alleged here, including claims for providing material support to terrorists, *Fields I*, 200 F. Supp. 3d 964; *Fields II*, 2016 WL 6822065, intentional infliction of emotional distress, *Jones*, 755 F.3d at 398, wrongful death, *Witkoff*, 2015 WL 5297912, aiding and abetting, *Goddard*, 2008 WL 5245490, at *7; *M.A. ex rel. P.K.*, 809 F. Supp. at 1041, and conspiracy, *Shrader v. Beann*, 503 F. App'x 650, 653 n.1, 654 (10th Cir. 2012); *Obado v. Magedson*, 2014 WL 3778261, at *8 (D.N.J. July 31, 2014).[3]

Plaintiffs cannot avoid this result by reformulating their claims to supposedly rest on Defendants' "provision of the infrastructure which provides

---

[3] *Accord Obado v. Magedson*, 612 F. App'x 90 (3d Cir. 2015) (negligent infliction of emotional distress); *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D. Cal. 2016) (same); *Manchanda v. Google*, 2016 WL 6806250 (S.D.N.Y. Nov. 16, 2016) (same); *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319 (D.N.J. 2015) (same); *Kabbaj v. Google, Inc.*, 2014 WL 1369864 (D. Del. Apr. 7, 2014) (same); *DiMeo v. Max*, 248 F. App'x 280, 282 (3d Cir. 2007) (intentional infliction of emotional distress); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp.2d 288 (D.N.H. 2008) (same); *Witkoff*, 2015 WL 5297912 (aiding and abetting); *Cornelius v. DeLuca*, 2009 WL 2568044 (E.D. Mo. Aug. 18, 2009) (conspiracy); *GW Equity LLC v. Xcentric Ventures LLC*, 2009 WL 62173 (N.D. Tx. Jan. 9, 2009) (same); *Simmons v. Danhauer & Assocs., LLC*, 2010 WL 4238856 (D.S.C. Oct. 21, 2010) (same); *Doe v. Bates*, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006) (same).

material support to ISIS," rather than on the "content of ISIS' social media postings." Am. Compl. ¶ 8. Nor can they avoid this result by pleading an infrastructure theory in the alternative. The plaintiffs in *Fields* made a nearly identical argument—that their case turned on Twitter's "provision of accounts" to ISIS and not on the content of ISIS-related Tweets. Judge Orrick properly rejected the argument with reasoning that equally applies here. *See Fields I*, 200 F. Supp. 3d at 970–74; *Fields II*, 2016 WL 6822065, at *5–7.

The most fundamental problem with Plaintiffs' approach is that imposing liability for providing infrastructure would be simply another way of penalizing a protected publishing decision: "the decision to permit third parties to post content." *Fields I*, 200 F. Supp. 3d at 972. A decision about who may use an online communications platform is just as much a decision about what content may be posted as a decision to withdraw or alter specific content directly. *See id.* at 972–73; *cf. Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) (restrictions based on the speaker's identity often are "'simply a means to control content'"). *Fields II* reinforced this point: "[P]rohibit[ing] ISIS members and affiliates from acquiring accounts … [is] a policy that necessarily targets the content, ideas, and affiliations of particular account holders." 2016 WL 6822065, at *6. The only difference between an infrastructure-provision theory and a failure-to-remove theory is that the former would hold Defendants "liable for granting permission to post …

20

instead of for allowing postings that have already occurred." *Fields I*, 200 F. Supp. 3d at 972. Both target publisher activity, and both are barred by § 230. *Id.*

Moreover, although Defendants would still be immune even if Plaintiffs' claims did turn on only the provision of infrastructure, that is not an accurate description of Plaintiffs' claims. Despite their disclaimers, Plaintiffs *do* seek to hold Defendants liable for third-party *content* made available through their services. Like the *Fields* pleadings from which it was borrowed, the Amended Complaint is "riddled with detailed descriptions of ISIS-related messages, images, and videos." *Fields I*, 200 F. Supp. 3d at 971; *see also Fields II*, 2016 WL 6822065, at *7. Its premise is that ISIS supporters used Defendants' sites to spread hateful messages and that Defendants should have done more to remove such material. *Fields II*, 2016 WL 6822065, at *7. That is a content-based theory.

Indeed, Plaintiffs allege no basis *other* than the content of specific postings for asserting that Defendants supported ISIS and thereby caused the Orlando shooting. If Plaintiffs' claims were premised only on an "infrastructure" theory, and not on a theory that Defendants failed to prevent ISIS from *using* that infrastructure to transmit messages and videos aimed at spreading and fomenting its extremist agenda, Plaintiffs simply could not claim that Defendants "ha[ve] been instrumental to the rise of ISIS"—let alone that they "enabled [ISIS] to carry out" the Orlando attack. Am. Compl. ¶ 1. Plaintiffs' theory necessarily seeks to

hold Defendants liable for the alleged consequences of content transmitted through their services.  Imposing liability for "deciding whether to publish" content is at the core of what § 230(c)(1) forbids.  *Jones*, 755 F.3d at 407; *accord Barnes*, 570 F.3d at 1103 (immunity covers "'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online'").

