UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EARL CROSBY, et al.

              Plaintiffs,

      v.

TWITTER, INC., GOOGLE INC.,
FACEBOOK, INC.

              Defendants.

Case No. 16-14406

Judge: Honorable David M. Lawson

**DEFENDANTS' REPLY IN SUPPORT
OF THEIR JOINT MOTION TO DISMISS THE
AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................ ii

I.  Section 230 Bars Plaintiffs' Claims ............................................ 1

    A.  JASTA Did Not Effect An Implied Repeal Of § 230 ......................... 2

    B.  Section 230 Bars Plaintiffs' Account-Provision Theory ..................... 6

    C.  Pairing Third-Party Content With Ads Does Not Make
        Defendants Providers Of That Content ................................... 9

II.  All Of Plaintiffs' Claims Also Fail On Their Own Terms ....................... 10

    A.  Numerous Defects Defeat Plaintiffs' Secondary Liability Claims ..... 11

    B.  Plaintiffs Do Not Seriously Defend Their Direct Liability
        Claims ................................................................. 13

        1.  Plaintiffs Do Not Even Try To Argue That
            Defendants Themselves Committed An Act Of
            International Terrorism ........................................ 13

        2.  The FAC Does Not Adequately Plead Proximate
            Causation .................................................... 14

        3.  The FAC Does Not Plausibly Allege A Violation
            Of The Material Support Statutes ............................. 17

III.  The FAC Should Be Dismissed Without Leave To Amend ......................... 19

CONCLUSION ........................................................................ 20

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Auto Club Prop.-Cas. Ins. Co. v. B.T*, 596 F. App'x 409 (6th Cir. 2015) .................................................................................................17

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) .............................................6

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) ............................................9

*Boim v. Holy Land Found. For Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc) ...........................................................................................15

*Branch v. Smith*, 538 U.S. 254 (2003) ..................................................................2, 4

*Brill v. Chevron Corp.*, No. 15-cv-04916-JD, 2017 WL 76894 (N.D. Cal. Jan. 9, 2017) .......................................................................................................14

*Cohen v. Facebook, Inc.,* No. 16-cv-4453(NG), 2017 WL 2192621 (E.D.N.Y. May 18, 2017) ..............................................................................5, 7

*Cruz v. Capital One, N.A.*, 192 F. Supp. 3d 832 (E.D. Mich. 2016) ......................11

*Doe v. Backpage.com*, 817 F.3d 12 (1st Cir. 2016) ..................................................5

*Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007) ......................................................11

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) .............................................7, 8

*Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008) ............................................................5, 9, 10

*Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016) .................................7

*Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016) ........................7, 16

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2010) ...........................18

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ......................................13, 14

ii

*Haverstick Enterps., Inc. v. Financial Federal Credit, Inc.*, 32 F.3d 989 (6th Cir. 1994) .........................................................................20

*Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163 (2009) ................................5, 6

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992)...........................................15

*Hui v. Castaneda*, 559 U.S. 799 (2010)............................................................4, 5

*Hussein v. Dahabshiil Transfer Servs.*, 15-cv-9623, 2017 WL 395210 (S.D.N.Y. Jan. 27, 2017) ...........................................................19

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) .............................................................................8, 9, 10, 20

*Kingdomware Tech., Inc. v. United States*, 136 S. Ct. 1969 (2016).........................6

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015)............................16

*Litwin v. Am. Exp. Co.*, 838 F. Supp. 855 (S.D.N.Y. 1993) ....................................6

*MCW, Inc. v. Badbusinessbureau.com*, No. 3:02-cv-2727-G, 2004 WL 833595 (N.D. Tex. Apr. 19, 2004) ...............................................9

*Morton v. Mancari*, 417 U.S. 535 (1974) ................................................................2

*NAHB v. Defs. of Wildlife*, 551 U.S. 644 (2007) .....................................................2

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) .........................................................................9

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) .........................................................3

*Pratt v. Martineau*, 870 N.E.2d 1122 (Mass. App. Ct. 2007) ................................17

*Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417 (6th Cir. 2000) .................19

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)............................................14, 15

*Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463 (S.D.N.Y. 2008)....................19

*Traynor v. Turnage*, 485 U.S. 535 (1988) ...............................................................3

iii

*United States v. Lee*, 991 F.2d 343 (6th Cir. 1993) ..................................................18