        This conclusion is unaffected by Plaintiffs' suggestions that Defendants could have used various (supposedly content-neutral) strategies to block more ISIS accounts.  Am. Compl. ¶¶ 117–31.  Because the necessary objective of such strategies would have been to exclude objectionable *content*, holding Defendants liable for not employing them would run afoul of § 230.  Moreover, Plaintiffs' suggestion that these strategies would not have required Defendants to monitor or review third-party content (*id.* ¶¶ 126–129) is incorrect.  For example, Plaintiffs fault Defendants' alleged failure to develop and employ an automated mechanism to block new accounts with the same "name root" (but incremental "numerical suffix[es]") as accounts removed due to a suspected ISIS connection.  *Id.* ¶¶ 116, 126–27.  But the only way to discover that a particular "name root" is associated with suspect content would be *based on suspect content* posted by a prior account.  *E.g.*, *id.* ¶ 125 ("The day after the attacks, he is now DriftOne0151 *and he posts pictures of those individuals who conducted the [ISIS] attacks*." (emphasis added)).  The same is true of Plaintiffs' proposed strategy of blocking new accounts that

22

immediately seek and receive large numbers of followers. *Id.* ¶¶ 128–30. This strategy relies on third-party content to decide whether an account is suspicious—namely, a Tweet containing a request such as, "Please F0ll0w & Retweet This Post!," *id.* ¶ 121 fig. 6, ¶ 122 fig. 7, ¶ 123 fig. 8, and/or the responses of other users, *id.* ¶ 129.

In sum, Plaintiffs' effort to impose liability based on Defendants' allegedly making offensive third-party content available on their services is barred by § 230.

## II.   All Of Plaintiffs' Claims Also Fail On Their Own Terms

Even apart from § 230, Plaintiffs' claims fail as a matter of law. Plaintiffs assert four causes of action under the ATA—two for secondary liability (Counts I–II), and two for direct liability (Counts III–IV)—and two state law causes of action (Counts V–VI). Each of these claims fails because Plaintiffs have not established, and cannot establish, their essential elements.

### A.   Plaintiffs' Secondary Liability Claims Fail (Counts I–II)

Section 2333(d), added to the ATA last year by the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222 (enacted Sept. 28, 2016) ("JASTA"), provides limited causes of action for aiding and abetting and conspiracy:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any

> person who aids and abets, by knowingly providing substantial
> assistance, or who conspires with the person who committed such an
> act of international terrorism.

*Id.* Section 2333(d) requires, at a minimum, that (1) the plaintiff's injury have arisen from "an act of international terrorism" that was (2) "committed, planned, or authorized" by a designated "foreign terrorist organization," and (3) that defendants aided and abetted (by "knowingly providing substantial assistance" to) or conspired with (by agreeing to and acting in furtherance of a common illegal enterprise) (4) "the person who committed" the "act of international terrorism." *Id.* The Amended Complaint does not and cannot establish any of these elements.

### 1. Plaintiffs Fail To Allege Facts Establishing That ISIS Committed, Planned, Or Authorized The Orlando Attack

Section 2333(d) allows secondary liability *only* where the relevant act of international terrorism was "committed, planned, or authorized" by a designated foreign terrorist organization—as distinguished from "lone wolf" attacks or similar criminal acts by individuals. Although ISIS is such an organization, the Amended Complaint does not allege facts establishing that ISIS "committed, planned, or authorized" the Orlando attack. Plaintiffs allege that Mateen may have been radicalized by ISIS propaganda (Am. Compl. ¶¶ 178–79, 181), that he pledged his allegiance to ISIS during the attack (*id.* ¶ 180), and that ISIS retroactively claimed credit for the attack (*id.* ¶¶ 174–75). But conspicuously missing from the Amended Complaint is any suggestion that ISIS was aware of Mateen,

24

communicated with or instructed him regarding the attack, or even knew about or approved his plan.  To the contrary, Plaintiffs concede that ISIS had no direct contact with Mateen and that Mateen was "self-radicalized" and "decided only recently before the attack to embrace [the] Islamic State."  *Id.* ¶ 177; *see also id.* ¶¶ 193, 195.  Plaintiffs' inability to plead that the act of terrorism in which they were injured was "committed, planned, or authorized" by a foreign terrorist organization precludes liability under § 2333(d).

### 2. Plaintiffs Fail To Allege That Defendants Aided And Abetted, Or Conspired With, The "*Person Who Committed*" The Act Of International Terrorism

Congress further limited the scope of secondary liability claims by requiring that the defendant have aided and abetted or conspired with "the person who committed" the act of international terrorism from which plaintiff's injury arose. 18 U.S.C. § 2333(d).  This language makes clear that aiding and abetting (or conspiring) the *actual perpetrator* of that act is required.

Plaintiffs cannot meet this requirement either.  The relevant act of "international terrorism" is the Orlando nightclub attack (Am. Compl. ¶¶ 206–14), and the person who committed that attack was Omar Mateen (*id.* ¶¶ 148, 150, 152, 158, 162–63, 165, 167, 169–71).  Whatever connection ISIS is alleged to have had to the shooting, it plainly was not the "person" who "committed" it, and nothing in

the Amended Complaint suggests otherwise. [4]  Yet Plaintiffs do not even try to suggest that Defendants conspired with or knowingly provided substantial assistance to Mateen—their allegations are focused on ISIS.  *Id.* ¶¶ 221–24.  That is not sufficient to state a claim under the plain language of § 2333(d).

### 3.  The Amended Complaint Fails To Allege Facts Establishing That Defendants Aided And Abetted Mateen (Count I)

Nor have Plaintiffs pled the essential substantive elements of aiding and abetting.  For a claim of aiding and abetting, the defendant must have "knowingly" provided "substantial assistance" to the "person who committed the violation."  18 U.S.C. § 2333(d)(2).  In enacting JASTA, Congress referenced the D.C. Circuit's decision in *Halberstam v. Welch* for the proper formulation, JASTA § 2(a)(5), Pub. L. No. 114-222, and that decision mandates that "the defendant must knowingly and substantially assist the principal violation."  705 F.2d 472, 488 (D.C. Cir. 1983).  This conforms to the Supreme Court's and Sixth Circuit's general definition of aiding and abetting liability in the civil context.  *See, e.g.*, *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) (civil aiding and abetting means "'know[ing] that the other's conduct constitutes a breach of duty and giv[ing] substantial assistance or encouragement to the other'");

---

[4] In addition to not having "committed" the Orlando attack, ISIS is not a "person" within the meaning of the ATA.  "Person" is defined as "any individual or entity capable of holding a legal or beneficial interest in property," 18 U.S.C. § 2331(3) —i.e., a juridical person—as distinguished from an organization such as ISIS.

*Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 570 (6th Cir. 2006) (civil aiding and abetting requires "(1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act" (internal quotations omitted)).  The Amended Complaint fails to satisfy these requirements.

### a) The Amended Complaint fails to plead the requisite knowledge or intent

The Amended Complaint does not plausibly allege *mens rea*, which is a bedrock requirement of aiding and abetting claims.  Section 2333(d) has a particularly strong version of that requirement, allowing a claim only where the defendant "knowingly" assisted the "person who committed" the principal violation (here, Mateen (*id.* ¶¶ 206–14)).  18 U.S.C. § 2333(d)(2); *see also Halberstam*, 705 F.2d at 487–88; *U.S. v. Hill*, 55 F.3d 1197, 1202 (6th Cir. 1995) (defendant must "have knowledge about the illegal … enterprise and the intent to aid in its success").  Plaintiffs' only references to Defendants' knowledge about the Orlando attack are threadbare recitals not entitled to a presumption of truth.  *See Iqbal*, 556 U.S. at 678.  For example, the Amended Complaint asserts that "Defendants *knowingly* provided substantial assistance and encouragement to ISIS … in committing, planning, or authorizing … the acts of international terrorism that injured Plaintiffs."  *Id.* ¶ 221 (emphasis added); *see also id.* ¶¶ 223, 227, 241. But the Amended Complaint does not and cannot allege that Defendants had any

27

advance knowledge of the Orlando attack, much less that they intended to assist or encourage Mateen in committing it.  There is no *mens rea* in this case.

### b) The Amended Complaint does not allege facts constituting substantial assistance

Plaintiffs also fail to plead facts establishing that Defendants "substantially assisted" anyone (much less Mateen) in connection with the Orlando attack.  In *Halberstam*, the court looked to the five Restatement factors to assess whether assistance to another's unlawful act is "substantial" enough for aiding and abetting liability:  "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind."  705 F.2d at 478 (quoting Restatement (Second) of Torts § 876 (1979), comment d).  The court also looked to a sixth factor, the "duration of the assistance provided."  *Id.* at 484.

These factors assume that, to be liable for aiding and abetting, the defendant must have acted in some deliberate way to assist the perpetrator in carrying out the "principal violation."  The Amended Complaint asserts nothing like that.  Plaintiffs allege only that Defendants provided social media services to the public and that ISIS sympathizers or affiliates might have been among the hundreds of millions who used those services.  They do not allege Defendants knew of Mateen's plan for the attack in advance or sought to assist it, and instead acknowledge that each Defendant had a practice of removing ISIS content and accounts from its platform.

28

*E.g.*, Am. Compl. ¶¶ 48, 87, 113, 116, 119–20, 123, 138. *See Halberstam*, 705 F.2d at 488 (lack of intent relevant to both *mens rea* and substantial assistance inquiries); *accord Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 537 (6th Cir. 2000). There is no plausible suggestion that Defendants were "essential" to the attack, that they were present during its commission, or that they had any "relationship" with Mateen. And Plaintiffs certainly do not claim that any assistance Defendants may have provided lasted for a meaningful duration. *See Halberstam*, 705 F.2d at 478, 488. These flaws doom Plaintiffs' substantial assistance theory.

### 4. Plaintiffs Fail To Allege A Conspiracy Claim (Count II)

Plaintiffs' conspiracy claim is equally deficient. Civil conspiracy requires three elements: "an agreement to do an unlawful act or a lawful act in an unlawful manner," "an overt act in furtherance of the agreement," and "injury caused by the act." *Halberstam*, 705 F.2d at 487. Agreement to violate the law is the core of conspiracy. There can be no liability unless "two or more individuals *agree* to participate in a collective venture directed toward a common goal." *United States v. Robelin*, 983 F.2d 1070, 1993 WL 6828, at *5 (6th Cir. Jan. 14, 1993) (emphasis added); *accord United States v. Schaffer*, 586 F.3d 414, 422 (6th Cir. 2009). And here, as discussed, the agreement must have been with Mateen, the "person who committed" the attack.

The Amended Complaint fails on each of these dimensions.  Plaintiffs allege no facts suggesting that Defendants had any unlawful agreement, with Mateen or anyone else, regarding the Orlando shooting.  At most, they assert that Defendants broadly agreed to provide their users with social media services, and that some of those users were ISIS members or sympathizers.  That does not support a claim that Defendants formed an agreement with Mateen (or ISIS) to commit the Orlando attack.

### 5.    The Orlando Attack Was Not "*International* Terrorism" Within The Meaning Of Section 2333

Finally, Plaintiffs' secondary liability claims (both for aiding and abetting and conspiracy (Counts I-II)) also fail because Plaintiffs cannot allege that the Orlando attack was an "act of *international* terrorism," as the statute requires.  18 U.S.C. § 2333(d) (emphasis added).  "[I]international terrorism," *id.* § 2331(1), which is defined in express contrast to "domestic terrorism," *id.* § 2331(5), means terrorism that occurs "primarily outside … the United States," or "transcend[s] national boundaries" in the "means by which [it is] accomplished, the persons [it] appear[s] intended to intimidate or coerce, or the locale in which [its] perpetrators operate or seek asylum."  *Id.* § 2331(1)(C).  Under § 2333(d), aiding and abetting and conspiracy are actionable *only* where the primary violation (the act from which plaintiff's injury arose) was an "act of international terrorism."  The statute does not authorize secondary liability for instances of domestic terrorism.