*United States v. May*, 430 F. App'x 520 (6th Cir. 2011).........................................17

*Universal Commc'n Sys. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007)..................7, 8

## STATUTES

18 U.S.C.
      § 2331 .................................................................................13, 15
      § 2333 ..................................................................................*passim*
      § 2339A................................................................................18
      § 2339B................................................................................18

47 U.S.C. § 230 .....................................................................................*passim*

Foreign Sovereign Immunities Act .....................................................3, 4

Justice Against Sponsors of Terrorism Act,
      Pub. L. No. 114-222 ...............................................1, 2, 3, 4, 5, 6

Plaintiffs' Opposition confirms the startling breadth of their legal theories in this case. Because Defendants' efforts to block terrorist content were allegedly imperfect, Plaintiffs seek to hold Defendants liable for atrocities committed by an individual who allegedly became "self-radicalized" by viewing that content. Defendants sympathize with Plaintiffs' losses, but neither § 230 nor the substantive requirements of the Anti-Terrorism Act ("ATA") allow such claims to proceed.

## I.      Section 230 Bars Plaintiffs' Claims

As shown in Defendants' opening brief, § 230 provides a robust immunity against federal and state claims that, like those here, seek to hold an online services provider liable for third-party content. Plaintiffs do not dispute that Defendants provide such services or that third parties created all of the allegedly objectionable content at issue. Instead, Plaintiffs try to evade § 230 based on three arguments: (1) that an uncodified statement of purpose in the recently-enacted Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, impliedly repealed § 230 as applied to terrorism-related claims, even though JASTA nowhere mentions § 230; (2) that Plaintiffs' claims do not treat Defendants as "publishers" to the extent they are based on Defendants' alleged failure to prevent users from opening new versions of previously blocked accounts; and (3) that Defendants are "information content providers" of terrorist content because they displayed ads from third parties next to that content. None of these arguments has merit.

1

## A.     JASTA Did Not Effect An Implied Repeal Of § 230

Plaintiffs' main argument for evading § 230 is that Congress somehow abrogated § 230 when it enacted JASTA, which, among other things, authorized limited forms of secondary liability under the ATA.  This argument fails: nothing in JASTA addresses § 230 or suggests an intent to curtail the important protections for online service providers that have long been recognized by federal law.

Plaintiffs' theory ignores the rule that new federal enactments are presumed not to effectuate an implicit repeal of existing federal statutes.  Courts are not at liberty to "pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).  "'[R]epeals by implication are not favored' and will not be presumed unless the 'intention of the legislature to repeal [is] clear and manifest.'"  *NAHB v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007).  More generally, the Supreme Court has made clear that an implied repeal will be found only where the provisions of the two statutes "are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'"  *Branch v. Smith*, 538 U.S. 254, 273 (2003).

No such manifest intent or conflict is present here.  Although JASTA made two specific amendments to *other* pre-existing statutes—the Foreign Sovereign

Immunities Act ("FSIA") and the ATA—it did not amend (or even reference) the immunity created by § 230 or address in any way the activities of online service providers.  Plaintiffs can point to nothing in the text or drafting history of JASTA that offers any hint that Congress meant to override § 230 or preclude online service providers from asserting its protections in the context of terrorism claims. *See Traynor v. Turnage*, 485 U.S. 535, 548 (1988) (court will not infer a statutory repeal "unless the later statute expressly contradict[s] the original act.").

The operative provision of JASTA at issue, codified at 18 U.S.C. § 2333(d), certainly indicates no such intent.  It states only that, under certain circumstances involving a defined act of international terrorism, "liability may be asserted as to any person" who aids and abets, or conspires with, the "person who committed" that act.  It does not say that liability is *assured*—for example, by providing for liability "notwithstanding" existing defenses or immunities.  *See generally PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621-622 (2011) (explaining that absence of a "notwithstanding" or "*non obstante*" clause indicates that legislature did not intend a repeal by implication).  Nor does it remotely suggest any intent to displace the specific immunity afforded to online service providers.  Congress's silence about § 230 is particularly significant because JASTA did partially curtail a *different* immunity—namely, foreign sovereign immunity for certain acts of international terrorism.  *See* 114 P.L. 222, § 3(a).  To read § 2333(d) as impliedly negating *all*

existing immunities would not only render superfluous JASTA's express (but partial) repeal of *one* immunity; it would also improperly override the careful lines Congress drew in effecting that repeal. *Id.* (negating sovereign immunity *only* for acts of terrorism occurring in the United States). JASTA's partial repeal of the FSIA powerfully suggests that Congress meant to abrogate only that one immunity, not surreptitiously to repeal other statutory immunities nowhere mentioned in the text of the act or in the extended debates about its passage.