30

Despite Plaintiffs' efforts to plead around Defendants' prior arguments on this point (Am. Compl. ¶ 214), the Orlando attack plainly was an act of "domestic terrorism." It occurred "primarily within the territorial jurisdiction of the United States." 18 U.S.C. § 2331(5)(C). As Plaintiffs admit, the attack was carried out in Orlando, Florida; the "perpetrato[r]," Mateen, was a U.S. citizen born within the United States; and the victims (the people Mateen "intended to intimidate or coerce") all were U.S. citizens. Am. Compl. ¶¶ 9–33, 174–75 nn.26–27. Plaintiffs do not allege that Mateen's actions were directed or funded by any international terrorist group, that he traveled overseas to train for or plan the attack, or that there was any other relevant international connection. Rather, Plaintiffs allege that Mateen was "self-radicalized" and had no direct contact with ISIS in connection with the attack. *Id.* ¶¶ 177, 178 n.2, 193, 195. In short, nothing material about the Pulse shooting occurred outside of the United States or transcended national boundaries.

Plaintiffs try to address this defect by referencing a New York Times article suggesting that ISIS may have been operationally involved in some attacks that had initially been portrayed by governments or media as so-called "lone wolf" attacks. Am. Compl. ¶ 74. But these allegations have no connection to Orlando. Neither the article nor anything else in the Amended Complaint suggests that Mateen's attack was orchestrated by ISIS from abroad or that foreign actors played

31

any role in the attack.  Even if Mateen was "inspired by" ISIS, that would not

transform an otherwise domestic event into an act of international terrorism.  The

fact that ISIS later claimed credit for the attack is similarly immaterial: such a

belated claim does not bear on any of what the statutory definition makes

relevant—the means by which the attack occurred, the persons whom it was

intended to intimidate, or the location in which its actual perpetrators operated.

18 U.S.C. § 2331(1)(C).

No court has suggested that an attack committed by a U.S. citizen in the

United States constitutes "international terrorism" under § 2331(1).  *See Smith v.*

*Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 221–22 (S.D.N.Y. 2003)

(warning that "an expansive interpretation of 'international terrorism' might render

'domestic terrorism' superfluous").  Indeed, to accept Plaintiffs' suggestion that

any attack that furthers the goals of a foreign terrorist organization constitutes

"international terrorism" (Am. Compl. ¶¶ 206–08), would render meaningless the

distinction the ATA draws between "domestic" and "international" terrorism.

That would not be proper.  The statute's distinction is not arbitrary; it

reflects a deliberate legislative choice.  Congress created a federal civil remedy

exclusively for injuries arising from acts of *international* terrorism because it was

mending a perceived gap in the law:  before the ATA, U.S. victims of terrorist acts

that occurred abroad or in ways that transcend national boundaries may not

otherwise have had adequate remedies under existing *domestic* laws. *See, e.g.*, H.R. Rep. No. 102-1040 (1992) (Section 2333 would "facilitate civil actions" against terrorist attacks "occurring" in "locale[s]" that "might not have been subject to civil action in the U.S."). Such victims may not have had any cause of action that allowed them to sue in this country to recover for their injuries. But Congress did not extend that new civil remedy for instances of *domestic* terrorism. Existing law—including state tort—already provided such remedies from appropriate defendants. Here, Plaintiffs have invoked precisely those laws, and while their state-law claims fail for reasons unrelated to geography, the fact that Plaintiffs have asserted them underscores that their injuries arise from what is clearly an act of domestic terrorism, which is not actionable under § 2333(d).

### B. The Amended Complaint Fails To State A Claim For Direct Liability Under The ATA (Counts III and IV)

Plaintiffs are no more successful in attempting to assert claims for direct liability under 18 U.S.C. § 2333(a). This provision creates a private right of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism." *Id.* By its terms, this section requires a plaintiff to plead and prove (1) that the plaintiff was injured "by reason of"—i.e., that the injury was proximately caused by—(2) an "act of international terrorism" committed by the defendant itself. The Amended Complaint does not allege facts sufficient to establish either of these elements.

33

### 1.    Plaintiffs Fail To Establish Proximate Cause

The "by reason of" language of § 2333(a) requires Plaintiffs to allege facts

showing "that defendants' actions proximately caused their injuries." *In re*

*Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123–25 (2d Cir. 2013) ("*Al*

*Rajhi*") (affirming dismissal for failure to allege proximate cause); *Rothstein v.*

*UBS AG*, 708 F.3d 82, 95–98 (2d Cir. 2013) (same).   Congress borrowed the

proximate cause language from the civil remedy provisions of the Sherman Act, 26

Stat. 209 (1890), the Clayton Act, 15 U.S.C. § 15(a), and RICO, 18 U.S.C.

§ 1964(c).  *See Rothstein*, 708 F.3d at 95.  Because Congress "used the same

words," we "assume it intended them to have the same meaning"—namely, a

plaintiff must show "some direct relation between the injury asserted and the

injurious conduct alleged." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268

(1992).