Applying JASTA as written creates no "irreconcilable conflict" with § 230. *Branch*, 538 U.S. at 273. JASTA permits secondary liability claims under the ATA in appropriate circumstances, but where such claims seek to hold online service providers liable for publishing third-party content, § 230 immunity continues to apply, just as it does to any other type of claim. That is how statutory immunities always work: one statute creates potential liability, while the immunity shields a defined class from that liability. In *Hui v. Castaneda*, 559 U.S. 799 (2010), for example, the Supreme Court unanimously rejected an argument that a later-enacted liability provision impliedly repealed a pre-existing immunity statute. The Court did not find an "irreconcilable conflict" merely because the later statute created liabilities that would (for some defendants) be barred by the earlier statute. Rather, the Court applied the settled rules of implied repeal—holding that, because nothing in the text or drafting history of the liability provision suggested a "clear

and manifest" intent to repeal the "more comprehensive immunity" contained in the earlier statute, that immunity continued to apply.  *Id.* at 809-810.

The same analysis applies here.  Indeed, courts repeatedly have applied § 230 to immunize service providers against claims arising under other federal statutes, *e.g.*, *Fair Hous. Council v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008) (Fair Housing Act)—including *later* enacted federal statutes, *e.g.*, *Doe v. Backpage.com*, 817 F.3d 12, 22 (1st Cir. 2016) (Trafficking Victims Protection Reauthorization Act of 2008).  Most directly on point is the very recent decision in *Cohen v. Facebook*, 2017 WL 2192621, at *12, n.11 (E.D.N.Y. May 18, 2017), which invoked § 230 to dismiss ATA secondary liability claims over the same objection made here—that JASTA must "control as its later enactment would be a tacit limiting of the CDA," Opp. to Mot. to Dismiss 27 n.6, *Cohen v. Force*, No. 16-cv-4453(NG), ECF No. 29.  This Court should follow the same path.

Plaintiffs' implied repeal argument is especially weak because it rests solely on an uncodified "statement of purpose" that precedes JASTA's operative provisions.  Opp. 8-12 (quoting 114 P.L. 222, § 2(a), (b)).  It is well settled that this kind of statutory preamble cannot change the scope or meaning of the statute's operative provisions—or bring about an implied repeal not supported by those provisions.  *See Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009) (rejecting implied repeal argument based on prefatory purpose clause); *accord*

5

*Kingdomware Tech., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016) (statement of purpose "does not change the plain meaning of the operative clause"); *Litwin v. Am. Express Co.*, 838 F. Supp. 855, 858 (S.D.N.Y. 1993). Beyond that, nothing in JASTA's statement of purpose evidences a "clear and manifest" intention to override § 230 immunity. *Hawaii*, 556 U.S. at 175. Despite its broad language, that statement, like the rest of JASTA, says nothing about online service providers, and it provides no reason to believe that Congress meant to dramatically change the law by eliminating § 230's settled protections for those providers.

### B.    Section 230 Bars Plaintiffs' Account-Provision Theory

Plaintiffs also cannot evade § 230 by casting their claims as concerning the provision of "functionality" in the form of "reconstitute[d]" social media accounts. Opp. 12-16. "[W]hat matters" for § 230 is not the "label[]" put on a claim but "whether the cause of action inherently requires the court to treat the defendant as the publisher or speaker of content provided by another." *Barnes v. Yahoo!*, 570 F.3d 1096, 1101-1103 (9th Cir. 2009). If "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker," that ends the analysis, and § 230 "precludes liability." *Id.* at 1102.