Courts have strictly applied this rule at the pleading stage, rejecting

"conclusory allegations" of causation. *Rothstein*, 708 F.3d at 95, 97; *Al Rajhi*, 714

F.3d at 124–25.  A plaintiff must allege facts plausibly establishing that the

defendant's allegedly unlawful conduct (which here would be the defendant's *own*

alleged act of international terrorism) "led directly" to the plaintiff's injuries. *Anza*

*v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).  A causation theory that

"stretche[s] the causal chain" linking defendant's allegedly unlawful conduct to

34

plaintiff's injury "well beyond the first step" cannot satisfy this "direct relationship requirement." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10–11 (2010).[5]

Plaintiffs have not satisfied this requirement.  The causation issue here is whether there is a plausibly direct and substantial link between alleged knowing material support that Defendants supposedly provided to ISIS generally and the Orlando attack that led to Plaintiffs' injuries.[6]  Beyond insufficient conclusory assertions (Am. Compl. ¶¶ 191–99, 224, 242), *see Iqbal*, 556 U.S. at 681, the causal "connection" alleged in the Amended Complaint is "tenuous at best," *Fields*

---

[5] Rather than using the *Holmes* "direct relation" test, some out-of-circuit courts have read § 2333(a) to allow a looser causal connection.  *E.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 697 (7th Cir. 2008) (en banc) (applying a more "relaxed" causation standard, at least in cases involving monetary donations funneled knowingly to a terrorist group); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015) (plaintiff need establish only that defendant's acts were "a substantial factor in causing plaintiffs' injuries" and that "such injuries were a foreseeable result of those acts"), *appeal docketed*, No. 16-2134 (2d Cir. June 23, 2016).  Those approaches ignore the dictate that the injury itself be "by reason of" the defendant's actions.  *See Holmes*, 503 U.S. at 267.  Under that test, there must be a "direct" connection between the defendant's conduct and the Plaintiffs' injury. *See Hemi Grp.*, 559 U.S. at 12; *Couch v. Cate*, 379 F. App'x 560, 565 (9th Cir. 2010).  Here, as in *Fields*, the causal "connection" is "tenuous at best" and is insufficient "[e]ven under … [a] 'substantial factor' test."  *Fields I*, 200 F. Supp. 3d at 974; *see also Fields II*, 2016 WL 6822065, at *9.

[6] Because Plaintiffs do not even attempt to allege (nor could they) that Defendants somehow committed an "act of international terrorism" by unknowingly permitting Mateen to use their services (Am. Compl. ¶¶ 179–81), Plaintiffs cannot establish proximate cause by linking those alleged uses to the Orlando attack.

*I*, 200 F. Supp. 3d at 974; *see also Fields II*, 2016 WL 6822065, at *9.  It proceeds

by piling speculation upon speculation:

(1)     Defendants "knowingly permit[ted]" ISIS and/or its
        sympathizers to create accounts on their platforms, and then
        allegedly failed to take "meaningful action to stop" ISIS-related
        activity by in every instance "censor[ing] user content,"
        "shut[ting] down … ISIS-linked account[s]," or blocking ISIS-
        related accounts from "springing right back up" (Am. Compl.
        ¶¶ 1, 75, 113, 116);

(2)     Defendants' failures to block content allegedly enabled ISIS to
        convey, via Defendants' platforms, posts or messages designed
        to recruit new members (*id.* ¶¶ 44–54), raise money (*id.* ¶¶ 55–
        60, 140), and spread propaganda (*id.* ¶¶ 61–74);

(3)     Recipients of those messages allegedly responded by joining
        ISIS and contributing funds (*id.* ¶¶ 50–52, 57–58);

(4)     Those recruits, funds, and publicity allegedly helped ISIS grow
        into a larger terrorist organization (*id.* ¶¶ 1–2);

(5)     This growth enabled someone to post some sort of "jihadist"
        content (Plaintiffs do not say how, who, or what) to "the
        Internet and social media," including Defendants' services (*id.*
        ¶¶ 177–79, 193–95);

(6)     Viewing some of that unspecified content caused Mateen to
        become self-radicalized (*id.*); and

(7)     Mateen was thus inspired to commit the Orlando attack (*id.*
        ¶ 195).[7]

This alleged chain of causation is "too speculative [and] attenuated to raise a

plausible inference of proximate causation."  *Fields I*, 200 F. Supp. 3d at 974 n.4;

---

[7] Plaintiffs do not even allege these facts as to each Defendant.  *See* note 1, *supra*.

*Fields II*, 2016 WL 6822065, at *10 n.3.  Courts, including in *Fields*, have rejected similarly circuitous efforts to link businesses offering widely available services to acts of terrorism under § 2333(a).  The Second Circuit dismissed allegations that "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda … proximately caused the September 11, 2001 attacks or plaintiffs' injuries."  *Al Rajhi*, 714 F.3d at 124.  That court reached the same conclusion about allegations that UBS provided cash to a state sponsor of terrorism that would be used to cause and facilitate terrorist acts, *Rothstein*, 708 F.3d at 97, and about allegations that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations," *Al Rajhi*, 714 F.3d at 124.

The alleged chain of causation here is even weaker.  The heart of Plaintiffs' direct liability theory is that Defendants provided material support *to ISIS*, but the Amended Complaint does nothing to establish that *ISIS* planned, authorized, or committed the Orlando shooting.  *See supra* pp. 24–25.  To the contrary, Plaintiffs describe Mateen as an independent actor who became "self-radicalized" by viewing "jihadist" content on "the Internet and social media" and who "decided only recently before the attack to embrace [the] Islamic State."  Am. Compl. ¶¶ 177–79, 193–95.  They do not allege that Mateen had ever "been directly in contact with ISIS."  *Id.* ¶ 195.  And although ISIS allegedly claimed credit for the

attacks (*id.* ¶¶ 174–75), courts view such statements skeptically given the "perverse" incentives for terrorists to claim credit for attacks they do not commit. *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 449 (E.D.N.Y. 2013); *see also Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 569 (E.D.N.Y. 2012).  Indeed, the Amended Complaint incorporates the FBI's statement that it found no evidence of any previous contact with or support for Mateen from ISIS or other international terrorist groups (Am. Compl. ¶ 178 n.29).  *See Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 330 (E.D.N.Y. 2015) (if Hamas itself did not fund the attack in which plaintiffs were injured, then defendant's act of allegedly funding Hamas "could not have been a substantial factor in causing that attack").  Given all that, Plaintiffs cannot establish that any supposed support that Defendants may have unwittingly provided to ISIS led directly to Plaintiffs' injuries at Mateen's hands in the Orlando attack.  They have not, and cannot, properly allege proximate cause.