Every court to confront a theory like Plaintiffs' has concluded that the provision of accounts is publishing conduct protected by § 230. The courts in *Fields* and *Cohen*, for example, rejected a nearly identical argument that the claims

in those cases turned on account provision alone.  *See Fields v. Twitter, Inc.*, 200 F.
Supp. 3d 964, 970-974 (N.D. Cal. 2016) ("*Fields I*"); 217 F. Supp. 3d 1116, 1123-
27 (N.D. Cal. 2016) ("*Fields II*"); *Cohen*, 2017 WL 2192621, at *12-13.  Appellate
courts have reached the same conclusion in cases outside the terrorism context.
*See Universal Commc'n v. Lycos*, 478 F.3d 413, 420 (1st Cir. 2007); *Doe v.
MySpace*, 528 F.3d 413, 421 (5th Cir. 2008).  As those cases explain, an account-
provision theory penalizes a protected publishing decision: "the decision to permit
third parties to post content." *Fields I*, 200 F. Supp. 3d at 972.  A provider's
"choices as to who may use its platform," in other words, "are inherently bound up
in its decisions as to what may be said on its platform." *Cohen*, 2017 WL
2192621, at *12.  Accordingly, any "attempt to draw a narrow distinction between
policing accounts and policing content must ultimately be rejected." *Id.* at *12.

The same is true here.  Plaintiffs concede that "the underlying decision to
take [an] account down is a traditional publishing decision" but contend that they
still can evade § 230 by limiting their claims to Defendants' alleged failure to
prevent previously removed accounts to "reconstitute." Opp. 13.  According to
Plaintiffs, Defendants could have prevented such accounts from reconstituting in a
supposedly "content neutral" manner by blocking new accounts that select a
username "closely related" to that of a blocked account and that "send out a large
number of friend/follow requests immediately after account creation." Opp. 14-15.

7

As Defendants have shown (Mem. 22-23), Plaintiffs are wrong that these strategies would not have required Defendants to review third-party content. But in any event, § 230 protection does not turn on whether a proposed strategy for controlling users or what they post would require the service provider to monitor content. *Lycos* and *MySpace* make that clear, applying § 230 to claims premised on platform operators' failures to employ supposedly content neutral strategies, such as barring users from having multiple screen names, *Lycos*, 478 F.3d at 420, and using age-verification software to prevent minors from using the platform, *MySpace*, 528 F.3d at 421-422. As these decisions explain, so long as the objective of a strategy is to control what users publish, § 230 bars claims that are based on an alleged failure to adopt that strategy. That is the situation here.

Plaintiffs' account-reconstitution theory would also defeat one of the primary objectives underlying § 230(c)(1): to "encourage[] interactive computer service providers to self-regulate." *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 408 (6th Cir. 2014); *see also* Mem. 13-14. Under Plaintiffs' theory, immunity would evaporate the moment a service provider "voluntarily" self-regulated by "tak[ing] accounts down," Opp. 12, meaning that only providers who worked to block objectionable content and users in the first instance would lose § 230 protection. That would be a perverse result, and precisely what Congress sought to avoid in enacting § 230. *Jones*, 755 F.3d at 40 (§ 230 "set out to

abrogate" precedent holding a service provider liable "because it had engaged in voluntary self-policing of … third-party content").

### C. Pairing Third-Party Content With Ads Does Not Make Defendants Providers Of That Content

Plaintiffs also are incorrect that § 230 is inapplicable because Defendants supposedly act as "information content providers" by "targeting ads" and creating "composite content." Opp. 16-20. As Defendants have shown (Mem. 16-18), the use of neutral tools to arrange third-party content does not take a service provider outside § 230. The Sixth Circuit has squarely held that service providers do not "create" or "develop" content merely by "augmenting the content generally." *Jones*, 755 F.3d at 410 (quoting *Roommates*, 521 F.3d at 1167-1168); *see also, e.g.*, *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 252, 258 (4th Cir. 2009) (providing the "structure and design" of a website is not content development). Rather, to lose immunity, a service must "contribute[] materially to the alleged illegality of the conduct"—that is, it must participate in "what makes the displayed content allegedly unlawful." *Jones*, 755 F.3d at 410.[1]

---

[1] The cases Plaintiffs cite do not suggest otherwise. *Blumenthal v. Drudge*, 992 F. Supp. 44, 51-52 (D.D.C. 1998), held that AOL was protected by § 230 even though it had paid a third party to provide content and actively promoted that content. In *MCW, Inc. v. Badbusinessbureau.com*, 2004 WL 833595, at *10 (N.D. Tex. Apr. 19, 2004), the court found that the defendants had acted as "information content providers" because they had supplied titles and headers that were themselves defamatory. Here, not only did third parties create the ads, but the ads