Accepting Plaintiffs' unbounded theory would have staggering consequences, exposing every online platform to possible liability for terrorist violence anywhere in the world, at any time, simply because the terrorists who committed the attack may have been loosely affiliated with some of the platforms' billions of users.  *See Fields II*, 2016 WL 6822065, at *9 ("Under such an expansive proximate cause theory, any plaintiff could hold [Defendants] liable for any ISIS-related injury without alleging any connection between a particular

38

terrorist act and [Defendants'] provision of accounts."). A theory that "stretche[s] the causal chain" this far "beyond the first step" cannot satisfy the "direct relationship requirement" of § 2333(a). *Hemi Grp.*, 559 U.S. at 10–11.

### 2. Plaintiffs Fail To Allege That Defendants Themselves Committed An "Act of International Terrorism"

Plaintiffs also fail to establish the other elements of direct liability under § 2333(a), which permits a national of the United States who was injured "by reason of an act of international terrorism" to "sue therefor." *Id.* For such a claim to lie, the Defendant must itself have committed the "act of international terrorism" that resulted in the injury for which the plaintiff is suing. *Id.* Here, under a straightforward reading of the Amended Complaint, the terrorist act that Plaintiffs allege to have caused their injuries is the Orlando attack. Am. Compl. ¶¶ 147–82. Defendants did not commit that attack, and, as explained above in Section II.A.5, the attack was not an act of "*international*" terrorism. The Amended Complaint therefore cannot state a claim for direct liability.

Plaintiffs try to avoid this conclusion by invoking two federal criminal statutes that prohibit the provision of "material support" to certain acts of terrorism or to designated terrorist organizations, 18 U.S.C. §§ 2339A and 2339B.

Plaintiffs' theory appears to be that by providing broadly available online platforms that allegedly were used by some members or supporters of a terrorist organization, Defendants violated §§ 2339A and 2339B. Plaintiffs then suggest

that those alleged violations automatically meet the definition of "international terrorism" under § 2331(1), which requires, among other things, conduct that (1) "involve[s] violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State"; and (2) "appear[s] to be intended" to achieve certain specified terrorist purposes—i.e., "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1)(A)–(C).

Plaintiffs' theory fails at each step of the argument.  First, the Amended Complaint simply does not state a viable claim that Defendants engaged in "material support" in violation of federal criminal law.  Second, material support, standing alone, is not an act of "international terrorism" under § 2333, and the Amended Complaint offers no allegations that Defendants' conduct actually meets the statutory definition of that term.

### a)   Plaintiffs cannot allege a violation of the criminal "material support" laws

Even if it were sufficient under § 2333(a) for Plaintiffs to allege facts showing that Defendants provided "material support" to ISIS or to terrorist acts within the meaning of § 2339A (Count III) and § 2339B (Count IV)—which it is not, as discussed below—they have not done so.  Because the material support provisions are criminal statutes with severe penalties, courts have read them,

40

consistent with their text, to impose strict *mens rea* requirements. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010); *see also Staples v. United States*, 511 U.S. 600, 616 (1994) (the "penalty imposed under a statute has been a significant consideration in determining" how to apply the *mens rea* requirement); *Crandon v. United States*, 494 U.S. 152, 168 (1990) (rule of lenity requires ambiguity in the scope of a criminal statute to "be resolved in [defendants'] favor," even where the statute is invoked in a civil context).

Section 2339A (Count III) requires proof that the defendant provided material support "knowing or intending that [it] be used in preparation for, or in carrying out [a violation of specific federal terrorism statutes]." 18 U.S.C. § 2339A(a). Plaintiffs' only allegations purporting to support this element (Am. Compl. ¶¶ 1, 8, 131, 141–46, 187, 205, 233, 238, 241–42, 244), are mere threadbare recitals, and are insufficient. *See Iqbal*, 556 U.S. at 678. Plaintiffs do not offer any well-pled fact that would support the notion that Defendants provided resources with the specific knowledge or intent that they be used to carry out acts of terrorism. And Plaintiffs' admission that Defendants prohibit and remove terrorist content (Am. Compl. ¶¶ 48, 87, 133), negates any such inference.

Section 2339B (Count IV) requires proof that the defendant "knowingly" provided material support to a designated foreign terrorist organization or an organization that has engaged or engages in terrorism. 18 U.S.C. § 2339B(a)(1).

The Supreme Court has read this provision to require support given "under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Humanitarian Law Project*, 561 U.S. at 26.

There is no such allegation here. Even if providing free online services to the general public could constitute "material support"—which it cannot—the Amended Complaint does not plausibly allege that any Defendant *knowingly* provided such services *to ISIS*. Here too, the "only relevant allegations are either wholly conclusory or inadequate." *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 665 (S.D. Tex. 2010). Plaintiffs nowhere allege that any Defendant knew of (and then failed to block) specific accounts that were controlled by ISIS, or knowingly furnished accounts to people or entities while knowing they were part of ISIS. Rather, the Amended Complaint is entirely general—referring only to reports that ISIS members or supporters used Defendants' online services to recruit and train ISIS operatives, and suggesting that Defendants could have done more to block such usage. Am. Compl. ¶¶ 75–133.