9

Here, Plaintiffs do not and cannot claim that by placing third-party ads near user-created content, Defendants contributed to what made that content illegal. Indeed, Plaintiffs' claims are not based on the content of the targeted ads at all. And Plaintiffs acknowledge that the use of targeted advertising applies across all categories of content on Defendants' services and has no special connection to the alleged terrorist content at issue.  Opp. at 17-18.  In short, targeted advertising is a "neutral tool[]" that, under established law, cannot deprive service providers of § 230 protection.  *Jones*, 755 F.3d at 411 (emphasis omitted).[2]

## II.    All Of Plaintiffs' Claims Also Fail On Their Own Terms

Plaintiffs' Opposition also confirms that their claims cannot be sustained even apart from § 230.

---

are not alleged to be unlawful.  Finally, the aspect of *Roommates* on which Plaintiffs rely is inapplicable because the defendant there designed its service to force users to submit unlawful content and then made "aggressive use" of such illegal content in conducting its business.  *Roommates*, 521 F.3d at 1172.

[2] Plaintiffs separately argue that Defendant Google contributed to the unlawful content at issue by sharing advertising revenue with users in some circumstances. Opp. 21-22.  Yet, Plaintiffs again do not (and cannot) explain how a general, neutral policy regarding ad revenue sharing materially contributes to the illegality of terrorist content.  But the court need not address whether § 230 applies to Plaintiffs' revenue-sharing allegations because those sparse allegations fail on their own terms to state any claim under the ATA or the state laws that Plaintiffs have invoked.  As discussed in Defendants' opening brief, Plaintiffs make no plausible allegation that Google actually shared revenue with ISIS—much less that it did so knowingly—or that any such hypothetical revenue sharing had any causal connection with the Orlando attack.  Mem. 42-43.  Plaintiffs offer no response.

### A.    Numerous Defects Defeat Plaintiffs' Secondary Liability Claims

As an initial matter, Plaintiffs do not respond at all to Defendants' showing (Mem. 29-30), that the FAC does not state a viable claim for conspiracy under the ATA.  Plaintiffs therefore have abandoned that claim.  *See, e.g.*, *Doe v. Bredesen*, 507 F.3d 998, 1007-1008 (6th Cir. 2007) (plaintiff abandoned claims they failed to defend in opposing a motion to dismiss); *Cruz v. Capital One, N.A.*, 192 F. Supp. 3d 832, 838-839 (E.D. Mich. 2016) (Lawson, J.) (same).

Plaintiffs' efforts to save their aiding and abetting claim fail on the merits, for multiple reasons.[3]  *First*, Plaintiffs cannot plausibly allege that a designated foreign terrorist organization "committed, planned, or authorized" the Orlando attack, as required by § 2333(d).  *See* Mem. 24-25.  The Opposition (at 25-26) cites Plaintiffs' allegations that ISIS sought to use social media to spread terrorism and inspire terrorist attacks; that Mateen was radicalized by ISIS propaganda and pledged his allegiance to ISIS during the attack; and that ISIS retroactively claimed credit for the attack.  *See also* FAC ¶¶ 174-175, 178-181, 216-225.  But § 2333(d) does not permit claims for attacks merely inspired by a terrorist group's online postings or where the group claims credit after the fact for having inspired the attack.  None of Plaintiffs' allegations establishes that ISIS (as opposed to Mateen) had the kind of *direct*, *deliberate*, and *advance* participation *in this specific attack*

---

[3] The first three reasons also defeat Plaintiffs' abandoned conspiracy claim.

that the three operative words of the statute—"committed, planned, or authorized"—plainly require as a prerequisite for any claim of secondary liability.

*Second*, even if Plaintiffs could establish that ISIS "planned" or "authorized" the Orlando attack, they still could not satisfy § 2333(d), which further requires that the defendant have knowingly provided substantial assistance to (or conspired with) "the person who committed" the relevant act of international terrorism.  18 U.S.C. § 2333(d).  By its terms, this provision allows secondary liability only where aid or agreement was knowingly given to the person who *committed* the terrorist act, not just the organization that "planned" or "authorized" it—and certainly not (as alleged here) the group that merely inspired it.  Here, the only person who "committed" the Orlando shooting was Mateen.  Yet Plaintiffs do not even try to suggest that Defendants "knowingly" assisted or conspired with Mateen himself.  Indeed, Plaintiffs disclaim any suggestion that Defendants had a relationship with Mateen.  Opp. 37.  That defeats any claim under § 2333(d).