Consider Plaintiffs' allegations about Google's practices for sharing advertising revenue with certain video uploaders. Am. Compl. ¶¶ 135–42. The Amended Complaint refers to a YouTube video that supposedly had advertising associated with it, but Plaintiffs do not suggest that Google actually knew of any alleged connection between the video (or its poster) and ISIS. Indeed, Plaintiffs do

42

not even say who uploaded the video or through what YouTube account.  Plaintiffs do not allege that YouTube users disclosed whether they were ISIS members when registering to upload videos or for revenue sharing, or that Google was given information linking ISIS to the person responsible for uploading and monetizing the video.  Indeed, Plaintiffs offer no facts to support the assertion (*id.* ¶ 142) that the video was posted by ISIS (rather than an ISIS sympathizer, or an innocent party), much less that any person who allegedly received revenue from any ads shown with the video was part of ISIS.  Plaintiffs thus fail to establish even the first link—that money went from Google to ISIS.  They certainly do not support the notion that Google *knowingly* shared revenue with ISIS.

There is a more general problem with Plaintiffs' approach.  Defendants offer online services used by billions of people around the globe.  Plaintiffs do not, and cannot, allege that Defendants know the actual identities of all their users, much less their affiliations.  The suggestion that Defendants should have known from public reports that an unidentified and tiny fraction of their users might have had ISIS ties does not establish the scienter required by §§ 2339A and 2339B.  To find violations of those criminal statutes on that basis—particularly as applied to Defendants' provision of neutral means for users to share information, ideas, and other content—would stretch them beyond reason.  Plaintiffs' sweeping theory would threaten liability not only for myriad online intermediaries, but also for

43

scores of other service providers, including wireless carriers and utilities, merely

because terrorists or terrorist sympathizers used their generally available services.

*Accord Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C.

2003) ("*Burnett I*"); *Stutts v. De Dietrich Grp.*, No. 03-CV-4058, 2006 WL

1867060, at *11, *14–15 (E.D.N.Y. June 30, 2006) (providing banking services to

manufacturers who allegedly sold chemicals and equipment to Iraq did not create

liability under § 2333(a)).   There is no support for such an expansive application of

the material support statutes, which would create serious First Amendment

problems that the Court can and should avoid.[8]

---

[8] Recognizing the tension between a broad reading of the material support laws and
the First Amendment, the Supreme Court and a court of appeals have held that
liability is allowed only where the speech bears a direct, non-speculative
relationship to terrorist purposes and the defendant actually coordinated or acted in
concert with the terrorist group. *See Humanitarian Law Project*, 561 U.S. at 23–
25, 31–32; *Al Haramain Islamic Found. v. Dep't of Treasury*, 686 F.3d 965, 995–
1001 (9th Cir. 2012).  Plaintiffs cannot satisfy these requirements here.  In
addition, the First Amendment applies to Defendants' editorial judgments
regarding what third-party speech to allow on their platforms and what procedures
are appropriate for identifying and removing objectionable content. *See, e.g.,
Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994); *Arkansas Educ. Telev.
Comm'n v. Forbes*, 523 U.S. 666, 674 (1998); *Miami Herald Publ. Co. v. Tornillo*,
418 U.S. 241, 258 (1974).  Imposing liability based on those judgments would
raise serious constitutional concerns, which this Court can and should avoid. *See
Shepard v. United States*, 544 U.S. 13, 15 (2005) (the "rule of reading statutes [is]
to avoid serious risks of unconstitutionality"); *United States v. Twitty*, 44 F.3d 410,
413 (6th Cir. 1995) ("[I]t is a well-known principle of statutory construction that
statutes should be construed to avoid unconstitutionality when fairly possible.").

**b)**   **Plaintiffs fail to establish that Defendants committed "violent" or "dangerous" acts that "appear[ed] to be intended" to achieve a specified terrorist purpose**

Even if Plaintiffs could somehow allege that Defendants engaged in "material support," Plaintiffs allege no facts to suggest that Defendants committed "violent" or "dangerous" acts that "appear[ed] to be intended" to achieve specifically defined terrorist purposes, namely "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1)(A), (B).

The intent element of § 2331(1) requires facts that "would … lead an objective observer to conclude" that the defendant meant to accomplish one of the specified terrorist ends.  *Stansell v. BGP, Inc.*, No. 09-CV-2501, 2011 WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011).  It is not enough that the defendant offered general services to a broad range of users.  In *Boim*, the Seventh Circuit noted that the Red Cross and Doctors Without Borders "provide [medical] assistance without regard to the circumstances giving rise to the need for it."  549 F.3d at 699.  Although those organizations "might know in advance" that they will "provid[e] … assistance to [individual] terrorists," an objective observer would conclude that providing such aid was intended to achieve a humanitarian, not a terrorist purpose.  *Id.*  And in *Burnett II*, the court dismissed a complaint that relied

45

on the mistaken proposition "'that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.'" 349 F. Supp. 2d at 832–33.  An objective observer would conclude that the bank meant to offer beneficial services to the public at large, not to further terrorism.  Indeed, even where (unlike here) the alleged "material support" is targeted to a terrorist group, courts have found the requisite intent lacking when context would "lead an objective observer to conclude" that the defendant had another goal.  *Stansell*, 2011 WL 1296881, at *9.

Here, an objective observer would conclude that Defendants intended to offer their platforms to the general public.  Defendants offer their services globally to individuals who use them to exchange information, express themselves, and communicate about myriad issues.  *E.g.*, Am. Compl. ¶¶ 3, 45, 61, 70, 86, 139.  Plaintiffs nowhere assert that Defendants provided specialized products or services specifically designed for ISIS members.  No reasonable observer could conclude that Defendants' actions were meant "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1)(B).