*Third*, the Opposition does nothing to establish that the act from which Plaintiffs' injuries arose—the Orlando attack—constituted "international terrorism" as defined in the ATA.  18 U.S.C. § 2331(1)(C).  Plaintiffs do not dispute that that "act" was purely domestic, having been carried out in Orlando, Florida, by a U.S. citizen born in the United States, against victims who also were U.S. citizens.  FAC ¶¶ 9–33, 174–175 nn.26–27.  And although Plaintiffs try to

12

cast their claims as involving actions by ISIS that "transcend national boundaries," Opp. 25-26, they do not show how their allegations about *this incident* transcend national boundaries in the ways demanded by the statute.  They do not allege that Mateen communicated with any international terrorist group in connection with the attack; that his actions were directed or funded by any such group; or that he traveled overseas to train for or plan the attack.  To the contrary, they contend that he was "self-radicalized" in the United States.  FAC ¶¶ 177, 178 n.9, 193, 195.

*Finally*, Plaintiffs' aiding and abetting claim also fails because they cannot show that Defendants knowingly provided "substantial" assistance related to the Orlando attack.  18 U.S.C. § 2333(d).  Plaintiffs tellingly offer no response to Defendants' showing (Mem. 28-29) that their role falls well short of what is required by *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  Nor could they. Nothing in the FAC suggests that any Defendant encouraged Mateen, was essential to or present during the attack, had any relationship with him, or had any intention to assist, or in fact did assist, him in carrying out the Orlando attack, much less for a meaningful duration.  *See id.* at 478, 484.

### B.   Plaintiffs Do Not Seriously Defend Their Direct Liability Claims

#### 1.   Plaintiffs Do Not Even Try To Argue That Defendants Themselves Committed An Act Of International Terrorism

Defendants' opening brief explained that any claim for direct liability under § 2333(a) requires a showing that the defendant *itself* committed an "act of

international terrorism." Mem. 38-40; *see also Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013); *Brill v. Chevron Corp.*, 2017 WL 76894, at *3 (N.D. Cal. Jan. 9, 2017). Plaintiffs ignore this requirement. The Opposition argues at length that the Orlando attack was an act of international terrorism. *E.g.*, Opp. 23. That is incorrect, as explained above. *Supra* pp. 12-13. But even if Plaintiffs were right about the Orlando attack, that still would not be enough to support direct liability because they never suggest that Defendants *themselves* committed that or any other act of international terrorism. Nor do they respond to Defendants' arguments (Mem. 39-40) that Defendants' alleged conduct neither "involve[d] violent acts or acts dangerous to human life," nor "appear[ed] to be intended" to achieve certain specified terrorist purposes. 18 U.S.C. § 2331(1)(A)-(C). Each of these defects requires dismissal of Counts III and IV.

### 2.    The FAC Does Not Adequately Plead Proximate Causation

Plaintiffs also fail to rebut Defendants' showing (Mem. 34-39) that their direct liability claims (under both the ATA and state law) must be dismissed because they do not and cannot allege a sufficient causal connection between the Orlando attack and any "material support" Defendants allegedly provided to ISIS.

As an initial matter, Plaintiffs do not even address the ATA's "by reason of" language. As Defendants explained, the Supreme Court has held that this language requires that the plaintiff plead and prove a *direct relationship* between his or her

14

injury and the defendant's allegedly unlawful conduct.  Mem. 34-35.  Plaintiffs

ignore this point, relying instead on *Boim v. Holy Land Foundation for Relief &*

*Development*, 549 F.3d 685, 697 (7th Cir. 2008).  But *Boim* involved very different

facts than those alleged here—direct monetary contributions to a known terrorist

organization that actually committed (rather than merely inspired) the attack at

issue.  *See id.* at 697-699.  To the extent *Boim* can be read more generally to allow

a "relaxed" causation standard under the ATA (*id.* at 697), the decision is not

controlling here and should not be followed.  In discussing causation, the Seventh

Circuit did not discuss either the statutory text or the Supreme Court's admonition

that when Congress uses "the same words" it ordinarily intends them to "have the

same meaning."  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).  This

Court instead should follow the Second Circuit's approach, which properly

recognizes that the "'by reason of' language" that Congress employed "had a well-

understood meaning" when the statute was enacted, and that the ATA does not

"permit recovery on a showing of less than proximate cause, as the term is

ordinarily used."  *Rothstein*, 708 F.3d at 95.  Plaintiffs' failure even to suggest a

direct relationship between Defendants' alleged material support and the Orlando

attack precludes any direct liability claim.  *See* Mem. 34-39.