Nor can Plaintiffs show that Defendants' conduct "involve[d] violent acts or acts dangerous to human life."  18 U.S.C. § 2331(1)(A).  Defendants' services are

not violent or dangerous and do not become so simply because a terrorist (or anyone else among their many users) might use them improperly.  Although some courts have suggested that any "material support" under § 2339A can meet the "violent act or acts dangerous to human life" element, *e.g.*, *Linde*, 97 F. Supp. 3d at 322–23, that interpretation contravenes § 2331(1), under which it is the *defendant's* acts—not those of the person who allegedly received "material support"—that must be violent or dangerous to human life.  *E.g.*, *Stutts*, 2006 WL 1867060, at *11–12.

Congress's recent amendment to include secondary liability under the ATA confirms this point.  *See generally* JASTA, 18 U.S.C. § 2333(d).  For defendants whose *own conduct* did not involve a "violent" or "dangerous" act that "appear[ed] to be intended" to achieve any of the specified terrorist purposes, the only provision of § 2333, as amended, that could support secondary liability is subsection (d).  As discussed above, Plaintiffs cannot state a claim under that provision.  And to permit them to get around that failing by reading subsection (a) to allow a different form of secondary liability—that is, liability without any showing that Defendants *themselves* committed an act of "international terrorism"—would render subsection (d) superfluous.  *See Corley v. U.S.*, 556 U.S. 303, 314–15 (2009).  It also would disregard the enacted preamble of JASTA, which states that subsection (d) was "necessary to recognize the substantive causes

47

of action for aiding and abetting and conspiracy liability." JASTA § 2(4).

Because Plaintiffs have not pled a valid claim under § 2333(a) or (d), their ATA

claims must be dismissed.

### C.   Plaintiffs' State Law Claims Fail (Counts V and VI)

As with their claims under § 2333(a), *see supra*, pp. 34–39, Plaintiffs'

failure to allege facts establishing proximate cause also dooms their newly added

common law tort claims. Plaintiffs assert claims for Negligent Infliction of

Emotional Distress (Count V) and Wrongful Death (Count VI), both of which

sound in tort and allow recovery only where the plaintiffs allege their injuries were

a proximate result of the defendant's negligent conduct. *See Stewart v. Gilliam*,

271 So. 2d 466, 477 (Fla. Dist. Ct. App. 1972), *quashed on other grounds by

Gilliam v. Stewart*, 291 So.2d 593 (Fla. 1974) (general rules of negligence,

including the concepts of proximate cause and foreseeability, apply to causes of

action for negligent infliction of emotional distress); Fla. Stat. § 768.19 (a plaintiff

may recover for wrongful death only where "caused by the wrongful act [or]

negligence"). Here, Plaintiffs' attenuated theory of causation (as discussed above

in Section II.B.1)—which would render any service provider, utility, or common

carrier liable in negligence solely due to the widespread availability of its

service—is unreasonable and "too speculative [and] attenuated to raise a plausible

inference of proximate causation." *Fields I*, 200 F. Supp. 3d at 974 n.4; *Fields II*,

48

2016 WL 6822065, at *10 n.3; *see also In re Complaint of Sheen*, 709 F. Supp.

1123, 1131 (S.D. Fla. 1989) ("The purported negligent conduct must have a

reasonable connection in fact … in order for proximate cause to exist.").

## CONCLUSION

For all the above reasons, the Amended Complaint should be dismissed with

prejudice.

Dated: April 28, 2017      Respectfully submitted,

s/ with the consent of Kristin A. Linsley

KRISTIN A. LINSLEY

klinsely@gibsondunn.com

JEANA BISNAR MAUTE

jbisnarmaute@gibsondunn.com

SHELI R. CHABON

schabon@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP

555 Mission Street, Suite 3000

San Francisco, CA 94105-0921

Telephone: (415) 393-8200

Facsimile: (415) 393-8306


THOMAS W. CRANMER (P25252)

cranmer@millercanfield.com

DAVID D. O'BRIEN (P65532)

obrien@millercanfield.com

MILLER, CANFIELD, PADDOCK &
   STONE, PLC

840 West Long Lake Road, Suite 200

Troy, MI 48098

(248) 267-3381


*Attorneys for Defendant*
**FACEBOOK, INC.**


s/*Patrick J Carome*     

SETH P. WAXMAN

seth.waxman@wilmerhale.com

PATRICK J. CAROME

patrick.carome@wilmerhale.com

WILMER CUTLER PICKERING
   HALE AND DORR LLP

1875 Pennsylvania Avenue, NW

Washington, D.C. 20006

Telephone: (202) 663-6000

Facsimile: (202) 663-6363


LEONARD M. NIEHOFF (P36695)

lniehoff@honigman.com

J. MICHAEL HUGET (P39150)

mhuget@honigman.com

HONIGMAN, MILLER, SCHWARZ &
   COHN, LLP

130 South First Street, 4th Floor

Ann Arbor, MI 48104

(734) 418-4246


*Attorneys for Defendant*
**TWITTER, INC.**


s/ with the consent of Brian M. Willen

BRIAN M. WILLEN (P75110)

bwillen@wsgr.com

WILSON SONSINI
   GOODRICH & ROSATI, P.C.

1301 Avenue of the Americas

New York, NY 10019

Telephone: (212) 999-5800


*Attorneys for Defendant*
**GOOGLE INC.**

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on April 28, 2017, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

                    By:  *s/ Patrick J. Carome*
                            Patrick J. Carome