    Plaintiffs instead ask this Court to accept a chain of causation that stretches

well beyond what any court has allowed—including courts applying the erroneous

test taken from *Boim*. Mem. 36-38. Even though they admit that Defendants had no direct connection to Mateen (Opp. 37) and "do not directly participate in any of ISIS's activities" (*id*. at 39), Plaintiffs argue that Defendants caused the Orlando attack because unspecified persons associated with ISIS allegedly were among the billions worldwide who used Defendants' open online platforms to disseminate information, and ISIS's propaganda may have helped "inspire" "lone wolves" like Mateen (*id*. at 37) to commit acts of mass violence. Accepting such a staggeringly broad theory would mean that "any plaintiff could hold [Defendants] liable for any ISIS-related injury without alleging any connection between a particular terrorist act and [Defendants'] provision of accounts." *Fields II*, 217 F. Supp. 3d at 1127. And it would relieve ATA plaintiffs of the need even to allege that the terrorist organization in question "use[d] its [own] resources to carry out the attack in which plaintiffs were injured." *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 330 (E.D.N.Y. 2015) (explaining that, without that prerequisite, the "defendant's support in augmenting those resources could not have been a substantial factor in causing that attack"). No ATA precedent supports such expansive liability.

Recognizing this, Plaintiffs resort to strained analogies: they posit a case where Smith provides a gun to Jones who leaves it to be found by Billy who, in turn, shoots Tommy, and they cite a pair of non-ATA cases involving firearms and sparklers. Opp. 37-39. But this comparison only illustrates what is lacking in this

16

case.[4] The conduct at issue here—providing social media accounts that can be used to share information about any conceivable issue—is not remotely comparable to giving a child a loaded gun.  Like all tools, online platforms can be misused.  But Defendants do not peddle firearms or any other "dangerous instrumentality."  *Pratt v. Martineau*, 870 N.E.2d 1122, 1128 (Mass. App. Ct. 2007).  And they do not take on legal responsibility merely because bad actors misuse their services.  Plaintiffs' unbounded causation theory cannot support their claims and would raise serious First Amendment concerns.  *See* Mem. 40-44 & n. 8.[5]

### 3.    The FAC Does Not Plausibly Allege A Violation Of The Material Support Statutes

As explained above (*supra* pp. 13-14), any direct liability claim fails because Defendants' alleged activities do not constitute an "act of international terrorism" as defined in the ATA.  Plaintiffs try to avoid this result by reference to two criminal material support laws, 18 U.S.C. §§ 2339A and 2339B.  Opp. 29-35.  Beyond the fact that such a violation would not be sufficient to impose civil liability under the ATA (*see supra* pp. 13-14; Mem. 39-40, 45-48), Plaintiffs have

---

[4] In *Auto Club Prop.-Cas. Ins. Co. v. B.T.*, the defendant had direct contact with the person (his son) who directly caused plaintiff's injury, 596 F. App'x 409, 410 (6th Cir. 2015)—in contrast to Plaintiffs' admission that "neither [Defendants] nor ISIS had direct contact with Mateen," Opp. 37.  And *United States v. May* involved a criminal sentencing enhancement that did not require the government to demonstrate proximate cause.  430 Fed. App'x 520, 525-526 (6th Cir. 2011).

[5] This same lack of proximate cause also defeats Plaintiffs' state law claims—as they effectively admit by not independently defending those claims.  *See* Opp. 42.

17

failed to allege facts that could amount to a violation of those statutes.

The material support laws are violated only if a defendant acts knowingly, 18 U.S.C. §§ 2339A, 2339B—a scienter requirement that applies with special force where, as here, there are First Amendment considerations at play. Mem. 40-44. But even if providing free online accounts to billions could constitute "material support" (which it cannot), Plaintiffs make no serious argument that any Defendant knew of (and then failed to block) specific accounts that they knew were being used to carry out terrorist acts or that they knew were controlled by ISIS. Mem. 41-42. Plaintiffs instead rely on the common law doctrine of "willful blindness" (Opp. 31, 33-34), but they cannot satisfy that doctrine's strict requirements. Where it applies, willful blindness is a means of establishing that a party had the requisite knowledge. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2010). It requires "deliberate ignorance," *United States v. Lee*, 991 F.2d 343, 350 n.2 (6th Cir. 1993), that is, "active efforts" by the defendant to avoid confirming the truth of a given fact, *Global-Tech*, 131 S. Ct. at 2070-2071. Even to invoke the doctrine here, Plaintiffs would have to allege that Defendants (1) were actually aware of a high probability that they were providing material support to ISIS and (2) made a deliberate and active effort to avoid confirming that fact. *Id.* (And Plaintiffs, of course, would then need to establish a causal link between that knowing material support and the Orlando attack. *See supra* pp. 14-17.)

18

Plaintiffs cannot meet these elements.  They nowhere allege that Defendants were aware of a high probability that particular accounts were being used by ISIS. Vague assertions that Defendants generally knew that unidentified persons tied to ISIS were among Defendants' billions of users (*e.g.*, Opp. 34) cannot establish this element.  *See Hussein v. Dahabshiil Transfer Servs.*, 2017 WL 395210, at *7 (S.D.N.Y. Jan. 27, 2017) (ATA claim dismissed because generalized knowledge of risk "is not the same as knowing or deliberately-indifferent support for terror"); *cf. Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 514-515 (S.D.N.Y. 2008), *aff'd in relevant part*, 600 F.3d 93 (2d Cir. 2010) (no willful blindness where defendant was "*generally* aware" of infringement on its platform but had "no specific knowledge of individual counterfeiters").  Nor have Plaintiffs plausibly alleged that Defendants, having become aware of a high likelihood that ISIS was using particular accounts, made deliberate efforts to avoid confirming that fact.  On the contrary, Plaintiffs' admission that Defendants prohibit and remove terrorist content when it comes to their attention negates any such inference.  *See* FAC ¶¶ 48, 87, 113, 116, 119-120, 123.

## III.   The FAC Should Be Dismissed Without Leave To Amend

Finally, the FAC should be dismissed with prejudice, as any additional attempt to amend would be futile.  *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).  Plaintiffs already have amended once—after having

the benefit of Defendants' initial motion—yet they failed to cure the defects in the

original complaint, and their Opposition (at 43-44) offers no reason to believe that

a further amendment would fare any better, especially in light of § 230's

overarching immunity.  *Accord Jones*, 755 F.3d at 417 (§ 230 immunity should be

addressed at an "earl[y] stage of [the] litigation" because it creates "'an immunity

from suit rather than a mere defense to liability'"); *Haverstick Enterps., Inc. v.*

*Financial Fed. Credit, Inc.*, 32 F.3d 989, 995-996 (6th Cir. 1994) (finding

amendment futile because plaintiffs' claims were barred by qualified immunity).

## CONCLUSION

For all these reasons, Plaintiffs' FAC should be dismissed with prejudice.

Dated:  June 30, 2017                              Respectfully submitted,

s/ with the consent of Kristin A. Linsley         s/*Patrick J Carome*
KRISTIN A. LINSLEY                                PATRICK J. CAROME
klinsely@gibsondunn.com                           patrick.carome@wilmerhale.com
GIBSON, DUNN & CRUTCHER LLP                        WILMER CUTLER PICKERING
555 Mission Street, Suite 3000                       HALE AND DORR LLP
San Francisco, CA  94105-0921                     1875 Pennsylvania Avenue, NW
Telephone:  (415) 393-8200                        Washington, D.C. 20006
Facsimile:  (415) 393-8306                        Telephone:  (202) 663-6000
                                                  Facsimile:  (202) 663-6363
*Attorneys for Defendant*
**FACEBOOK, INC.**                                *Attorneys for Defendant*
                                                  **TWITTER, INC.**
s/ with the consent of Brian M. Willen
BRIAN M. WILLEN (P75110)
bwillen@wsgr.com                                  (Complete list of counsel included
WILSON SONSINI                                    on the signature page of Defendants'
   GOODRICH & ROSATI, P.C.                        opening brief.)
1301 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 999-5800

*Attorneys for Defendant*
**GOOGLE INC.**

20

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2017, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By:   <u>_s/ Patrick J. Carome_____</u>
      Patrick J. Carome