

## Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022

PHONE 212.999.5800
FAX 212.999.5899
**www.wsgr.com**

October 5, 2017

**Via CM/ECF**

The Honorable David M. Lawson
United States District Court
   for the Eastern District of Michigan
The Theodore Levin U.S. Courthouse
231 West Lafayette Blvd., Room 718
Detroit, MI 48226

      Re:   ***Crosby, et al. v. Twitter, Inc., et al.***
             **Case No. 2:16-CV-14406-DML-DRG**

Dear Judge Lawson:

      In connection with yesterday's oral argument, we are providing the Court with complete citations, and copies, of three cases that Defendants' counsel referenced during argument but did not cite in the briefs supporting their pending motion to dismiss:

- *Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009) (Tab 1)

- *Ryan v. Hunton & Williams*, No. 99-CV-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) (Tab 2)

- *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296 (2017) (Tab 3)

AUSTIN   BEIJING   BOSTON   BRUSSELS   HONG KONG   LOS ANGELES   NEW YORK   PALO ALTO
SAN DIEGO   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, DC   WILMINGTON, DE

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable David M. Lawson
October 5, 2017
Page 2

Respectfully submitted,

s/ with the consent of Kristin A. Linsley | s/ Brian M. Willen
--- | ---
KRISTIN A. LINSLEY | BRIAN M. WILLEN (P75110)
klinsley@gibsondunn.com | bwillen@wsgr.com
JEANA BISNAR MAUTE | WILSON SONSINI
jbisnarmaute@gibsondunn.com | GOODRICH & ROSATI, P.C.
SHELI R. CHABON | 1301 Avenue of the Americas
schabon@gibsondunn.com | New York, NY 10019
GIBSON, DUNN & CRUTCHER LLP | Telephone: (212) 999-5800
555 Mission Street, Suite 3000 | 
San Francisco, CA 94105-0921 | ***Attorneys for Defendant***
Telephone: (415) 393-8200 | **GOOGLE INC.**
Facsimile: (415) 393-8306 | 
 | s/ with the consent of Patrick J. Carome
THOMAS W. CRANMER (P25252) | SETH P. WAXMAN
cranmer@millercanfield.com | seth.waxman@wilmerhale.com
DAVID D. O'BRIEN (P65532) | PATRICK J. CAROME
obrien@millercanfield.com | patrick.carome@wilmerhale.com
MILLER, CANFIELD, PADDOCK & | WILMER CUTLER PICKERING
  STONE, PLC | HALE AND DORR LLP
840 West Long Lake Road, Suite 200 | 1875 Pennsylvania Avenue, NW
Troy, MI 48098 | Washington, D.C. 20006
(248) 267-3381 | Telephone: (202) 663-6800
 | Facsimile: (202) 663-6363
***Attorneys for Defendant*** | 
**FACEBOOK, INC.** | LEONARD M. NIEHOFF (P36695)
 | lniehoff@honigman.com
 | J. MICHAEL HUGET (P39150)
 | mhuget@honigman.com
 | HONIGMAN, MILLER, SCHWARZ &
 |   COHN, LLP
 | 130 South First Street, 4th Floor
 | Ann Arbor, MI 48104
 | (734) 418-4246
 | 
 | ***Attorneys for Defendant***
 | **TWITTER, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2017, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system, which will send a copy to all counsel of record.

*s/ Brian M. Willen*
Brian M. Willen (P75110)

Tab 1

660 F.Supp.2d 410
United States District Court,
E.D. New York.

Karen GOLDBERG, Chana Goldberg, Esther
Goldberg, Yitzhak Goldberg, Shoshana Goldberg,
Eliezer Goldberg, Yaakov Moshe Goldberg
and Tzvi Yehoshua Goldberg, Plaintiffs,
v.
UBS AG, Defendant.

No. CV–08–375 (CPS).
|
Sept. 24, 2009.

**Synopsis**

**Background:** Widow and children of Canadian citizen and
Israeli resident killed in terrorist attack on Jerusalem bus
brought action against international financial institution
seeking to impose liability on institution for its alleged role
in facilitating transfer of funds to terrorist group allegedly
responsible for bombing. Institution moved to dismiss.

**Holdings:** The District Court, Sifton, Senior District
Judge, held that:

[1] plaintiffs had standing to bring action;

[2] as matter of first impression, term "substantially the
same," in context of forum non conveniens provisions of
Anti-Terrorism Act (ATA), requires a foreign court to be
essentially the same in both type and magnitude as that
afforded in United States courts;

[3] remedies available under Israeli law were not
"substantially similar" to those available in American
court;

[4] plaintiffs stated claim that institution was liable for "act
of international terrorism" under civil liability provisions
of ATA;

[5] institution had requisite scienter in completing funds
transfers, as was required under civil liability provisions
of ATA;

[6] plaintiffs stated adequate causal nexus between
institution's transfer of monies and terrorist attack, as
required for relief under civil remedies of ATA; and

[7] plaintiffs stated claim that institution provided support
for "foreign terrorist organization" in violation of ATA.

Motion granted in part and denied in part.

West Headnotes (19)

**[1]** **Federal Civil Procedure**
🔑 Pleading

**Federal Civil Procedure**
🔑 Matters deemed admitted;acceptance as
true of allegations in complaint

While the party invoking federal jurisdiction
bears the burden of establishing standing, at
the pleading stage general factual allegations
that the injury resulted from the defendant's
conduct may suffice, because on a motion
to dismiss the court presumes that general
allegations embrace those specific facts that
are necessary to support the claim.

1 Cases that cite this headnote

**[2]** **War and National Emergency**
🔑 Private Remedies

Widow and children of Canadian citizen and
Israeli resident killed in terrorist attack on
Jerusalem bus had standing to bring action
against international financial institution
seeking to impose liability on institution for
its alleged role in facilitating transfer of
funds to terrorist group allegedly responsible
for bombing, since there was sufficient
causal connection linking institution's alleged
wire transfers for group's main fundraising
organization and bombing; plaintiffs alleged
that institution provided material support to
terrorist group in maintaining account for
organization, in knowingly transferring to
entities controlled by group, that terrorist
group's activities were fueled by funds that
flowed into organization, and that group

was responsible for bus bombing in which Canadian citizen was killed.

2 Cases that cite this headnote

**[3]** **Federal Civil Procedure**
🔑 In general;injury or interest

Where intervening acts of third-parties exist, plaintiffs must at least allege the existence of each of the intermediate causal links in the chain from defendant's action through to the ultimate harm in order to assert standing to bring a claim.

2 Cases that cite this headnote

**[4]** **Federal Courts**
🔑 Forum Non Conveniens

**Federal Courts**
🔑 Discretion in general

**Federal Courts**
🔑 Convenience of parties and witnesses; location of evidence

The doctrine of "forum non conveniens" (FNC) grants a court discretion to resist imposition upon its jurisdiction, even though jurisdiction may be lawfully exercised and venue is technically proper, where the convenience of the parties and interests of justice favor trial in another forum.

2 Cases that cite this headnote

**[5]** **Federal Courts**
🔑 Parties' choice of forum;forum-shopping

**Federal Courts**
🔑 Public and private interests;balancing interests

**Federal Courts**
🔑 Availability and adequacy

In determining whether to apply forum non conveniens, the court must: (1) determine the degree of deference properly accorded to plaintiff's choice of forum; (2) determine whether an alternative and adequate forum exists; and (3) balance private and public interests implicated in choice of forum.

Cases that cite this headnote

**[6]** **Federal Courts**
🔑 Public and private interests;balancing interests

**Federal Courts**
🔑 Availability and adequacy

To prevail on a motion to dismiss based on forum non conveniens, defendant must typically demonstrate that an adequate alternative forum exists and that, considering the relevant private and public interest factors, the balance of convenience tilts strongly in favor of trial in foreign forum.

2 Cases that cite this headnote

**[7]** **Federal Courts**
🔑 Alternate Forum

Term "substantially the same," in context of forum non conveniens provisions of Anti-Terrorism Act (ATA), requires a foreign court to be essentially the same in both type and magnitude as that afforded in United States courts; in passing ATA, Congress explicitly attempted to extend United States jurisdiction to terroristic acts occurring abroad, and ATA was designed to give American nationals broad remedies in procedurally privileged United States forum. 18 U.S.C.A. § 2334(d).

2 Cases that cite this headnote

**[8]** **Federal Courts**
🔑 Availability and adequacy

Remedies available under Israeli law were not "substantially similar" to those available in American court, as was required for forum non conveniens under provisions of Anti-Terrorism Act (ATA); Israeli law did not contain provisions for treble damages of attorney fees as were provided under ATA, and Israel lacked mechanism by which plaintiffs could obtain compensation for their emotional or non-economic injuries, as Israeli courts excluded emotional harm from loss-of-consortium damages by limiting those

damages to economic value of substitute's cost on market and Israeli law provided no compensation in wrongful death suit for loss of companionship, affection and intimacy by immediate family members of victim. 18 U.S.C.A. § 2334(d).

3 Cases that cite this headnote

**[9]    War and National Emergency**
      Private Remedies

Widow and children of Canadian citizen and Israeli resident killed in terrorist attack on Jerusalem bus failed to state claim, under Anti-Terrorism Act (ATA), that international financial institution aided and abetted citizen's murder through its alleged role in facilitating transfer of funds to terrorist group allegedly responsible for bombing, since deceased victim was not United States citizen or national. 18 U.S.C.A. §§ 2332(a–c), 2333(a).

1 Cases that cite this headnote

**[10]    War and National Emergency**
      Private Remedies

Widow and children of Canadian citizen and Israeli resident killed in terrorist attack on Jerusalem bus failed to state claim, under Anti-Terrorism Act (ATA), that international financial institution aided and abetted act of international terrorism through its alleged role in facilitating transfer of funds to terrorist group allegedly responsible for bombing; institution's alleged actions in performing three wire transfers for group's fundraising organization was not "substantial assistance" required to support aiding and abetting claim. 18 U.S.C.A. § 2333(a).

4 Cases that cite this headnote

**[11]    War and National Emergency**
      Private Remedies

Provision in Anti-Terrorism Act (ATA) which permitted civil action for party "injured in his person, property, or business," was not limited to physical injures, and thus, could

include claims for non-physical, emotional and pecuniary damages. 18 U.S.C.A. § 2333(a).

1 Cases that cite this headnote

**[12]    War and National Emergency**
      Private Remedies

Allegations that international financial institution was liable for knowingly providing financial services to alleged terrorist group was sufficient for widow and children of Canadian citizen and Israeli resident killed in terrorist attack on Jerusalem bus to state claim that such violation constituted "act of intentional terrorism," as required for institution to be liable under civil liability provisions of Anti-Terrorism Act (ATA). 18 U.S.C.A. §§ 2331, 2333(a), 2339B.

2 Cases that cite this headnote

**[13]    War and National Emergency**
      Private Remedies

Allegations that international financial institution consciously disregarded fact it was supporting terrorist organization despite strong probability that its services would be used to further organization's terrorist activities, that institution's client, and that institution had actual knowledge of ties of its client, the organization's fundraising entity, and the recipient of the transfer, to the organization, and would in all likelihood use institution's services to further terrorist activities, was sufficient for widow and children of Canadian citizen and Israeli resident killed in terrorist attack on Jerusalem bus to state that institution had requisite scienter in completing acts, as required for relief under civil liability provisions of Anti-Terrorism Act (ATA). 18 U.S.C.A. § 2333(a).

3 Cases that cite this headnote

**[14]    War and National Emergency**
      Private Remedies

Allegations that international financial institution provided material support to terrorist group in maintaining account for organization, in knowingly transferring monies to entities controlled by group, that terrorist group's activities were fueled by funds that flowed into organization, and that group was responsible for bus bombing in which Canadian citizen-Israeli resident was killed was sufficient for widow and children of citizen killed in terrorist attack on Jerusalem bus to state causal nexus between institution's transfer of monies and terrorist attack, as required for relief under civil liability provisions of Anti-Terrorism Act (ATA). 18 U.S.C.A. § 2333.

2 Cases that cite this headnote

**[15]    Statutes**
     👉 Extraterritorial operation

Congressional intent that a statute apply to conduct outside of the territorial jurisdiction of the United States must be clear; in the absence of clear intent there is a presumption against such extraterritorial application.

1 Cases that cite this headnote

**[16]    Constitutional Law**
     👉 Legislative jurisdiction; extraterritoriality

Even where Congressional intent is clear, Due Process Clause limits Congress's power to regulate foreign entities' conduct outside of United States and requires a sufficient nexus between conduct and United States' interest so that applying U.S. law would not be arbitrary or fundamentally unfair. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[17]    War and National Emergency**
     👉 Private Remedies

Liability may be found under Anti-Terrorism Act (ATA) even where support was not provided directly to a Foreign Terrorist

Organization (FTO); such a circumstance may be found where an entity provides support to an alias or agent of an FTO. 18 U.S.C.A. § 2339B.

3 Cases that cite this headnote

**[18]    War and National Emergency**
     👉 Anti-Terrorism Measures

A violation of Anti-Terrorism Act (ATA) may be found where an entity provides money or support to an organization knowing that the ultimate beneficiary is Foreign Terrorist Organization (FTO). 18 U.S.C.A. § 2339B.

3 Cases that cite this headnote

**[19]    War and National Emergency**
     👉 Private Remedies

Allegations that international financial institution knew that ultimate beneficiary of wire transfers made by its client, an alleged fundraising organization for terrorist group, was Foreign Terrorist Organization, was sufficient for widow and children of Canadian citizen and Israeli resident killed in terrorist attack on Jerusalem bus to state that institution provided support for "foreign terrorist organization" in violation of Anti-Terrorism Act (ATA). 18 U.S.C.A. § 2339B.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*413** Aaron Schlanger, Gary M. Osen, Joshua D. Glatter, Ari Ungar, Osen LLC, Oradell, NJ, Neil L. Glazer, Stephen H. Schwartz, Steven M. Steingard, Kohn Swift & Graf P.C., Philadelphia, PA, for Plaintiffs.

Daniel Lucas Cantor, Jonathan Rosenberg, O'Melveny & Myers LLP, New York, NY, for Defendant.

MEMORANDUM OPINION AND ORDER

SIFTON, Senior District Judge.

Plaintiffs Karen Goldberg and her seven children, Chana Goldberg, Esther Goldberg, Yitzhak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Yaakov Moshe Goldberg, and Tzvi Yehoshua Goldberg, commenced this action against defendant bank UBS AG on January 28, 2008. Plaintiffs bring claims under the civil remedy provisions of the Anti–Terrorism Act ("ATA"), 18 U.S.C. § 2333(a) [1] alleging that UBS is liable for: (1) aiding and abetting the murder or attempted murder of a United States citizen or causing the commission or attempted commission of physical violence upon United States Citizens in violation of 18 U.S.C. § 2332(a)-(c) [2] and 18 U.S.C. § 2333(a); (2) **414** committing acts of international terrorism in violation of 18 U.S.C. § 2339B(a)(1) [3] and 18 U.S.C. § 2333(a); and (3) collecting and transmitting funds on behalf of a terrorist organization in violation of 18 U.S.C. § 2339C [4] and 18 U.S.C. § 2332(a). Presently before this court is defendant's motion to dismiss on grounds of (1) lack of standing; (2) *forum non conveniens;* (3) unconstitutionality of the ATA [5] as applied to UBS's conduct; and (4) failure to satisfy the pleading standards of Federal Rule of Civil Procedure 8. For the reasons set forth below, defendant UBS AG's motion is granted to dismiss the first count of plaintiffs' Complaint, and denied in all other respects.

[1] 18 U.S.C. § 2333(a) provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

[2] 18 U.S.C. § 2332(a)-(c) provide criminal penalties for the killing or conspiracy to kill "a national of the United States" by an individual outside the United States, and for "whoever outside the United States engages in physical violence ... with the result that serious bodily injury is caused to a national of the United States."

[3] 18 U.S.C. § 2339B(a)(1) provides criminal and civil penalties for "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so,"

and requires that "[t]o violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization ... that the organization has engaged or engages in terrorist activity ... or that the organization has engaged or engages in terrorism."

[4] 18 U.S.C. § 2339C provides criminal and civil penalties for whoever "by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out ... [an act] intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

[5] The Anti–Terrorism Act of 1990("ATA") comprises §§ 2332–2338 of title 18 of the U.S.Code, excluding sections 2332a-h. The Act was enacted in 1990, repealed for technical reasons in 1991, and reenacted virtually unchanged as part of the Federal Courts Administration Act of 1992. *See* Pub.L. No. 102– 572, § 1003, 106 Stat. 4506, 4521–24 (1992). The related provisions in §§ 2332a-h and §§ 2339– 2339D were enacted by various other laws, including the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub.L. No. 107–56, 115 Stat. 272 (2001). For simplicity's sake, I refer to all of these provisions collectively as "the ATA."

## I. BACKGROUND

The following facts are drawn from plaintiffs' Complaint and the affirmations, affidavits and exhibits submitted in connection with the present motion. These facts alleged in the Complaint are taken as true for purposes of the motion to dismiss, except as noted.

### A. The Parties

Plaintiffs are the widow and children of Stuart Scott Goldberg, a Canadian citizen and Israeli resident killed in a January 29, 2004 terrorist attack on a Jerusalem

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

bus.[6] Complaint ("Compl.") ¶¶ 5,7. Plaintiffs are each dual citizens of the United States and Israel and currently reside in the State of Israel. Compl. ¶¶ 7–9.

[6]  That Stuart Goldberg was an Israeli resident appears nowhere in the Complaint, but that fact is on the Israeli Ministry of Foreign Affairs Website in a report on the victims of the Bus 19 bombing. As the website's authenticity is not disputed and appears not reasonably subject to question, at least on this type of issue, I assume Israel to have been Mr. Goldberg's country of residence. *Oneida Indian Nation of New York v. State of N.Y.,* 691 F.2d 1070 (2d Cir.1982) (citing Fed.R.Evid. 201(b)).

Defendant USB AG[7] ("UBS") is an international **\*415** financial institution headquartered in Basel and Zurich, Switzerland, with offices in, among other locations, Israel and the United States.[8] Compl. ¶¶ 12–14. UBS's U.S. corporate headquarters is currently located in New York City. Compl. ¶ 13.

[7]  According to UBS's website, the name "UBS" came from a predecessor firm—the Union Bank of Switzerland. However, UBS is no longer considered an acronym. The "AG" in the company's name means *Aktiengesellschaft,* which is the equivalent to a shareholder-based corporation in the U.S. Their papers identify the party simply as "UBS AG"

[8]  Defendant urges that the court take judicial notice of various facts contained on UBS's own corporate website, including the number of UBS's worldwide offices and employees, and the fact that UBS's Israel office is not licensed to provide banking services in Israel. I decline to do so. While the court may take judicial notice of the contents of a website for the fact that such information was published and in the public realm, UBS attempts to introduce these facts here for their truth. *See Muller–Paisner v. TIAA,* 289 Fed.Appx. 461, 466 n. 5 (2d Cir.2008) (judicial notice may be taken of the defendant's website for the fact of its publication). Facts on Defendant's own corporate website do not fall into the category of a "source[ ] whose accuracy cannot reasonably be questioned" as required by Federal Rule of Evidence 201. Finally, even if the Court were to find such facts unimpeachable, the Defendant has not stated whether the facts in question were true as of the date of the 2003–04 banking transactions that allegedly give rise to Defendant's liability in this case.

### B. Hamas and its Financing

Plaintiffs' claims all arise out of a terrorist bus bombing that occurred in Israel in January of 2004 and killed their father or spouse. Through this litigation, they seek to impose liability on the defendant for its alleged role in facilitating the transfer of funds to a terrorist group, Hamas,[9] which was allegedly responsible for the bombing.

[9]  "Hamas" is an acronym for "Harakat al-Muqawama al-Islamiyya," meaning Islamic Resistance Movement. Compl. ¶ 1 n. 1.

Plaintiffs allege that Hamas is a terrorist organization founded in 1987 as an offshoot of an Egyptian radical Islamic group, the Muslim Brotherhood. Compl. ¶ 21. It has, according to the complaint, openly acknowledged perpetrating attacks which have resulted in the deaths of numerous civilians in Israel and the Gaza strip. Compl. ¶¶ 6, 22, 25–27. Because of its announced agenda, Hamas was designated a terrorist organization and "unlawful organization" by the State of Israel beginning in 1989. Compl. ¶ 23. The United States has designated Hamas as a Foreign Terrorist Organization ("FTO") since 1997 and as a Specially Designated Global Terrorist ("SDGT") since 2001. Compl. ¶¶ 31–32. Among those said to have been killed in Hamas's terrorist attacks have been a number of United States citizens. Compl. ¶¶ 30, 33.

While the Hamas organization includes both a terrorism component and a religious/social component, (Compl. ¶ 36), the two are, according to the complaint, interrelated, and the religious and social infrastructure used in part to recruit and train terrorists, while funds raised by Hamas for purportedly charitable purposes are in fact, according to the complaint, used to finance terrorist activities. Compl. ¶¶ 36, 43.

Financing for Hamas is said to be principally procured through an extensive network of "charities" and organizations that together make up the "Union of Good," an umbrella organization established in 2000 to provide financial support for Hamas and its agents. Compl. ¶¶ 45–47. Among the members of the Union of Good is the Association de Secours Palestiniens ("ASP"), an organization headquartered in Basel, Switzerland. Compl. ¶¶ 58, 61. According to the U.S. Treasury Department, ASP is the primary fundraiser for Hamas **\*416** in Switzerland. Compl. ¶ 65. ASP was identified as

a Hamas fundraising entity by President Bush on October 22, 2003 and placed on the Office of Foreign Assets Control ("OFAC") list as an SDGT. Compl. ¶¶ 63–64. ASP's parent organization, Comité de Bienfaisance et de Secours aux Palestinians, a/k/a Comité Bienfaisance pour la Solidarite avec la Palestine ("CBSP"), which is also a member of the Union of Good and shares the same chairman as ASP (Compl. ¶¶ 44, 60), has similarly been designated as a SDGT by the U.S. Government. Compl. ¶ 59. According to the Treasury Department, CBSP is the primary fundraiser for Hamas in France. Compl. ¶ 65.

Plaintiffs allege that despite the U.S. Government's designation of ASP as an SDGT on August 22, 2003, UBS continued to provide services for ASP, including transferring money from ASP's account to the account to a West Bank institution, the Tulkarem Zakat Committee. Compl. ¶¶ 69, 72–75. Three transfers are specifically alleged to have been made between October 3, 2003 and January 8, 2004, totaling approximately $25,000. *Id.* The recipient of the money, the Tulkarem Zakat Committee, was designated as an "unlawful organization," (but not a "terrorist organization," a separate designation) by the Israeli government prior to the date of the transfers. Compl. ¶ 80.

### C. The Bus 19 Attack

On January 29, 2004, suicide bomber Ali Ju'ara (aka Ali Jaara) is alleged to have detonated a bomb on Bus No. 19 in Jerusalem, killing 11 people and wounding 50 others. Compl. ¶ 15. Among those killed was Stuart Scott Goldberg. Compl. ¶ 7. Two terrorist groups claimed responsibility for the attack: Hamas and the Al Aqsa Martyrs' Brigades. Compl. ¶ 16. An Israeli Military Court subsequently indicted Nufal Adawin, identified as a Hamas member, for his involvement in the attack. Compl. ¶ 17. The Israeli indictment alleged that in planning the attack Adawin collaborated with at least one other Hamas member and was assisted by another terrorist group, Tanzim–Fatah. Compl. ¶¶ 18–19.

## II. DISCUSSION

The plaintiffs seek to hold defendant UBS liable for having provided financial services to the alleged terrorist organization, Hamas. Defendant raises several objections to the case being heard in this court, which I address first,

before turning to the substance of the motion to dismiss. Jurisdiction is alleged pursuant to 28 U.S.C. § 1331.

### A. Standing

**[1]** The threshold issue is whether plaintiffs have standing to bring this action. The standing requirement serves as a constitutional limitation on the scope of cases that may be heard by federal courts. *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Taking its basis in the Constitution's Article III, § 2 provision that federal courts are empowered to decide only "cases" and "controversies," the analysis of whether a particular plaintiff has standing is composed of three essential elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the **\*417** court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision".

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted; alteration in original). In deciding questions of standing on the basis of the pleadings, the court "accepts as true all material allegations of the complaint and construes the complaint in favor of the complaining party." *Kendall v. Employees Retirement Plan of Avon Prods.,* 561 F.3d 112, 118 (2d Cir.2009). While the party invoking federal jurisdiction bears the burden of establishing standing, at the pleading stage general factual allegations that the injury resulted from the defendant's conduct may suffice, because "on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 (citing *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990)).

The issue here is what constitutes a causal connection sufficiently strong to render a plaintiff's injury "fairly ... trace[able] to the challenged action of the defendant."

*Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136. Specifically defendant argues that plaintiffs have failed to plead a sufficient causal connection to establish standing because the actions of several third parties (e.g. Nafal Adawin, Ali Ju'ara and various members of Hamas) "break[ ] the causal chain" connecting defendant's actions to plaintiffs' alleged injury. Defendant's Memorandum of Law in Support of UBS's Motion to Dismiss ("Def. Br.") at 24 (citing *Greenberg v. Bush,* 150 F.Supp.2d 447, 455 (E.D.N.Y.2001)). Defendant further contends that plaintiffs have not, and cannot, show that the Bus 19 attack "most likely would not have occurred if UBS had not processed ASP's three wire transfers." Def. Br. at 25.

**[2]  [3]**  I conclude that plaintiffs have pled a sufficient causal nexus to establish standing and that defendant's arguments are in this context without merit. It is well-settled that the fact that a plaintiff's injury was not caused directly by the defendant is not itself a bar to standing. *See Heldman on Behalf of T.H. v. Sobol,* 962 F.2d 148, 156 (2d Cir.1992) ("A plaintiff does not lack standing simply by virtue of the indirectness of his or her injury."). Rather, in order to establish that their alleged injury is "fairly" traceable to the challenged action, plaintiffs must simply allege facts which, if true, would demonstrate a causal connection between the defendant's conduct and the alleged injury. Where intervening acts of third-parties exist, plaintiffs must at least allege the existence of each of the intermediate causal links in the chain from Defendant's action through to the ultimate harm. *Sobol,* 962 F.2d at 156. Here, while a number of independent third parties were involved in the attack on Bus 19, plaintiffs have alleged a coherent and plausible causal nexus linking UBS's alleged wire transfers for ASP to the bombing of Bus 19. Thus, plaintiffs plausibly allege that UBS provided material support to Hamas in maintaining an account for ASP, (Compl. ¶ 88), and in knowingly transferring money to Hamas-controlled entities (Compl. ¶ 86). They further allege that Hamas's terrorist activities are fueled by the funds that flow into the organization, (Compl. ¶ 68) (quoting testimony by U.S. Treasury Department General Counsel David Aufhauser before the Financial Services Committee, Subcommittee on Oversight and Investigations, Sept. 24, 2003), and that Hamas was responsible for the Bus 19 bombing in which Stuart Scott Goldberg was killed. Compl. ¶¶ 6, 17–18, 20. This is sufficient **\*418** to meet their burden of establishing standing at this stage in the pleadings. *Kendall,* 561 F.3d at 118. *See also United States v. SCRAP,*

412 U.S. 669, 689, 93 S.Ct. 2405, 2417, 37 L.Ed.2d 254 (1973) ("If, as the [defendants] now assert, these allegations were in fact untrue, then the appellants should have moved for summary judgment on the standing issue").

*United States v. SCRAP* is illustrative of the relatively low burden a plaintiff must meet at the pleading stage in order to establish causation for standing purposes. In *SCRAP,* an environmental group was held to have standing to challenge the Interstate Commerce Commission's failure to suspend a 2.5% freight rate surcharge proposed by a number of railroad companies. Plaintiff's claimed causal connection was that:

> a general rate increase would [ ] cause increased use of nonrecyclable commodities as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area.

*SCRAP,* 412 U.S. at 688, 93 S.Ct. at 2416. While the court concluded the causal connection was attenuated, plaintiffs were nonetheless found to have standing because they had laid out the series of links which, if true, would causally connect the challenged action to the ultimate harm. *Id.* The alleged causal nexus here is more direct.

Defendant further contends that plaintiffs lack standing since they did not allege, and can not prove, that the Bus 19 attack "most likely would not have occurred if UBS had not processed ASP's three wire transfers." Def. Br. at 24. However, the law does not impose such a requirement. Were defendant's "but-for" causation requirement in fact the applicable standard for establishing standing, federal courts would lack jurisdiction over any case or controversy where several acts each independently would have sufficed to cause the harm. [10] Under such a standard, plaintiffs' pleading burden in establishing standing would often exceed its burden on the merits, since but-for causation is not required for plaintiffs to ultimately succeed at trial. *See, e.g., Linde v. Arab Bank PLC,* 384 F.Supp.2d. 571, 584–85 (E.D.N.Y.2005) (holding that in order to prevail on the merits "there

is no requirement of a finding that the suicide bomber would not, or could not, have acted but for the assistance of Arab Bank."). Defendant has cited no case support for the proposition that in order to establish standing, a plaintiff must allege that a particular harm "most likely would not have occurred" but for the defendant's actions. Rather, courts in this district have held that a plaintiff must allege facts "from which it could be reasonably inferred that, absent Defendants' unlawful acts, there is a substantial probability" that plaintiffs wouldn't have suffered harm. *Greenberg v. Bush,* 150 F.Supp.2d 447, 455 (E.D.N.Y.2001). What plaintiffs must allege are facts from which it may be inferred that cessation of the defendant's allegedly illegal activity would "make an appreciable difference" in bringing about the harm which is the subject of the complaint. *Allen,* 468 U.S. 737, 758, 104 S.Ct. 3315, 3328. Here plaintiffs have alleged facts which, if true, demonstrate **\*419** that UBS's client ASP is "a pivotal part of Hamas's fundraising structure and a significant source of Hamas's financing," Compl. ¶ 84, and that terrorist activity, including the act that killed Stuart Scott Goldberg, depends on financing of a type similar to the three monetary transfers from ASP to the Tulkarem Zakat Committee allegedly effected by UBS. Compl. ¶ 43. Plaintiffs have accordingly met their burden of establishing a causal nexus between the defendant's conduct and the harm complained of for the purposes of standing.

10   A concept often described as "overdetermination." *See, e.g.,* Derek Turner, *Making Prehistory: Historical Science and the Scientific Realism Debate* 38 (2007) (providing, as an illustration of overdetermination, an incident where a firing squad executes an individual, but any one shot would have been sufficient to kill him.)

### B. Forum Non Conveniens

**[4]**   I now turn to the question of whether this action should dismissed on *forum non conveniens* grounds. The doctrine of *forum non conveniens* ("FNC") grants a court discretion, "to resist imposition upon its jurisdiction," even though jurisdiction may be lawfully exercised and venue is technically proper, where the convenience of the parties and interests of justice favor trial in another forum. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). In considering the Defendant's forum non conveniens argument, I have relied on the plaintiffs' Complaint, and on the affirmations, affidavits

and exhibits submitted in connection with the present motion, but have not presumed all facts pleaded to be true. *See Alcoa S.S. Co. v. M/V Nordic Regent,* 654 F.2d 147, 158–59 (2d Cir.1980) (en banc) ("[I]t is the well established practice ... to decide [forum non conveniens] motions on affidavits"), *cert. denied,* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980); *see also Construtora Norbeto Oderbrecht S.A. v. Gen. Elec. Co.,* No. 07–cv–8014 (CM), 2007 WL 3025699, at *1 (S.D.N.Y. Oct. 12, 2007) ("On a motion to dismiss pursuant to forum non conveniens, a court considers not only the allegations of the pleadings but all evidence before it, and does not presume the facts pleaded to be true.")

### 1. Traditional FNC Analysis vs. 18 U.S.C. § 2334(d)
The parties agree that *forum non conveniens* analysis is governed by the ATA, which includes explicit provisions concerning that subject in 18 U.S.C. § 2334(d). However, the parties disagree regarding the extent to which the language of 18 U.S.C. § 2334(d) dictates an analysis stricter than that typically used.

**[5]**   **[6]**   In the usual case, the Second Circuit employs a three-part FNC analysis. First, the court must determine the degree of deference properly accorded to plaintiff's choice of forum. *Iragorri v. United Tech. Corp.,* 274 F.3d 65, 72 (2d Cir.2001). Second, the court must determine whether an alternative and adequate forum exists. *Id.* at 73. Lastly, the court must balance the private and public interests implicated in the choice of forum. *Id.* at 73–74. To prevail on a motion to dismiss based on *forum non conveniens,* a defendant must typically demonstrate that an adequate alternative forum exists and that, considering the relevant private and public interest factors set forth in *Gilbert,* the balance of convenience tilts strongly in favor of trial in the foreign forum. *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167 (2d Cir.1991).

In cases brought under 18 U.S.C. § 2333, the ATA prescribes a different standard. That provision, codified as 18 U.S.C. § 2334(d), provides that:

The district court shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience or inappropriateness of the forum chosen, unless-

(1) the action may be maintained in a foreign court that has jurisdiction over **\*420** the subject matter and over all the defendants;

(2) that foreign court is significantly more convenient and appropriate; and

(3) that foreign court offers a remedy which is substantially the same as the one available in the courts of the United States.

The requirements of 18 U.S.C. § 2334(d) are on the face of it more difficult to meet than those of traditional FNC analysis. The few courts that have addressed the issue have reached the same conclusion. *See Linde,* 384 F.Supp.2d at 591 n. 13 ("Defendant has failed to meet its burden of showing that this *heightened* standard for dismissal under the ATA has been met.") (emphasis added); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.,* 153 F.Supp.2d 76, 99–100 (D.R.I.2001) (citing heightened standard imposed by 2334(d)). Secondary sources are in accord. *See,* John D. Shipman, Comment, *Taking Terrorism to Court: A Legal Examination of the New Front in the War on Terrorism,* 86 N.C. L.Rev. 526, 554 (2008) (citing *Linde* and noting heightened standard); Captain Gal Asael, *The Law in the Service of Terror Victims; Can the Palestinian Authority be Sued in Israeli Civilian Courts for Damages Caused by its Involvement in Terror Acts During the Second Intifada?* 2008 Army Law. 1, 28 (Jul 2008) (citing higher standard imposed by § 2334(d)).

The difference between the two standards is most visible in their provisions concerning the suitability of the proposed alternate forum. Under the traditional FNC analysis, a defendant must be able to show that an "adequate alternative forum exists," *Iragorri,* 274 F.3d at 73. However, in order to qualify as "adequate", an alternative foreign forum need *not* have equivalent, or even substantially similar remedies. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 249, 102 S.Ct. 252, 262, 70 L.Ed.2d 419 (1981). For example, in *Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 129 (2d Cir.1987) (per curiam), the Second Circuit held the Philippines was an "adequate" alternative forum notwithstanding the fact that Philippine law provided no treble damage remedy equivalent to that available under the plaintiffs' RICO claim. ("That they could not get triple damages if they proved the frauds underlying their RICO claim in the Philippines is irrelevant.") Indeed, the adequacy prong

of the traditional FNC analysis can be satisfied by the existence of essentially *any* remedy:

> "A forum in which defendants are amenable to service of process and which permits litigation of the dispute is generally adequate. Such a forum may nevertheless be inadequate if it does not permit the reasonably prompt adjudication of a dispute, if the forum is not presently available, or if the forum provides a remedy so clearly unsatisfactory or inadequate that it is tantamount to no remedy at all."

*Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 189 (2d Cir.2009) (citations omitted).

In contrast, under the ATA, a Defendant must be able to show "that foreign court offers a remedy which is *substantially the same* as the one available in the courts of the United States." 18 U.S.C. § 2334(d) (emphasis added).

*2. The Meaning of "Substantially The Same" in Light of the History and Purpose of the ATA*

Assuming without deciding that defendant UBS could meet its burden of establishing the first two requirements in 18 U.S.C. § 2334(d), I conclude that UBS has not met its burden of showing that the adequate alternative forum, Israel, offers a **\*421** remedy which is "substantially the same" as the one available in the U.S.

**[7]**   As I am aware of no decision interpreting this phrase in the context of the ATA and the parties have cited no case law on this point, I address this issue as an issue of first impression. While the words themselves are not defined, their meaning may be gleaned from the general purposes for which the ATA was enacted, and how the language in question fits into that statutory scheme. *Almendarez–Torres v. United States,* 523 U.S. 224, 228, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) ("We therefore look to the statute before us and ask what Congress intended.... In answering this question, we look to the statute's language, structure, subject matter, context, and history-factors that typically help courts determine a statute's objectives and thereby illuminate its text.").

In passing the ATA, Congress was explicitly attempting to extend U.S. jurisdiction to terroristic acts occurring abroad. Congress acknowledged that "[e]nactment of the bill would marginally increase the number of cases in U.S. District Courts," H.R. Rep. 102–1040, at 9, but that it was important to "allow[ ] any U.S. national injured in his person, property, or business by an act of international terrorism to bring a civil action in a U.S. District Court." H.R. Rep. 102–1040, at 5. The Act was not designed simply to afford *some* forum to victims of terrorism; it was designed to give them a forum in the courts of the United States. 138 Cong. Rec. S17254–01, S17260 ("the first and best remedy is to bring these terrorists to justice in our courts of law.") (emphasis added). *See also Statement by President H.W. George Bush Upon Signing S. 1569,* 1992 U.S.C.C.A.N. 3942, 1992 WL 475753 (October 29, 1992) ("I am pleased that the bill explicitly authorizes an American national to file suit *in the United States* for the recovery of treble damages against the perpetrators of international terrorism.") (emphasis added); Statement of Senator Grassley, 136 Cong. Rec. S4568–01 at S4593 ("With the enactment of this legislation, we set an example to the world of how the United States legal system deals with terrorists.").

An essential inspiration for the ATA was a then-recent case of *Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 739 F.Supp. 854 (S.D.N.Y.1990) in which relatives of an individual murdered during the hijacking of the *Achille Lauro* cruise ship brought suit against the Palestine Liberation Organization ("PLO") for its alleged responsibility for the hijacking. In enacting the ATA, Congress was cognizant that federal court jurisdiction existed in *Klinghoffer* only because of happenstance: the attack occurred aboard a ship in international waters and maritime law provided the necessary jurisdiction. *See* H.R. Rep. 102–1040, at 5 (1992) ("Only by virtue of the fact that the [Klinghoffer] attack violated certain Admiralty laws and the organization involved—the Palestinian Liberation Organization—had assets and carried on activities in New York, was the court able to establish jurisdiction over the case. A similar attack occurring on an airplane or in some other locale might not have been subject to civil action in the U.S. In order to facilitate civil actions against such terrorists the Committee [on the Judiciary] recommends [this bill]."). Thus, contrary to defendant's contention that Congress merely intended to ensure "that victims of terrorism

would have an appropriate forum, *somewhere,* to pursue their claims," Def. Br. at 8 (emphasis in original), the legislative history establishes that providing jurisdiction in the Federal Courts of this **\*422** country was a fundamental purpose of the statute. *See also Boim v. Quranic Literacy Inst. and Holy Land Found. For Relief And Dev. ("Boim II"),* 291 F.3d 1000 (7th Cir.2002) (summarizing legislative history).

Second, reference to the adequacy of remedies in the bill were not an afterthought, but rather was conceived of as a mechanism through which to accomplish the primary purposes of the act. *See See* S.Rep. No. 102–342 ("[B]y its provisions for compensatory damages, treble damages, and the imposition of liability along the causal chain of terrorism, it would interrupt, or at least, imperil, the flow of money."). *See also* 136 Cong. Rec. S14279–01, S14284 (daily ed. Oct. 1, 1990) ("terrorists will be held accountable where it hurts them most: at their lifeline, their funds.").

Thus the legislative history as well as the language of the statute demonstrate that the ATA was designed to give American nationals broad remedies in a procedurally privileged U.S. forum, and that 18 U.S.C. § 2334 in particular was designed to protect plaintiffs' access to that forum. Accordingly, I interpret 18 U.S.C. § 2334's requirement that a remedy be "substantially the same" to mean one that is essentially the same in both type and magnitude as that afforded in this jurisdiction.

*3. Defendant Fails to Satisfy the "Substantially the Same" Remedy Prong of 18 U.S.C. § 2334(d)*

While the declarations submitted by experts on both sides who are familiar with Israeli law present the proverbial "battle of the experts"—due in part to apparent ambiguities in the applicable foreign law—taken together, they demonstrate that the remedies available under Israeli law differ substantially in both type and magnitude from those available in this court.

**[8]** *First,* the measure of damages is different. The ATA permits a successful plaintiff to recover treble damages plus the cost of bringing suit, including attorneys fees. 18 U.S.C. § 2333. Israeli law contains no provision for treble damages. Declaration of Professor Alex Stein ("Stein Decl.") at ¶ 22. Defendant makes arguments that the damages available under Israeli law are in fact still "substantially the same," but they fail.[11]

Nonetheless, though I conclude that while the absence of a treble damages remedy under Israeli law is a significant factor weighing against FNC dismissal, [12] defendant has mitigated any effect by offering to stipulate trebling any compensatory damage award determined by an Israeli court. [13] Def. Br. at 15.

11     Defendant contends that despite the absence of treble damages, the Israeli court's measure of damages is nonetheless comparable because that court might in an exceptional case grant punitive damages, and because an additional cause of action could be brought on behalf of the estate of the deceased. But it is not disputed that Israeli courts grant punitive damages only in extremely rare cases, Stein Decl. ¶ 27, that whether an Israeli court would impose punitive damages on these facts is uncertain, at best, Stein Decl. ¶ 30, and that the amount of those damages, if awarded, would likely be modest by American standards. *Id.* Defendant's expert does not dispute these assertions but simply contends that it is *possible* an Israeli court could award significant punitive damages. Reply Declaration of Professor Daniel More ("More Reply Decl.") ¶ 20.

12     In concluding that the absence of a treble damages remedy under Israeli law is a significant factor weighing against FNC dismissal, I note that this conclusion is applicable only to FNC analysis governed by of 18 U.S.C. § 2334(d)(3).

13     Such stipulations can assuage courts' concerns regarding potential deficiencies in the adequacy of a foreign tribunal, and a court may condition dismissal on the parties agreeing to such stipulations. *See, e.g., Reino De Espana v. ABSG Consulting, Inc.* Nos. 08–0579–cv(L), 08–0754–cv(XAP), 2009 WL 1636122 at *1 (2d Cir. June 12, 2009) ("[defendant's] willingness to stipulate to personal jurisdiction in an alternative forum is a relevant factor to any declination of jurisdiction"). *See generally* Tim A. Thomas, Annotation, *Validity and Propriety of Conditions Imposed Upon Proceeding in Foreign Forum by Federal Court in Dismissing Action Under Forum Non Conveniens,* 89 A.L.R. Fed. 238 (1988).

**\*423** *Second,* and more significantly, Israel lacks a mechanism by which plaintiffs could obtain compensation for their emotional or non-economic injury. Specifically, it is undisputed that Israeli courts exclude emotional harm from loss-of-consortium damages by limiting those damages to the economic value of a substitute's cost on the market (e.g. the cost of obtaining a housekeeper, to compensate for the lost spouse's contribution to the maintenance of the household). Israeli law provides no compensation in a wrongful death suit for the loss of companionship, affection and intimacy by the immediate family members of the victim. Stein Decl. ¶ 37–38, More Reply Decl. ¶ 10. Under Israeli law emotional injury suffered as a result of the death of a loved one is generally not compensable unless it manifests as a psychiatric illness. [14] Stein Decl. ¶ 33(4). Further, emotional harm is generally not compensable under Israeli law unless the plaintiff has established a reasonable causal proximity in both time and place, between the event and the emotional harm, and plaintiff either personally experiences the tragic event, or in an exceptional case, learns about the event in such circumstances that the emotional damage is "expectable." Stein Decl. ¶ 33(2) & (3). [15]

14     Defendant's expert contends that plaintiffs' allegations of severe mental anguish and extreme emotional distress would, if proven, "most probably [ ] be sufficient to satisfy" Israeli law. More Reply Decl. ¶ 16. However, he cites no case law in support of this conclusory statement, and the only cases cited by either party are to the contrary, Stein Decl. ¶ 31, 34, or at best suggest that Israeli courts might revisit the doctrine at some time in the future. More Reply Decl. ¶ 14. Moreover, defendant's expert does not state the basis for his conclusion that a medical professional would find the plaintiffs to be at least 20% incapacitated. For these reasons, I do not credit his conclusion that Israeli law would "most probably" compensate the mental distress alleged by plaintiffs.

15     The parties have not addressed the question of whether the lack of geographic and temporal proximity would pose an independent bar to recovery for plaintiffs' emotional injuries under Israeli law. As it is defendant's burden to prove a substantially similar remedy, the failure to address this point weighs against the defendant.

The cumulative result of these distinctions is that plaintiffs would have no adequate remedy under Israeli law for emotional injury not rising to the level of a medically diagnosable disability. Moreover, defendant UBS does not seriously dispute the opinion of Plaintiffs' expert that Israeli courts are unlikely to award a quantum of damages that approaches that which is typical in this jurisdiction, Stein Decl. ¶¶ 41–43, except by noting the commonplace that it is difficult to predict how much any

court (whether U.S. or Israeli) would award in damages. It is certainly not impossible to compare the average awards between two jurisdictions over a period of time, as done in the declaration of plaintiffs' expert, who concludes such awards in Israel are typically lower than those in the United States.

### C. Motion To Dismiss

I next address defendant's motion to dismiss for failure to state a claim for which relief can be granted. Defendant **\*424** raises six arguments in favor of dismissal: 1) since Stuart Goldberg was not a United States national, plaintiffs fail to state a claim under ATA section 2332; 2) plaintiffs have not alleged an injury as required by section 2333; 3) plaintiffs fail to allege that defendant UBS committed an act of international terrorism; 4) plaintiffs haven't pled the required elements of knowledge and intent; 5) plaintiffs have not adequately pled the "by reason of" element of section 2333(a); and 6) plaintiffs haven't sufficiently pled their claims under section 2339. I address each in turn.

### Standard

In considering a motion pursuant to Rule 12(b)(6), I construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (internal citations and quotations omitted), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). Dismissal is appropriate only when it "appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000).

However, more recently, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1970, 167 L.Ed.2d 929 (2007). Although the complaint need not provide "detailed factual allegations," *id.* at 1964; *see also ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 n. 2 (2d Cir.2007) (applying the standard of plausibility outside

*Twombly*'s anti-trust context), it must "amplify a claim with some factual allegations ... to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (emphasis in original). The complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns,* 493 F.3d at 98 (quoting *Twombly,* 127 S.Ct. at 1965). Finally, a complaint must be dismissed under Rule 12(b)(6) if a court finds that the plaintiff's claims are barred as a matter of law. *Conopco, Inc. v. Roll Int'l,* 231 F.3d 82, 86 (2d Cir.2000).

### 1. Aiding and Abetting Liability

**[9]**   Plaintiffs' first cause of action is confused. They allege UBS aided and abetted the murder or attempted murder of United States citizens or the commission or attempted commission of physical violence upon United States citizens in violation of 18 U.S.C. § 2332(a)-(c) and 18 U.S.C. § 2333(a). However, the deceased victim, Stuart Scott Goldberg, was not a United States citizen and is not alleged to be a United States national as required by § 2332. Since there is no primary violation of § 2332, defendant UBS cannot be guilty of aiding and abetting such a violation. The statute is clearly inapplicable.

Acknowledging in their papers that there is no basis for a § 2332 violation, plaintiffs ask that their Complaint be read to instead allege defendant UBS aided or abetted an act of international terrorism (as defined in § 2331) which would thus in turn constitute a violation of § 2333(a). Assuming arguendo that 1) I were able to read plaintiffs' complaint to in fact make that allegation; and 2) that aiding and abetting liability exists under section 2333, **\*425**   I nonetheless find plaintiffs have failed to sufficiently plead such a claim.

**[10]**   Courts are divided on whether Congress intended to include aiding and abetting liability for a violation of § 2333(a). The Seventh Circuit recently issued a comprehensive opinion on the subject in *Boim v. Holy Land Foundation for Relief and Development ("Boim III"),* 549 F.3d 685 (7th Cir.2008) (en banc), and held that Congress's "[s]tatutory silence on the subject of secondary liability [in § 2332] means there is none." *Id.* at 689 (citing *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In contrast, other courts have found that "Congress expressed an intent in section 2333 to render civil liability

at least as extensive as criminal liability in the context of the terrorism cases, and criminal liability attaches to those who aid and abet of terrorism." *Linde,* 384 F.Supp.2d at 583 (citing *Boim II,* 291 F.3d at 1019). However, even those courts finding section 2333 includes aiding and abetting liability have held that such liability exists only where a defendant "gives substantial assistance or encouragement to the other so to conduct himself." *Linde,* 384 F.Supp.2d at 584 (quoting Restatement (Second) of Torts, § 876 (1979)). It has long been recognized that " 'substantial assistance' means more than just a little aid," *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490 (7th Cir.1986), and requires knowledge of the illegal activity that is being aided and abetted, a desire to help that activity succeed, and some act to further such activity to make it succeed. *United States v. Zafiro,* 945 F.2d 881, 887 (7th Cir.1991), *aff'd,* 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

I need not resolve here whether aiding and abetting liability exists for violations of section 2333 because defendant's alleged actions in performing three wire transfers for ASP fail to establish "substantial assistance" of the sort required to support an aiding and abetting claim. *Weiss v. National Westminster Bank PLC,* 453 F.Supp.2d 609 (E.D.N.Y.2006) ("the mere maintenance of a bank account and the receipt or transfer of funds do not ... constitute substantial assistance"); *Strauss v. Credit Lyonnais, S.A.,* No. CV–06–0702 (CPS), 2006 WL 2862704, at *9 (E.D.N.Y. Oct. 5, 2006) (same). *Cf. Boim II,* at 1011 ("To say that funding *simpliciter* constitutes an act of terrorism is to give the statute almost unlimited reach.").

Plaintiffs argue that *Linde v. Arab Bank,* 384 F.Supp.2d at 571, supports aiding and abetting liability here. But that case is distinguishable because the assistance alleged was an order of magnitude greater than in this matter. In *Linde,* plaintiffs alleged that an extremist organization, the Saudi Committee in Support of the Intifada Al Quds ("Saudi Committee"), provided rewards for perpetrators of suicide bombings by paying approximately $5,316.06 to the families of Palestinian terrorists who died as "martyrs". 384 F.Supp.2d at 577. In order to claim the benefits, families of a suicide bomber were required to present the defendant, Arab Bank, with an official certification from the Palestinian Authority identifying their relative as a martyr and providing a individualized martyr identification number. The Bank was also

alleged to have an active role in finalizing the list of eligible martyrs, in collaboration with the Saudi Committee and local representatives of Hamas. *Id.* In sum, the bank was alleged to have acted essentially as the officially designated administrator for terrorism incentive payments. Here, plaintiffs have alleged only that defendant UBS transferred funds to institutions that were part of Hamas's financial infrastructure, including **\*426** some which had been declared unlawful by the Government of Israel. Compl. ¶ 71. Even if, as plaintiffs allege, the defendant had knowledge of the designation of its client, ASP, as an SDGT by the U.S. government, and the designation of the payments' recipients as unlawful organizations by the Israeli government, defendant UBS's assistance to the overall terrorist scheme would still be insufficiently "substantial" to warrant aiding and abetting liability.

*2. Physical Injuries*

**[11]** Defendant claims that all of plaintiffs' claims must fail because plaintiffs have failed to allege they were "injured in [their] person, property or business," as required by § 2333(a). Plaintiffs in their complaint claim damages stemming from the emotional and pecuniary injuries resulting from Mr. Goldberg's death. Whether their claims may proceed thus depends on whether an emotional injury of the sort they allege may qualify as an injury to "person, property or business" within the meaning of § 2333(a).

The history and structure of the statute suggest that Congress intended to include non-physical injuries in the phrase "injured in [their] person." It would make little sense for Congress to have intended that U.S. nationals "could recover for losses of property yet not losses of family members." *Linde,* 384 F.Supp.2d at 589. In fact, every court that has construed § 2333(a) has reached the same conclusion. *See, e.g., Linde* at 589 ("In the absence of any limiting language in the statute, the court will not limit the scope of section 2333(a) to physical injuries"); *Biton v. Palestinian Interim Self–Gov't Auth.,* 310 F.Supp.2d 172, 181–82 (D.D.C.2004) ("The [ATA] does not specifically require that a plaintiff suffer *physical* harm prior to filing suit."); *Hurst v. Socialist People's Libyan Arab Jamahiriya,* 474 F.Supp.2d 19 (D.D.C.2007) (same). Accordingly, I decline to dismiss plaintiffs' claims due to the lack of a physical injury.

*3. Whether the Complaint Alleges the Defendant Committed an "Act of International Terrorism"*

**[12]** Plaintiffs' second claim alleges that defendant is liable for knowingly providing financial services to Hamas in violation of section 2339(B)(a)(1), that such a violation constitutes an "act of international terrorism" as defined in § 2331, and that consequently defendant is civilly liable to plaintiffs under § 2333(a). At issue is whether a violation of § 2339 suffices to qualify as an act of international terrorism; defendant argues it does not.

There exists a "chain of explicit statutory incorporations by reference," (*Boim III,* at 690–91), from sections 2333(a) to 2331(1), to 2339B and 2339C as follows: 18 U.S.C. § 2333 provides a civil cause of action to any national of the United States injured "by reason of an act of international terrorism." 18 U.S.C. § 2331 in turn defines international terrorism as activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended-

(i) to intimidate or coerce a civilian population; or

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

**\*427** (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

§ 2339B criminalizes the act of providing material support or resources to designated foreign terrorist organizations.

The final link in the chain is that a violation of § 2339B(a)(1) qualifies as an act of international terrorism for the purposes of § 2333(a). Defendant is simply incorrect in asserting that no court has held that a § 2339B violation satisfies each of the prongs of 18 U.S.C. § 2331; indeed

this court has so held. *Strauss v. Credit Lyonnais, S.A.,* 2006 WL 2862704 at \*1 (E.D.N.Y.2006) ("[v]iolations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)."); *Weiss v. National Westminster Bank PLC,* 453 F.Supp.2d 609, 613 (E.D.N.Y.2006) (same). *See also Almog v. Arab Bank, PLC,* 471 F.Supp.2d 257, 268 (E.D.N.Y.2007) ("violations of sections 2339A, 2339B(a)(1), and 2339C can serve as predicate crimes giving rise to liability under the ATA"); *Boim II,* 291 F.3d at 1015 ("If the plaintiffs could show that [the defendants] violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under sections 2333 and 2331."). Accordingly, I conclude that plaintiffs have sufficiently alleged that defendant USB committed acts of international terrorism.

*4. Knowledge and Intent Requirement*

Defendant argues that plaintiffs haven't pled the required level of knowledge and intent for a section 2333(a) violation. The question is what sort of intent is required; plaintiffs certainly do not allege that defendant UBS was aware that its wire transfers would ultimately go to suicide bomber Ali Ju'ara, or that UBS actually intended to assist Hamas in its terrorist agenda. Plaintiffs argue that neither of those is required.

The level of scienter required is different for each of the underlying statutory violations that plaintiffs allege give rise to section 2333(a) liability: section 2339B, the basis for plaintiffs' third claim, has a "specific intent requirement," requiring "knowledge or intent that the resources given to terrorists are to be used in the commission of terrorist attacks." *Linde,* 384 F.Supp.2d at 586 n. 9. However, it does not require "the specific intent to aid or encourage the particular attacks that injured plaintiffs." *Id.*

In section 2339B, however, Congress omitted the intent requirement. *Strauss,* 2006 WL 2862704, at \*13. It thus requires only "knowledge that the organization is a designated terrorist organization ... that the organization has engaged or engages in terrorist activity ... or that the organization has engaged in terrorism." *Linde,* 384 F.Supp.2d at 586 (citing Congress's December 2004 amendment to section 2339B, PL 108–458, 118 Stat 3638 (December 17, 2004)). [16]

16 Though the amendment occurred after the wire transfers at issue in this case, it merely clarified the *mens rea* requirement in the statute, and thus there is no issue regarding whether the amendment is retroactive in effect. *See Linde,* 384 F.Supp.2d at 587 n. 10 (noting the amendment did not change the *mens rea* requirement of § 2339B, but merely provided clarification on Congress's original intent.)

However, irrespective of which statute (§ 2339B or § 2339C) provides the basis for a finding that defendant engaged in international terrorism, plaintiffs must still **\*428** meet the scienter requirements of § 2333(a) itself in order to hold defendant liable under that statute. *Boim II,* 291 F.3d at 1016 ("We are using sections 2339A and 2339B *not* as independent sources of liability under section 2333, but to amplify what Congress meant by 'international terrorism,' "). I therefore turn to the intent requirements of § 2333(a).

While 18 U.S.C. § 2333(a) does not contain an explicit *mens rea* requirement, courts have interpreted the statute to include a requirement that there be some deliberate wrongdoing by the defendant, in light of the fact that the statute contains a punitive element (i.e. treble damages). As *Boim III held,* 549 F.3d at 692:

> "Punitive damages are rarely if ever imposed unless the defendant is found to have engaged in deliberate wrongdoing There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton."

(citing W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 2, pp. 9–10 (5th ed.1984)). It is this category that is of particular relevance here: conscious and deliberate disregard of the interest of others, in the face of a known risk, can qualify as sufficiently deliberate wrongdoing. Plaintiffs need not show that the defendant in fact knew its actions would further terrorism. Rather, it is sufficient to show that it knew the entity had been designated as a terrorist organization, and deliberately disregarded that fact while continuing to provide financial services

to the organization with knowledge that the services would in all likelihood assist the organization in accomplishing its violent goals. *Boim III,* 549 F.3d at 692–94 (comparing intent requirement to that required for criminal negligence).

**[13]** Here, plaintiffs have sufficiently pled that the defendant consciously disregarded the fact that it was supporting a terrorist organization, despite a strong probability that the bank's services would be used to further the organization's terrorist activities. According to plaintiffs' allegations, the defendant's client, ASP, was designated as a SDGT by President Bush in August of 2003. ASP was placed on the OFAC list at that time because it was found to be engaging in large-scale fundraising for Hamas. Compl. ¶¶ 63–67. Hamas itself had been designated a terrorist organization by the United States Government since at least 1995, Compl. ¶ 28. ASP's parent organization, CBSP, has also been designated a SDGT. Compl. ¶ 59. Numerous other publicly available sources of information suggested that ASP was funneling money to terrorist organizations, [17] and that the organization to which defendant UBS transferred the funds, the Tulkarem Charity Committee, was affiliated with terrorist organizations and funneled money to Hamas. At least one prominent member of the Tulkarem Charity Committee is alleged to have appeared in public in the name of Hamas. Compl. ¶ 79. Additionally, the Israeli Government is alleged to have declared the Tulkarem Zakat Committee an "unlawful organization" in February 2002 explicitly because of its connection to Hamas. Compl. ¶ 80; Declaration of Daniel L. Cantor, Esq., Exhibit **\*429** 8 (certified translation of excerpts from Israel's official gazette, *Yalkut Hapirsumim,* date March 7, 2002) (declaring as "unlawful organizations" certain groups which "belong to the Hamas ... or which support the infrastructure of Hamas" including the Tulkarm [sic] Charity Committee).

17 For instance, in 2002, the Palestinian Authority froze wire transfers from ASP and CBSP's chairman and director to a Hamas-controlled "charity." Compl. ¶ 62. In addition, the head of the Union of Good, an umbrella organization of which ASP is a member, made public statements authorizing suicide bombings against Israel. Compl. ¶ 55.

The parties dispute whether defendant UBS is a licensed financial institution in Israel so that the Israeli government's designation of Tulkarem Zakat

as an "unlawful organization" would have constituted constructive notice to UBS. But that fact is not indispensable; plaintiffs have pled sufficient facts from which it could be reasonably inferred that the defendant had actual knowledge of the ties of their client ASP and the recipient of the transfers, Tulkaren Zakat, to Hamas, and would in all likelihood use their services to further terrorist activities.

*5. Causation*

Defendant argues that plaintiffs haven't sufficiently pled that their injuries were caused by defendant's conduct for three reasons: (1) plaintiffs fail to allege particularized facts from which it may be inferred that UBS's wire transfers were a "substantial factor" in causing the Bus 19 attack; (2) the attack wasn't a reasonably foreseeable consequence of those wire transfers; and (3) the terrorist attack was in fact carried out by a terrorist group unrelated to Hamas, and thus had no causal connection to the wire transfers that UBS allegedly facilitated.

The relevant causation requirement has been derived from the language in 18 U.S.C. § 2333 authorizing any national of the United States to sue where he or she was "injured in his or her person, property, or business by reason of an act of international terrorism." The words "by reason of" have been interpreted to express Congress's intent to require a showing of proximate causation. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 265–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (interpreting identical "by reason of" language in civil RICO provision to require a showing that defendant's conduct proximately caused plaintiff's injury).

A showing of proximate causation requires that plaintiffs show defendant's actions were "a substantial factor in the sequence of responsible causation," and that the injury was "reasonably foreseeable or anticipated as a natural consequence." *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 123 (2d Cir.2003). Common sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff. Such a burden would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA. *See, e.g.,* S.Rep. No. 102–342 at 22. ("Noting that Congress intended to impose "liability at any point along the causal

chain of terrorism."). As the Ninth Circuit has noted, "money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts." *Weiss,* 453 F.Supp.2d at 631 (quoting *Humanitarian Law Project v. Reno,* 205 F.3d 1130, 1136 (9th Cir.2000). Consequently, as I have held before, "[t]aking into account the legislative history of these statutes and the purpose behind them, [ ] it is clear that proximate cause may be established by a showing only that defendant provided material support to, or collected funds for a terrorist organization which brought about plaintiffs' injuries. **\*430** *Strauss,* 2006 WL 2862704 at *18; *Weiss,* 453 F.Supp.2d at 631–32 (same).

**[14]** The plaintiffs here have sufficiently pled such a causal nexus. Specifically, they have alleged that the defendant transferred funds from a designated terrorist organization, ASP, to Tulkarem Zakat, an organization controlled by Hamas in the West Bank territory, Compl. ¶ 76. They have also identified three specific transfers to Tulkarem Zakat, the last of which occurred a few weeks before the terrorist bombing that killed Stuart Scott Goldberg. Compl. ¶ 73–75. In addition, they have alleged with specificity that Hamas, an organization claimed to control Tulkarem Zakat, was responsible for the bombing of Bus 19. Plaintiffs have thus sufficiently pled that defendant's conduct was a substantial cause of their injuries. For the same reason, the ultimate harm was foreseeable. A fact finder could plausibly find that it was entirely foreseeable that transmitting money to a terrorist organization would lead to violence and Congress had precisely that lethal connection in mind in passing the ATA.

Finally, defendant argue that members of the terrorist group Tanzim Fatah, an organization unrelated to Hamas, were in fact the perpetrators of the Bus 19 attack, and "[t]hus, even if the approximately $25,000 (the dollar equivalent of 31,270 Swiss francs) that ASP sent to Tulkarem Charity Committee ended up with Hamas, the Bus 19 Attack cannot in any manner be traced to those funds." [18] Def. Repl. Br. at 18–19. While plaintiffs will need to establish at trial Hamas's responsibility for the Bus 19 attack, at this stage all they must do is plausibly allege it. *See, e.g., Linde,* 384 F.Supp.2d at 581 n. 7. ("If, at trial, plaintiffs fail to prove that these acts were terror attacks, rather than "mere" street crime, they will have failed to establish a claim under the ATA. However, at this stage of the litigation, dismissing these

claims would be premature."). I conclude that plaintiffs' complaint adequately pleads Hamas' responsibility for the bombing of Bus 19. Moreover, defendant's interpretation of the Israeli Military Court's indictment against Nafal Adawin (which the Complaint incorporates by reference) as demonstrating that Tanzin Fata—not Hamas—was responsible for the bombing, is not the only reasonable interpretation of the indictment. The indictment may in fact be interpreted to state that both groups share responsibility. Indeed, the Israeli indictment appears to allege that Adawin, a Hamas operative, was the source of the original idea for the attack, recruited the suicide bomber Ali Ju'ara to perpetrate the attack on behalf of Hamas, personally filmed Ju'ara wearing an explosive device, and later sent that footage to a television station claiming responsibility for the bombing on behalf of Hamas. Indictment at 10–12. Plaintiffs have thus plausibly pleaded a causal connection tying defendant's wire transfers to the ultimate harm.

18      Defendant notes that in a separate lawsuit, plaintiffs alleged that the Bus 19 attack perpetrator was an employee and agent of the PLO [Palestinian Liberation Organization] and the PA [Palestinian Authority]." Def. Br. at 2. However, plaintiffs here allege that members of more than one terrorist group were involved in planning and executing the attack.

*6. Plaintiffs' Claims Under Sections 2339B and 2339C*
The final ground on which defendant urges dismissal of the complaint is that plaintiffs haven't adequately alleged that UBS violated § 2339B and § 2339C. This argument presents two issues: whether there is a constitutional or jurisdictional bar to § 2339B and § 2339C's application to defendant UBS's alleged conduct; and, **\*431** secondarily, if the answer to the first question is "yes," has plaintiff sufficiently alleged a violation of those statutes?

 **[15]**   Defendant argues § 2339B and § 2339C cannot be constitutionally applied to UBS's alleged conduct because there is an insufficient nexus tying their conduct to the jurisdiction of the United States. "It is beyond doubt that, as a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.' " *United States v. Yousef,* 327 F.3d 56, 86 (2d Cir.2003) (quoting *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)). However, Congressional intent that a statute apply to conduct outside of the territorial jurisdiction of the United

States must be clear; in the absence of clear intent there is a presumption against such extraterritorial application. *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949); *Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); *United States v. Gatlin,* 216 F.3d 207, 211 (2d Cir.2000).

 **[16]**   Moreover, even where Congressional intent is clear, the Due Process Clause of the Fifth Amendment limits Congress's power to regulate foreign entities' conduct outside of the United States and requires a "sufficient nexus" between the conduct and the United States' interest so that applying U.S. law "would not be arbitrary or fundamentally unfair." *Yousef,* 327 F.3d at 111; *See also United States v. Pinto–Mejia,* 720 F.2d 248, 259 (2d Cir.1983).

Congress, however, clearly intended the ATA have extraterritorial application; 18 U.S.C. § 2333 provides civil remedies for victims of "international terrorism" and 18 U.S.C. § 2331 explicitly defines that term to include acts which occur primarily outside the territorial jurisdiction of the United States. Thus the only question is whether defendant's alleged conduct was "so unrelated to American interests as to render their [being sued] in the United States arbitrary or fundamental unfair." *Yousef,* 327 F.3d at 112. There can be no dispute that combating international terrorism is a paramount interest of the United States: "international terrorism is a serious and deadly problem that threatens the vital interests of the United States." Pub.L. No. 104–132 § 301(a)(1) & 7, 110 Stat. 1250 (1996), *reprinted in* 18 U.S.C. § 2339B, note. In order to see why that is so, it is necessary to look no further than the plausible allegations in the complaint in this case, in which a terrorist attack in Israel is said to have had immediate and grave consequences for a family of United States citizens, who lost their father and spouse. Moreover, there is nothing fundamentally unfair about requiring UBS, a large and sophisticated company which maintains a full-time active presence in the United States, to comply with United States law. *See United States v. Al Kassar,* 582 F.Supp.2d 488, 494 (S.D.N.Y.2008) (explaining purpose behind the Due Process nexus requirement is to "ensure[ ] that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country."). There is accordingly no Due Process bar to 18 U.S.C. § 2339B and § 2339C's application to defendant UBS's conduct here.

Defendant also contends that jurisdiction is lacking under 18 U.S.C. § 2339B and § 2339C because those statutes apply only to natural persons "found in the United States," and not to corporations. This contention must be rejected. As plaintiffs note, had Congress limited sections § 2339B and § 2339C to natural persons, individuals could evade both criminal and civil liability for supporting terrorism **432** through the simple act of incorporation. Moreover, neither legislative history case law or reason provide an indication that the statute was intended to be limited to natural persons.

I turn to whether plaintiffs have pled sufficient facts to state claims for § 2339B and § 2339C violations.

### a. § 2339B

Defendant argues that plaintiffs cannot show that § 2339B was violated because cannot plausibly allege defendant UBS provided support for a "foreign terrorist organization;" an express requirement for liability under § 2339B. [19]

[19]  Section 2339B(a)(1) provides:

> "Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both ... To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization ..., that the organization has engaged or engages in terrorist activity ..., or that the organization has engaged or engages in terrorism."

Classification as a "foreign terrorist organization" requires that the organization be designated as such by the by the United States Secretary of State in accordance certain procedures. The designation lasts for a period of two years unless renewed. INA Section 219 (8 U.S.C. § 1189).

Since it is undisputed that neither defendant's client, ASP, nor the recipient of the funds, Tulkaren Zakat, was ever formally designated as an FTO, the issue is whether defendant either (1) had knowledge that the ultimate beneficiary was an FTO, or (2) either of the entities to which defendant provided direct support, ASP or Tulkaren, can be said to have been acting as agents of Hamas (which was and is an FTO).

[17]  As this court explained in *Strauss,* 2006 WL 2862704 at *10–11, liability may be found under § 2339B even where support wasn't provided directly to an FTO. Such a circumstance may be found where an entity provides support to an alias or agent of an FTO. In *National Council of Resistance of Iran v. Department of State,* 373 F.3d 152 (D.C.Cir.2004) the D.C. Circuit clarified the sort of relationships that would justify a transfer of FTO status from one organization to another:

> Just as it is silly to suppose "that Congress empowered the Secretary to designate a terrorist organization ... only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have enjoyed had it never been designated" *NCRI* [*v. Department of State*], 251 F.3d [192], at 200 [ (D.C.Cir.2001) ], so too is it implausible to think that Congress permitted the Secretary to designate an FTO to cut off its support in and from the United States, but did not authorize the Secretary to prevent that FTO from marshaling all the same support via juridically separate agents subject to its control. For instance, under NCRI's conception, the Government could designate XYZ organization as an FTO in an effort to block United States support to that organization, but could not, without a separate FTO designation, ban the transfer of material support to XYZ's fund-raising affiliate, FTO Fundraiser, Inc. The crabbed view of alias status advanced by NCRI is at war not only with the antiterrorism objective of AEDPA, but common sense as well.

*Id.* at 157–158. Thus, the Court held that "ordinary principles of agency law are fairly encompassed by the alias concept under AEDPA," *id.* at 157, and that "the requisite relationship for alias status is established **433** at least when one organization so dominates and controls another that the latter can no longer be considered meaningfully independent from the former." *Id.* at 158. Factors to be considered include whether the organizations share leadership, *id.* at 159, whether they

commingle finances, publications, offices, etc., *id.,* and whether one operates as a division of the other. *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 403, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960).

[18]   In addition, a violation of § 2339B may be found where an entity provides money or support to an organization knowing that the ultimate beneficiary is the FTO. For instance, in *U.S. v. Rahmani,* 209 F.Supp.2d 1045 (C.D.Cal.2002) the Central District of California upheld an indictment charging defendants with providing material support to a designated Foreign Terrorist Organization, despite the fact that the funds were not provided directly to any FTO. The court held that it was sufficient that the indictment charged "that the ultimate destination of the solicited funds was a designated foreign terrorist organization," and that defendants were aware of the ultimate beneficiaries. *Rahmani,* 209 F.Supp.2d at 1052, *rev'd sub nom. on separate grounds, United States v. Afshari,* 426 F.3d 1150 (9th Cir.2005).

Plaintiffs here have plausibly alleged that ASP acted as an fundraising agent of Hamas. The Complaint alleges that: (1) ASP is the primary fundraiser for Hamas in Switzerland (Compl. ¶ 64) (2) ASP collects large amounts of money from mosques and Islamic centers and transfers that money to sub-organizations of Hamas (*id.*); (2) ASP provides financial support for Hamas (Compl. ¶ 61); (3) OFAC issued a "Blocking Notice" freezing all of ASP's funds, accounts, and real property because of its association with Hamas (Compl. ¶ 68); (4) ASP transferred funds to organizations belonging to Hamas's financial infrastructure (Compl. ¶¶ 71, 76); (6) the Board of Directors of ASP's umbrella organization, the Union of Good, includes three senior Hamas figures (Compl. ¶ 50); and (7) the Chairman of ASP has made wire transfers to a well-known Hamas front (Compl. ¶ 62).

[19]   Plaintiffs have also plausibly alleged that UBS violated § 2339B through UBS's knowledge that the ultimate beneficiary of its wire transfers was Hamas, an FTO. Plaintiffs cite to public sources of information on both ASP and Tulkarem Zakat which plausibly could have informed UBS of that fact. The Complaint alleges that in designating ASP as an SDGT in August of 2003, President Bush noted that the designation was due to ASP's provision of financial support to Hamas. Compl. ¶ 64. In addition, Khalid Muhammad Ahmad Al–Shuli, the current chairman and director of CBSP and ASP's current

chairman, is alleged to have ties to Hamas, Compl. ¶ 60, and in January of 2002, the Palestinian Authority froze wire transfers from Al–Shuli to a charity that plaintiffs describe as a well-known Hamas front, Al–Mujama al-Islami, because of its connections to Hamas. Compl. ¶ 62. The charity had been established by the Sheik Ahmed Yassin, the founder of Hamas. Compl. ¶ 21, 62. Both ASP and its parent organization CBSP are members of the Union of Good, which serves as the principal fundraising mechanism for Hamas and is headed by a number of senior Hamas figures. Compl. ¶¶ 46, 50. According to the Complaint, the Tulkren Zakat Committee serves as part of the worldwide support system of Hamas's operational-terrorist wing. Compl. ¶ 78. The Israeli Government, in declaring the Tulkarem Zakat Committee an "unlawful organization" in February 2002 stated that Tulkrem was among the organizations that "belong to **\*434** the Hamas Organization or which support the infrastructure of Hamas." Tulkarem Zakat is alleged to be headed by a Hamas terrorist. Plaintiffs have thus sufficiently pled that UBS knowingly provided financial support to a FTO, Hamas.

### b. § 2339C

Defendant UBS's final contention is that plaintiffs have failed to sufficiently plead that UBS acted "knowingly" in providing funds to an FTO as required by § 2339C. But plaintiffs have clearly pled that the defendant was aware of the terroristic purposes of ASP, Tulkarem Zakat and Hamas. As discussed above, Congress couldn't have required that plaintiffs establish that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff. Providing funds to an organization known to be engaged in violent acts of terrorism is sufficient to establish defendant's knowledge that the funds provided would be used in whole or in part for terrorist activities. *Strauss,* 2006 WL 2862704 at *17. Plaintiffs have sufficiently alleged that defendant UBS was aware that ASP and Tulkarem were controlled by or provided money to Hamas, and that Hamas is a designated FTO. They have thus met their burden in demonstrating UBS acted knowingly under section 2339C.

### CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is granted with respect to plaintiffs' first claim, and denied in all other respects. The Clerk is directed to provide a copy of the within to the attorneys for both sides.

SO ORDERED.

**All Citations**

660 F.Supp.2d 410

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 2

2000 WL 1375265
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Peter F. RYAN, PRD Corp., Dale W. Ryan, PDR
Holdings, Inc., PDR Corp. Defined Benefit
Plan & Trust, Ryan Realty Trust, Loperena
Trust, Jaquith Holdings, Inc., Peter F. Ryan
Irrevocable Trust, Research & Finance Corp.,
Glen Guillet, DOIT Corp., Zayin Investments,
Ltd., Beny Primm, RPE Management, Inc.,
Daniel Langer, Jay Sicklen, Mykerinus
Holdings, Inc., and Charles Schmidt, Plaintiffs,
v.
HUNTON & WILLIAMS, Scott J. McKay Wolas,
Franklin H. Stone, Christopher M. Mason, Kathy
McClesky Robb, Jerry E. Whitson, Tardino &
Tardino, Victor J. Tardino, Jr., Victor J. Tardino,
Sr., Crystal Waters, N.V., Crystal Distributors, L.P.,
Crystal Distributors, L.P. II, Chase Manhattan Bank
f/k/a Chemical Bank, Fleet Bank f/k/a National
Westminster Bank, and Gregory Wolas, Defendants.

No. 99–CV–5938 (JG).
|
Sept. 20, 2000.

**Attorneys and Law Firms**

Sigmund S. Wissner–Gross, Esq., Heller, Horowitz &
Feit, P.C., New York, for Plaintiffs.

Andrew R. Kosloff, Esq., The Chase Manhattan Bank
Legal Department, New York, for Defendant Chase
Manhattan Bank.

## MEMORANDUM AND ORDER

GLEESON, District J.

**\*1** The plaintiffs initiated this action to recover for
injuries they sustained as a result of their investment in
a "Ponzi" scheme operated by Scott J. McCay Wolas
("Wolas"), a partner at the New York office of Hunton &
Williams ("H & W"). Defendant Chase Manhattan Bank
("Chase") has moved to dismiss the claims against it for
failure to state a claim upon which relief can be granted

and for failure to plead fraud with particularity pursuant
to Rules 12(b)(6) and Rule 9(b) of the Federal Rules of
Civil Procedure. For the following reasons, the motion is
granted.

## BACKGROUND

The following factual background is based on the
allegations contained in the plaintiffs' complaint, which
are assumed to be true for the purposes of this motion.

From 1989 to 1995, Wolas ran a "Ponzi" scheme. He
induced the plaintiffs and others to invest with him by
misrepresenting that their investments would be used to
purchase large shipments of Scotch whiskey in Scotland
for resale in the Orient. In fact, there were no such
purchases; instead, Wolas used the funds to pay prior
"investors" and for other unknown purposes. In 1995,
Wolas absconded, and his whereabouts are still unknown.
(*See* Compl. ¶ 1.)

In 1994 Chemical Bank [1] ("Chemical") was on notice of
various of "red flags" that indicated fraudulent conduct
by Wolas and/or those with whom he was associated. For
example, in May 1994, John Dolan, a cohort of Wolas,
tried to open an account at Chemical in the name of SEV
Enterprises, Inc. ("SEV"). Chemical, however, declined to
open the account because Patrick J. Connor, of Chemical's
in-house fraud investigative unit, suspected that SEV was
probably running an "advance fee scam." (*Id.* ¶¶ 111–
12.) Then, on June 29, 1994, a lawyer representing a
former associate at H & W contacted Mark E. Segal,
Assistant General Counsel of Chemical, and informed
him that Wolas fraudulently overbilled Manufacturers
Hanover Trust, Chemical's predecessor, for work done on
a litigation matter. Later that year, Chemical shut down
accounts maintained by Wolas and Albert H. Wolas, Inc.,
a family business owned by Wolas's father and brother,
after a $950,000 check to Wolas, drawn on one of the
business accounts, bounced. (*See id.* ¶¶ 113–14.)

1    Chemical Bank has since merged with Defendant
     Chase Manhattan Bank.

On March 16, 1995, just three months before the "Ponzi"
scheme collapsed, Dolan opened a primary account in the
name of SEV and Wolas opened a sub-account (to the
SEV account) at a Chemical branch on Third Avenue in

Manhattan. Although the sub-account was an attorney escrow account, Wolas authorized Dolan, a non-lawyer, to have signing authority over the sub-account. Wolas and/or Dolan further informed Chemical in-house counsel Manuel Gottlieb that the sub-account was an attorney escrow account and that all of the money passing through the sub-account was escrow money. (*See id.* ¶¶ 110, 115–16.)

From the accounts' inception, branch officer Kevin O'Dea suspected that they were a vehicle for fraudulent activity and immediately referred them to Chemical's in-house fraud investigative unit. On May 2, 1995, an employee of the fraud unit notified O'Dea and Gottlieb of the unit's concerns one year earlier when Dolan tried to open an account in the name of SEV, and urged that Chemical immediately shut down the primary and subaccounts. Then, on May 5, 1995, O'Dea notified Dolan and SEV that the accounts had to be closed by June 5, 1995, one month later.[2] (*See id.* ¶¶ 115, 117–18.)

[2]    On May 30, 1995, a grand jury in the Southern District of Texas issued a subpoena, in part, to one of the two SEV sub-accounts. This subpoena was faxed to in-house counsel Gottlieb on June 1, 1995. (*See* Compl. ¶ 124.)

A. *The Account Activity*
 **\*2**  In April and May of 1995, O'Dea and his assistant signed or approved bank checks and transfers out of Wolas's sub-account and into the SEV primary account. Specifically, O'Dea effected the following transactions:

(i) Beginning on April 27, 1995, O'Dea personally signed bank checks drawn on the Wolas sub-account;

(ii) On April 25, 1995, O'Dea personally approved the internal transfer of $1 million of investor funds from the sub-account to the SEV primary account, and such transfer occurred on April 27, 1995; and

(iii) On May 2, 1995, O'Dea's assistant approved the transfer of $1.6 million from the sub-account to the SEV primary account.

(*See* Compl. ¶ 119.)

Then, on April 27, 1995, O'Dea personally approved the issuance of two Chemical checks drawn on the SEV primary account, each in the amount of $100,000, and

certified another SEV primary account check, in the amount of $28,459. Several days later, O'Dea approved a May 2, 1995, certified check for $200,000 drawn on the SEV primary account. This check was immediately altered to indicate that it was drawn on the sub-account. By no later than May 10, 1995, O'Dea knew that this certified check had been altered, and relied on this information in insisting that the accounts be closed. (*See id.* ¶ 120.)

By May 2, 1995, O'Dea was also aware that $10 million was to be wired into another SEV sub-account at Chemical. (*See id.* ¶ 121 .) O'Dea (and/or another Chemical employee or officer) specifically approved multiple wire transfers that resulted in the theft of investor funds. For example, O'Dea approved the following transactions:

(i) the May 2, 1995, wire transfer of $50,000 from the SEV primary account to Kehle & Co., Inc. in Florida;

(ii) the May 4, 1995, wire transfer of $40,000 to a "Keeco" entity in Washington;

(iii) the May 4, 1995, wire transfer of $50,000 for credit to Warley, Inc.;

(iv) the May 4, 1995, wire transfer of $7,500 to Jim Roma in Washington, with "special instructions" from "F. Kelly," which O'Dea knew was false and fraudulent since the funds did not come from F. Kelly;

(v) the May 12, 1995, wire transfer of $10,000 to "David J. Friednbach" in Oregon; and

(vi) the May 12, 1995, wire transfer of $500,000 to "Jack Vita, Esq. Client Trust Account," with "special instructions" from "Warley, Inc.," which O'Dea knew was false and fraudulent since the funds did not come from Warley, Inc.

(*See id.* ¶ 122.)

B. *The Relevant Plaintiffs*

1. *DOIT Corp.*
O'Dea was aware that several million dollars had been wired from the Florida Cordova Law Center ("Cordova"), in April and May 1995, to the Wolas sub-account at Chemical. However, neither O'Dea nor anyone else at Chemical contacted Cordova regarding the purpose of those transfers or alerted it of Chemical's concerns. On

May 16, 1995, Plaintiff DOIT Corp. ("DOIT") deposited $500,000 in escrow with the Cordova, with the expectation that the funds would then be transferred to the Wolas sub-account at Chemical. DOIT was never advised that Chemical had already taken steps to shut down the sub-account. (*See id.* ¶ 125.)

2. *Research & Finance Corp.*
**\*3** In late May 1995, the Chairman of the Research & Finance Corp. ("RFIN"), who maintained personal accounts at Chemical, contacted Chemical's Private Banking Group to confirm the status of what he believed was an H & W Client Funds account before he transferred $500,000 out of his personal account on behalf of RFIN to that account. The Chairman was advised that the H & W Client Funds account was in good standing, but was not told, among other things, (i) that the escrow account was a sub-account of SEV; (ii) that the sub-account was Wolas's and that H & W did not maintain the firm's principal attorney escrow account at Chemical; (iii) that Chemical had notified Wolas and SEV in early May 1995 to close the primary and subaccounts; and (iv) that Chemical believed that primary and subaccounts were being used for fraudulent purposes. (*See id.* ¶ 126.)

On June 29, 1995, pursuant to H & W's instructions, RFIN's accountant attempted to transfer $500,000 on RFIN's behalf to the Wolas sub-account at Chemical, believing it to be an escrow account maintained by H & W. As the SEV account and Wolas sub-account had already been closed at that point, the transfer did not go through. Chemical did not disclose to RFIN, however, why the Wolas sub-account had been closed. Believing it to be an administrative matter and that H & W had moved its escrow account to another bank, RFIN transferred the funds on July 13, 1995, to an account at National Westminster Bank ("Nat West"), now known as Fleet Bank, maintained by Wolas. (*See id.* ¶ 127.)

C. *This Action*
On September 24, 1999, various investors in Wolas's "Ponzi" scheme commenced this action for damages against H & W, Wolas, and other defendants for violations of the Securities Exchange Act of 1934, the Racketeering Influenced and Corrupt Organization Act, and New York common law. Relevant to the motion before me now are the claims by DOIT and RFIC against Chase (formerly Chemical) for fraud, aiding and abetting

fraud, and commercial bad faith. [3] Chase has moved to dismiss these claims for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity, pursuant to Rules 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure.

[3]     Although Plaintiff Glen Guillet originally asserted these claims against Chase as well, I was informed at oral argument on May 26, 2000, that Guillet's claims had been settled.

DISCUSSION

A. *The Rule 12(b)(6) Standard*
In a 12(b)(6) motion, a federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The inquiry focuses not on whether a plaintiff might ultimately prevail on her claim, but on whether she is entitled to offer evidence in support of the allegations in the complaint. *See id.* "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* Rule 12(b)(6) warrants a dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59 (2d Cir.1997). In considering a defendant's motion, the Court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Hamilton,* 128 F.3d at 59 (citing *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 740 (1976)).

B. *Common Law Fraud*
**\*4** Chase contends that RFIN's fraud or fraudulent concealment claims must be dismissed because it has failed to allege the elements of the claims and sufficient facts to give rise to a strong inference of fraudulent intent under Rule 9(b). [4]

[4]     DOIT has abandoned its fraud claim against Chase. (*See* Pls.' Mem. of Law in Opp'n at 3 n. 2.)

To state a claim of common law fraud under New York law, plaintiff must establish, by clear and convincing evidence, that (i) the defendant made a material misrepresentation; (ii) with knowledge of its falsity; (iii)

with the intent to defraud the plaintiff; (iv) on which the plaintiff reasonably relied; and (v) that caused damage to the plaintiff as a result. *See Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997); *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir.1995).

### 1. *Proximate Cause*
RFIN alleges that Chemical made a material false misrepresentation when it represented to RFIN's Chairman that the Wolas sub-account was in good standing. It further alleges that it reasonably relied on this representation and suffered at least $500,000 in damages when its investment was later misappropriated by Wolas from his account at NatWest. In response, Chase contends that RFIN has failed to establish that Chemical's statement was the proximate cause of RFIN's injury. I agree.

"The absence of adequate causation is ... fatal to a common law fraud claim under New York law." *Bennett v. United States Trust Co.,* 770 F.2d 308, 316 (2d Cir.1985). A plaintiff may establish proximate cause if an injury "is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." ' *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1496 (2d Cir.1992) (quoting *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.1986)). "The requisite causation is established only where the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes." *Revak v. SEC Realty Corp.,* 18 F.3d 81, 89–90 (2d Cir.1994) (citing *Bennett,* 770 F.2d at 316).

In *Bennett,* the plaintiffs used the proceeds of a series of loans from the defendant bank to purchase public utility stock and then deposited the stock with the bank as collateral for the loans. *See* 770 F.2d at 310. In negotiating the loans, the bank misrepresented to the plaintiffs that the Federal Reserve's margin rules do not apply when public utility stock is deposited as collateral. The stock subsequently generated insufficient dividends to cover the interest, and its market value decreased. Thus, in addition to the plaintiffs' loss of the equity itself, they owed the bank the outstanding interest and principal in excess of the stock's depreciated value. *See id.* The district court dismissed the plaintiffs' common law fraud claim for lack of causation and the Second Circuit affirmed, concluding

that the plaintiffs had only alleged "but for" causation, *i.e.,* that they would not have purchased the stock if the bank had denied the loans. *See id.* at 314–16. Noting that the plaintiffs' common law fraud and securities fraud claims were equally flawed, the court stated that there was "simply no direct or proximate relationship between the loss and the misrepresentation." *Id.* at 314, 316. The court emphasized that the plaintiffs approached the bank for a loan with the plan to purchase the public utility stock; the bank recommended neither public utility stock in general, that stock in particular, nor the investment value of any such stock. *See id.* at 313–14. Accordingly, the court concluded that the "loss at issue was caused by the [plaintiffs'] own unwise investment decisions, not by [the bank's] misrepresentation." *Id.* at 314.

**\*5** RFIN's fraud claim fails for precisely the same reasons. RFIN approached Chemical with the intention of investing in Wolas's whiskey scheme. Indeed, RFIN's Chairman contacted Chemical's Private Banking Group only to confirm the status of Wolas's account at Chemical prior to directing the transfer of $500,000 into the account. (*See* Compl. ¶ 126.) At that time, the Chairman was told that Wolas's account was in good standing. (*See id.*) Although RFIN insists that it would not have invested with Wolas (by depositing $500,000 in his account at Nat West after learning that the Chemical account was closed) if the Chemical officer had not made that representation or had told RFIN's Chairman of Chemical's concerns about the Wolas sub-account, these allegations at most establish "but for" causation. Simply put, the direct and proximate cause of RFIN's loss was Wolas's fraud, not Chemical's representation about the status of the Wolas sub-account.

### 2. *Duty to Disclose*
In addition, RFIN asserts that it has a claim of fraudulent concealment based on Chemical's failure to disclose to RFIN's Chairman that (i) Chemical had notified Wolas and SEV that it would close the accounts as of June 5, 1995; (ii) Chemical suspected fraudulent activity in the accounts; (iii) H & W did not maintain an escrow account at Chemical; and (iv) Wolas's escrow account was a sub-account of the SEV account.

To establish a claim of fraudulent concealment under New York law, the plaintiff must prove the aforementioned elements of common law fraud *and* that "the defendant had a duty to disclose the material information." *Banque*

*Arabe,* 57 F.3d at 153. A duty to disclose may arise in two circumstances: (i) "where the parties enjoy a fiduciary relationship" and (ii) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984).

RFIN claims that Chemical's duty to disclose arose from its superior information about the status of the Wolas sub-account. It argues that such information was not readily available to RFIN, and that Chemical knew that RFIN was acting, or attempting to act, on the basis of mistaken knowledge when RFIN attempted to transfer $500,000 to the account after it was closed.

As an initial matter, I question whether RFIN may bring a fraudulent concealment claim against Chase since such a claim "ordinarily arises only in the context of business negotiations where parties are entering a contract." *Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,* No. 89 Civ. 2809(BSJ), 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996); *see also Renner v. Chase Manhattan Bank,* No. 98 Civ. 926(CSH), 2000 WL 781081, at *9 n. 5 (S.D.N.Y. June 14, 2000) (questioning in *dicta* whether defendant bank had duty to disclose where plaintiff neither conducted business nor negotiated contracts with bank or bank employee); *Williams v. Bank Leumi Trust Co.,* No. 96 Civ. 6695(LMM), 1998 WL 397887, at *8 (S.D .N.Y. July 15, 1998) (questioning in *dicta* whether insurance company receiver had standing to bring fraudulent concealment claim where defendant bank and insurance company "never stood on opposite sides of the same transaction").

 *6 However, even if RFIN can state a fraudulent concealment claim in these circumstances, it has not done so. Chase cannot properly be held accountable for failing to disclose information about the Wolas's sub-account to RFIN. "[A] bank should keep its own customers' affairs confidential." *Aaron Ferer,* 731 F.2d at 123 (citing *Graney Dev. Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (Sup.Ct.), *aff'd,* 411 N.Y.S.2d 756 (4th Dep't 1978)); *see also Graney,* 400 N.Y.S.2d at 719 ("It is implicit in the contract of the bank with its customer or depositor that no information may be disclosed by the bank or its employees concerning the customer's or depositor's account.") (internal quotation marks and citations omitted); *Renner,* 2000 WL 781081, at *9 (citing

*Aaron Ferer* and *Graney* and noting that bank officer had no duty to respond to plaintiff's letters inquiring about bank customers); *cf. Young v. United States Dep't of Justice,* 882 F.2d 633, 640–43 (2d Cir.1989) (encouraging New York courts to recognize duty of confidentiality between bank and customer). Thus, Chemical had no duty to volunteer to RFIN additional information about the alleged suspicious activity in the Wolas sub-account.

Finally, even if Chemical was obligated to disclose this additional information, there is no indication that Chemical knew that RFIN was acting on the basis of mistaken knowledge concerning the financial transaction between Wolas and RFIN. According to the plaintiff's allegations, Chemical knew only that RFIN inquired about the sub-account and attempted to transfer funds to the account after it had been closed. This attempted transfer does not support an inference that RFIN was acting on its mistaken information that Wolas was not engaging in fraud. For all Chemical knew, assuming Chemical knew of the scheme at all, RFIN was a cohort of Wolas, not a potential defrauded investor. Accordingly, RFIN has not stated claim for fraudulent concealment.[5]

---

[5]    RFIN's fraudulent concealment claim also fails due to the absence of proximate cause. *See supra.*

---

### 3. Intent to Defraud Under Rule 9(b)

Lastly, RFIN's fraud claim must also be dismissed for the failure to plead Chemical's intent to defraud with the requisite particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) provides, in pertinent part, that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The rule is designed to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (quoting *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)) (internal quotation marks omitted). Allegations of fraud, therefore, must be specific enough to provide a defendant with "a reasonable opportunity to answer the complaint and ... adequate information to frame a response." *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557–58 (2d Cir.1979).

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Ryan v. Hunter & Williams, Not Reported in F.Supp.2d (2000)
2:16-cv-14406-DML-DRG  Doc # 46  Filed 10/05/17  Pg 32 of 50  Pg ID 828
2000 WL 1375265

**\*7** Four essential requirements comprise Rule 9(b). A plaintiff must (i) " 'specify the statements that the plaintiff contends were fraudulent' "; (ii) " 'identify the speaker' "; (iii) " 'state where and when the statements were made' "; and (iv) " 'explain why the statements were fraudulent.' " *Acito,* 47 F.3d at 51 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). Although a plaintiff need not plead detailed evidentiary matters, *see Credit & Fin. Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981), it must plead "facts that give rise to a strong inference of fraudulent intent," *see Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). This inference may be established either (i) "by alleging facts to show that defendants had motive and opportunity to commit fraud," or (ii) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

RFIN concedes that it does not rely on evidence of motive and opportunity to commit fraud to satisfy its burden under Rule 9(b). Accordingly, I will restrict my analysis to whether RFIN's allegations establish circumstantial evidence of recklessness to give rise to the requisite inference of fraudulent intent.

Recklessness is established by conduct which is " 'highly unreasonable and which represents an extreme departure from the standard of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)) (alteration in *Rolf* ). In some instances, an inference of recklessness may be raised by " '[a]n egregious refusal to see the obvious, or to investigate the doubtful.' " *Id.* (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989)). Nonetheless, the plaintiff bears a "significant burden ... in stating a fraud claim based on recklessness." *Id.* at 270.

Here, RFIN has failed to allege facts that constitute strong circumstantial evidence of recklessness. First, in March 1995, when the accounts were opened, Chemical had no actual knowledge that Dolan and Wolas had previously engaged in fraudulent activity. Rather, Chemical's officer, Bruce Whitcomb, had been "suspicious" of fraud in 1994, and had referred the matter to the fraud unit, which had concluded that it was "probably an advance fee scam." (Compl.¶ 112.) Likewise, neither the anonymous report to Chemical's Assistant General Counsel, Mark Segall, that Wolas had fraudulently overbilled Chemical's predecessor on a litigation matter nor the allegation that Chemical closed down a Wolas family business account due to a bounced check (both of which occurred in 1994) establishes that Chemical knew Wolas was engaged in fraud in 1995. (*See* Com pl. ¶¶ 113–14.) Thus, these allegations do not give rise to any inference of Chemical's fraudulent intent.

**\*8** Second, the allegations that Chemical's branch officer, Kevin O'Dea, approved various internal transfers between the SEV account and the sub-account, (*see* Compl. ¶¶ 119–20), similarly do not satisfy Rule 9(b)'s requirement. *See Williams v. Bank Leumi Trust Co.,* No. 96 Civ. 6695(LMM), 1997 WL 289865, at \*3 (S.D.N.Y. May 30, 1997) (mere transfer of funds between accounts was insufficient to raise inference of knowledge of check-kiting scheme to satisfy Rule 9(b) or Rule 12(b)(6) for claim of fraudulent concealment).

Third, as soon as Chemical's fraud investigative unit alerted O'Dea of the prior suspected advance fee scam and urged that Chemical shut down the accounts, O'Dea notified Dolan that the SEV account and the Wolas sub-account would be closed in one month. (*See* Compl. ¶¶ 117–18.) Although Chemical may have shown greater vigilance by closing the accounts immediately, rather than continuing to approve transfers and bank checks until the accounts were closed one month later, this failing does not establish recklessness sufficient to raise a strong inference of Chemical's intent to defraud RFIN. *See Chill,* 101 F.3d at 269; *see also Renner,* 2000 WL 781081, at \*14 (bank's failure to detect fraud sooner insufficient to satisfy Rule 9(b) burden of pleading fraudulent intent for aiding and abetting fraud claim); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,* No. 98 Civ. 4960(MBM), 1999 WL 558141, at \*7–\*8 (S.D.N.Y. July 30, 1999) (bank's negligent failure to investigate several red flags and to prevent additional wire transfers after second fraudulent transfer uncovered by transferring bank did not give rise to strong inference of fraudulent intent to satisfy Rule 9(b) for claims of commercial bad faith and aiding and abetting fraud).

Finally, in light of the aforementioned case law concerning the confidential nature of bank customer information, Chemical's failure to provide information to RFIN about Wolas's sub-account beyond the representation that it was

in good standing cannot give rise to an inference of an intent to defraud.

In sum, RFIN has failed its significant pleading burden. Its allegations do not raise any inference, let alone a strong inference, of an intent to defraud. Accordingly, RFIN's fraud and fraudulent concealment claims must be dismissed.

### C. *Aiding and Abetting Fraud*

To establish a claim of aiding and abetting fraud under New York law, a plaintiff must establish (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong. *See Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983). Chase contends, and I agree, that RFIN and DOIT have failed to allege either Chemical's knowledge of Wolas's fraud or that Chemical substantially assisted in the commission of the fraud.

#### 1. *Actual Knowledge*

New York law requires a plaintiff to establish that the alleged aider and abettor had " 'actual knowledge' " of the primary wrong. *Renner,* 2000 WL 781081, at *6 (quoting *Kolbeck v. LIT Am., Inc .,* 939 F.Supp. 240, 246 (S.D.N.Y.1996)); *see also Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000) (stating that "knowledge of the underlying wrong" is "required element" under New York law).

**\*9** Here, the plaintiffs have failed to allege that Chemical had actual knowledge of Wolas's fraud. As explained *supra,* the allegations that Chemical suspected that Dolan and SEV were running an advance fee scam in 1994, (*see* Compl. ¶ 112), that Wolas allegedly overbilled Chemical's predecessor in connection with litigation, (*see id.* ¶ 113), and that Chemical shut down a Wolas family account in 1994 due to a bounced check, (*see id.* ¶ 114), do not establish that Chemical had actual knowledge of Wolas's fraudulent scheme in 1995.

Turning to the allegations in 1995, O'Dea requested Chemical's fraud investigation unit to review the SEV account and the Wolas sub-account based on suspicions —not actual knowledge—of fraudulent activity. (*See id.* ¶ 115, 117.) Subsequently, upon receiving the recommendation of the fraud unit that the accounts be closed, O'Dea informed Dolan that Chemical would close the accounts in one month. (*See id.* ¶ 117–18.) Allegations that Chemical suspected fraudulent activity, however, do not raise an inference of actual knowledge of Wolas's fraud. [6]

[6]  This case is closely analogous to Judge Haight's opinion in *Renner,* 2000 WL 781081. In that case, the plaintiff alleged that Chase aided and abetted a prime bank guarantee scam. The allegation of actual knowledge on the part of Chase was based on, *inter alia,* its officials' rejection of a letter of credit proposal based on their suspicion that the letters were potential vehicles for fraud. *See id.* at *12. The court rejected this argument, however, and concluded that there was "no factual basis for the assertion that Chase officials actually knew the fraud [they suspected] was, in fact, occurring." *Id.*

Finally, O'Dea's authorization of transfers between the SEV account and the sub-account, (*see id.* ¶ 119), and his approval of multiple wire transfers, (*see id.* ¶ 122), do not create an inference of knowledge of the scheme. In *Williams,* 1997 WL 289865, a statutory receiver for an insurance company brought an action for, *inter alia,* aiding and abetting fraud, and alleged that the defendant bank had actual knowledge of a check-kiting scheme where the bank had approved various bank transfers. *See id.* at *4. The court rejected this argument, concluding that the account transfers and other allegations established only constructive knowledge on the part of the bank, which is insufficient to state a claim for aiding and abetting fraud. *See id.* Similarly, in this case, the plaintiffs have failed to establish that Chemical had any actual knowledge of Wolas's fraud, and thus, their aiding and abetting fraud claim must be dismissed. [7]

[7]  The plaintiffs' remaining allegations, that Chemical improperly permitted Dolan, a non-lawyer, to be a signatory on the Wolas's attorney escrow account, (*see* Compl. ¶ 116), that Chemical knew that a check drawn on the SEV account had been altered to reflect that it was issued from the Wolas sub-account, (*see id.* ¶ 120), and that Chemical knew that H & W did not maintain a firm escrow account at Chemical, (*see id.* ¶ 123), do not establish that Chemical knew of Wolas's fraud. These allegations only support a finding that Chemical had constructive notice of the fraud.

#### 2. *Substantial Assistance*

The second element of an aiding and abetting fraud claim is substantial assistance. "A defendant provides substantial assistance only if it 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed.' " *Nigerian Nat'l,* 1999 WL 558141, at *8 (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992)) (alteration in *Nigerian Nat'l* ).

Again, the plaintiffs have failed to allege that Chemical substantially assisted Wolas's fraud. The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts on the basis of suspected fraud, without more, do not constitute substantial assistance. In *Williams,* the court considered whether the use of bank accounts by the participants in the fraudulent scheme constituted substantial assistance by the bank in the participants' fraud. *See* 1997 WL 289865, at *4. Rejecting the claim, the court held that "the mere fact that all the participants in the alleged scheme used accounts at [the bank] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability." *Id.; see also Nigerian Nat'l,* 1999 WL 558141, at *8 (bank's execution of repeated wire transfers for millions of dollars did not constitute substantial assistance for an aiding and abetting fraud claim); *Renner,* 2000 WL 781081, at *12 (Chase did not give substantial assistance to participants of prime bank guarantee scam simply because participants used accounts at Chase).

 *10  Turning to the plaintiffs' allegations of Chemical's inaction, *e.g.,* failing to shut down the accounts sooner or to inform the plaintiffs about the suspected fraud, these omissions likewise do not rise to the level of substantial assistance. As previously stated, a defendant may provide substantial assistance by failing to act only when it was required to act. *See Nigerian Nat'l,* 1999 WL 558141, at *8. Absent a confidential or fiduciary relationship between the plaintiff and the aider and abettor, the inaction of the latter does not constitute substantial assistance warranting aider and abettor liability. *See King v. George Schonberg & Co.,* 650 N .Y.S.2d 107, 108 (1st Dep't 1996); *see also Renner,* 2000 WL 781081, at *12 ("[A]bsent a fiduciary duty, inaction does not constitute substantial assistance."). Here, the plaintiffs and Chemical do not have a fiduciary relationship. The relationship between a bank and its depositor is not a fiduciary one, but only that of a debtor and creditor. *See Aaron Ferer & Sons,*

*Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 122 (2d Cir.1984). Thus, RFIN or RFIN's Chairman, who had an account at Chemical's Private Banking Group, did not have a fiduciary relationship with Chemical. DOIT is not even a client of Chemical. Moreover, even assuming that RFIN had a confidential relationship with Chemical by virtue of its status as a customer, *see id.* at 123 ("[A] bank should keep its own customers' affairs confidential." (citing *Graney Dev. Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (Sup.Ct.), *aff'd,* 411 N.Y.S.2d 756 (4th Dep't 1978))), Chemical was under no obligation to disclose confidential information about Wolas, another customer. The plaintiffs, therefore, have failed to establish that Chemical substantially assisted in Wolas's fraud. Accordingly, their aiding and abetting fraud claim must be dismissed.

### D. *Commercial Bad Faith*
A claim for commercial bad faith against a depository bank will lie if the "bank acts dishonestly—where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in the fraudulent scheme." *Prudential–Bache Sec., Inc. v. Citibank, N.A.,* 73 N.Y.2d 263, 275 (1989). Thus, "knowledge of the underlying wrong" is a "required element" of commercial bad faith under New York law. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000).

As I have already concluded that the complaint fails adequately to allege that Chemical had actual knowledge of Wolas's fraud, the plaintiffs' claim for commercial bad faith must also be dismissed. At most, the plaintiffs have alleged that Chemical negligently failed to monitor the accounts adequately and close them promptly. However, pleading " 'merely a lapse of wary vigilance or even suspicious circumstances which might well have induced a prudent banker to investigate' " is insufficient to state a claim of commercial bad faith. *Renner,* 2000 WL 781081, at *17 (quoting *Prudential–Bache,* 73 N.Y.2d at 275); *see also Nigerian Nat'l,* 1999 WL 558141, at *8 (bank's alleged failure to investigate "red flags" and negligent approval of additional wire transfers, even after bank was alerted to fraudulent transfer, insufficient to state commercial bad faith claim).

 *11  The plaintiffs' reliance on *Prudential–Bache,* 73 N.Y. 263, and *Peck v. Chase Manhattan Bank, N.A.,* 593 N.Y.S. 509 (1st Dep't 1993), to support their

contention that Chemical had actual knowledge of Wolas's fraud is unpersuasive. Indeed, these cases support Chase's position. In *Prudential–Bache,* two bank officers were convicted of accepting bribes in connection with participation in a fraudulent scheme. The bank officers set up accounts without proper opening records and corporate resolutions, and with fictitious corporate officers, and also agreed not to prepare certain records required to be filed with the Internal Revenue Service. *See* 73 N.Y.2d at 267. To implement the embezzlement scheme, one of the co-conspirators cashed several checks on a single day and often left the branch with large quantities of cash or cashiers' checks. Furthermore, other bank employees, including managers, were also allegedly aware of the fraud due to a co-conspirator's frequent visits to the bank, his repeated large cash withdrawals at teller windows, and his conversations with other bank employees. *See id.* at 268. Although the bank argued that the conduct of its agents, the convicted officers, could not be imputed to it under the adverse agent doctrine, the New York Court of Appeals declined to decide that issue and held that the plaintiff had stated a commercial bad faith claim against the bank. *See id.* at 276–77. In *Peck,* the plaintiff alleged that an internal bank memorandum reflected that bank employees actually knew that checks payable to third parties were being deposited into the thief's account, but no action was taken. 593 N.Y.S.2d at 511. The trial court granted the bank's motion to dismiss, but the Appellate Division reversed, holding that the allegations of actual knowledge adequately stated a claim for commercial bad faith. *See id.*

Here, the plaintiffs' allegations fall short of these cases, which involved either active participation in the fraud by bank officials or actual knowledge on their part of the ongoing fraud, as they have failed to allege either on the part of Chemical. Accordingly, their commercial bad faith claim must be dismissed.

E. *Leave to Amend*
The plaintiffs argue, in the alternative, that if I grant Chase's motion I should give them leave to replead. I decline to do so.

A district court may deny leave to amend a complaint if the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962). As the plaintiffs drafted their complaint well after discovery had been taken in a related case, *see Accousti v. Wolas,* 95–CV–5267 (JG) (E.D.N.Y. filed Dec. 20, 1995), an opportunity to amend would be futile. *See Billard v. Rockwell Int'l Corp.,* 683 F.2d 51, 57 (2d Cir.1982) (denial of leave to amend not abuse of discretion where plaintiff had "access to full discovery" in a related case).

CONCLUSION

For the aforementioned reasons, Chase's motion to dismiss is granted.

**\*12** So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1375265

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 3

Bank of America Corp. v. City of Miami, Fla., 137 S.Ct. 1296 (2017)

2:16-cv-14406-DML-DRG    Doc # 46    Filed 10/05/17    Pg 37 of 50    Pg ID 833

197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

137 S.Ct. 1296
Supreme Court of the United States

BANK OF AMERICA CORP. et al., Petitioners
v.
CITY OF MIAMI, FLORIDA.

Wells Fargo & Co., et al., Petitioners
v.
City of Miami, Florida.

Nos. 15–1111, 15–1112.
|
Argued Nov. 8, 2016.
|
Decided May 1, 2017.

**Synopsis**

**Background:** City brought action against mortgage lender under Fair Housing Act (FHA), claiming that lender engaged in decade-long pattern of racially discriminatory lending in the residential housing market that caused city economic harm. The United States District Court for the Southern District of Florida, William P. Dimitrouleas, J., 2014 WL 3362348, dismissed for failure to state a claim and denied reconsideration, 2014 WL 4441368. City appealed. The United States Court of Appeals for the Eleventh Circuit, Marcus, Circuit Judge, 800 F.3d 1262, affirmed in part, reversed in part, and remanded. On remand, the District Court, William P. Dimitrouleas, J., 171 F.Supp.3d 1314, granted lender's motion to dismiss. In second action, city brought similar claims against another mortgage lender. The United States District Court for the Southern District of Florida, William P. Dimitrouleas, J., dismissed for failure to state a claim. City appealed. The Court of Appeals, Marcus, Circuit Judge, 801 F.3d 1258, affirmed in part, reversed in part, and remanded. Certiorari was granted in both cases.

**Holdings:** The Supreme Court, Justice Breyer, held that:

[1] city was an "aggrieved person," as basis for statutory standing to sue for damages under the FHA, but

[2] to establish proximate cause, as required for recovery of damages for violation of FHA, a plaintiff must do more than show that its injuries foreseeably flowed from the alleged statutory violation.

Vacated and remanded.

Justice Thomas filed an opinion concurring in part and dissenting in part, in which Justices Kennedy and Alito joined.

Justice Gorsuch took no part in the consideration or decision of the cases.

---

West Headnotes (10)

**[1]    Federal Courts**
   👉 Case or controversy requirement; justiciability;mootness and ripeness

To satisfy the Constitution's restriction of the Supreme Court's jurisdiction to "Cases" and "Controversies," a plaintiff must demonstrate constitutional standing, and to do so, the plaintiff must show an injury in fact that is fairly traceable to the defendant's conduct and that is likely to be redressed by a favorable judicial decision. U.S.C.A. Const. Art. 3, § 2, cl. 1.

7 Cases that cite this headnote

**[2]    Federal Civil Procedure**
   👉 In general;injury or interest

The question regarding prudential standing or statutory standing is whether the statute grants the plaintiff the cause of action that he asserts, and in answering that question, the court presumes that a statute ordinarily provides a cause of action only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.

9 Cases that cite this headnote

**[3]    Federal Civil Procedure**
   👉 In general;injury or interest

Whether a plaintiff comes within the zone of interests protected by a statute, as required for prudential standing or

Bank of America Corp. v. City of Miami, Fla., 137 S.Ct. 1296 (2017)

2:16-cv-14406-DMM-DRG Doc # 46 Filed 10/05/17 Pg 38 of 50 Pg ID 834

197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

statutory standing, is an issue that requires the court to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.

10 Cases that cite this headnote

**[4]**    **Civil Rights**
👈 Property and housing

City was an "aggrieved person," as basis for statutory standing to sue home mortgage lenders for damages under Fair Housing Act (FHA), based on lenders' allegedly discriminatory lending to African–American and Latino mortgagors, because city's claimed financial injuries from lost tax revenue and extra municipal expenses fell within the zone of interests that the FHA arguably protected. Fair Housing Act, §§ 802(i), 804(b), 805(a), 42 U.S.C.A. §§ 3602(i), 3604(b), 3605(a); Fair Housing Amendments Act of 1988, § 8(2), 42 U.S.C.A. § 3613(a)(1)(A), (c)(1).

1 Cases that cite this headnote

**[5]**    **Civil Rights**
👈 Property and housing

The Fair Housing Act's (FHA) definition of "aggrieved person," as basis for prudential standing or statutory standing to sue for damages for housing discrimination, reflects a congressional intent to confer standing broadly. Fair Housing Act, §§ 802(i), 804(b), 805(a), 42 U.S.C.A. §§ 3602(i), 3604(b), 3605(a); Fair Housing Amendments Act of 1988, § 8(2), 42 U.S.C.A. § 3613(a)(1)(A), (c)(1).

2 Cases that cite this headnote

**[6]**    **Civil Rights**
👈 Housing

To establish proximate cause, as required for recovery of damages for violation of the Fair Housing Act (FHA), a plaintiff must do more than show that its injuries foreseeably flowed from the alleged statutory violation,

by showing some direct relation between the injury asserted and the injurious conduct alleged. Fair Housing Act, §§ 804(b), 805(a), 42 U.S.C.A. §§ 3604(b), 3605(a).

3 Cases that cite this headnote

**[7]**    **Negligence**
👈 Necessity of and relation between factual and legal causation

**Negligence**
👈 Remoteness and attenuation; mere condition or occasion

**Torts**
👈 Proximate cause

It is a well-established principle of the common law that in all cases of loss, courts are to attribute it to the proximate cause, and not to any remote cause.

2 Cases that cite this headnote

**[8]**    **Negligence**
👈 Necessity of and relation between factual and legal causation

**Negligence**
👈 Remoteness and attenuation; mere condition or occasion

**Torts**
👈 Proximate cause

Courts assume that Congress is familiar with, and does not mean to displace sub silentio in federal causes of action, the common-law rule that in all cases of loss, courts are to attribute it to the proximate cause and not to any remote cause.

1 Cases that cite this headnote

**[9]**    **Negligence**
👈 Violations of statutes or other regulations

**Torts**
👈 Proximate cause

Proximate-cause analysis is controlled by the nature of the statutory cause of action, and the question it presents is whether the harm

Bank of America Corp. v. City of Miami, Fla., 137 S.Ct. 1296 (2017)

2:16-cv-14406-DMM-DRG   Doc # 46   Filed 10/05/17   Pg 39 of 50   Pg ID 835

197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

alleged has a sufficiently close connection to the conduct the statute prohibits.

3 Cases that cite this headnote

[10]    **Federal Courts**
    👉 Particular cases

Upon determining that to establish proximate cause, as required for recovery of damages for violation of Fair Housing Act (FHA), a plaintiff must do more than show that its injuries foreseeably flowed from the alleged statutory violation, the Supreme Court would not draw the precise boundaries of proximate cause under the FHA and determine on which side of the line the city's financial injuries fell, with respect to home mortgage lenders' allegedly discriminatory lending to African–American and Latino mortgagors, and instead would vacate and remand; the Court of Appeals had grounded its decision on the theory that proximate cause under the FHA was based on foreseeability alone, so the Supreme Court lacked the benefit of the Court of Appeals' judgment on how the contrary principles the Supreme Court had just stated applied to the FHA, and no other Court of Appeals had weighed in on the issue. Fair Housing Act, §§ 804(b), 805(a), 42 U.S.C.A. §§ 3604(b), 3605(a).

2 Cases that cite this headnote

*1298 *Syllabus**

*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

The City of Miami filed suit against Bank of America and Wells Fargo (Banks), alleging violations of the Fair Housing Act (FHA or Act). The FHA prohibits, among other things, racial discrimination in connection with real-estate transactions, 42 U.S.C. §§ 3604(b), 3605(a), and permits any "aggrieved person" to file

a civil damages action for a violation of the Act, §§ 3613(a)(1)(A), (c)(1). The City's complaints charge that the Banks intentionally targeted predatory practices at African–American and Latino neighborhoods and residents, lending to minority borrowers on worse terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms. The City alleges that the Banks' discriminatory conduct led to a disproportionate number of foreclosures and vacancies in majority-minority neighborhoods, which impaired the City's effort to assure racial integration, diminished the City's property-tax revenue, and increased demand for police, fire, and other municipal services. The District Court dismissed the complaints on the grounds that (1) the harms alleged fell outside the zone of interests the FHA protects and (2) the complaints failed to show a sufficient causal connection between the City's injuries and the Banks' discriminatory conduct. The Eleventh Circuit reversed.

*Held* :

1. The City is an "aggrieved person" authorized to bring suit under the FHA. In addition to satisfying constitutional standing requirements, see *Spokeo, Inc. v. Robins,* 578 U.S. ——, ——, 136 S.Ct. 1540, 194 L.Ed.2d 635 a plaintiff must show that the statute grants the plaintiff the cause of action he or she asserts. It is presumed that a statute ordinarily provides a cause of action "only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.' " *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. ——, ——, 134 S.Ct. 1377, 1388, 188 L.Ed.2d 392.

The City's claims of financial injury are, at the least, "arguably within the zone of interests" the FHA protects. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184. The FHA defines an "aggrieved person" as "any person who" either "claims to have been injured by a discriminatory housing practice" or believes that such an injury "is about to occur," 42 U.S.C. § 3602(i). This Court has said that the definition of "person aggrieved" in the original version of the FHA "showed 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution,' " *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415; and has held that the

Bank of America Corp. v. City of Miami, Fla., 137 S.Ct. 1296 (2017)

197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

2:16-cv-14406-DML-DRG   Doc # 46   Filed 10/05/17   Pg 40 of 50   Pg ID 836

Act permits suit by parties similarly situated to the City, see, *e.g., Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (village alleging that it lost tax revenue and had the racial balance of its **\*1299** community undermined by racial-steering practices). Against the backdrop of those decisions, Congress did not materially alter the definition of person "aggrieved" when it reenacted the current version of the Act.

The Banks nonetheless contend that the definition sets boundaries that fall short of those the Constitution sets. Even assuming that some form of their argument is valid, this Court concludes that the City's financial injuries fall within the zone of interests that the FHA protects. The City's claims are similar in kind to those of the Village of Bellwood, which the Court held in *Gladstone, supra,* could bring suit under the FHA. The Court explained that the defendants' discriminatory conduct adversely affected the village by, among other things, producing a "significant reduction in property values [that] directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." *Id.,* at 110–111, 99 S.Ct. 1601. The City's alleged economic injuries thus arguably fall within the FHA's zone of interests, as this Court has previously interpreted that statute. *Stare decisis* principles compel the Court's adherence to those precedents, and principles of statutory interpretation demand that the Court respect Congress' decision to ratify those precedents when it reenacted the relevant statutory text. Pp. 1303 – 1304.

2. The Eleventh Circuit erred in concluding that the complaints met the FHA's proximate-cause requirement based solely on the finding that the City's alleged financial injuries were foreseeable results of the Banks' misconduct. A claim for damages under the FHA is akin to a "tort action," *Meyer v. Holley,* 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753, and is thus subject to the common-law requirement that loss is attributable " 'to the proximate cause, and not to any remote cause,' " *Lexmark,* 572 U.S., at ——, 134 S.Ct., at 1390. The proximate-cause analysis asks "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.,* at ——, 134 S.Ct., at 1390. With respect to the FHA, foreseeability alone does not ensure the required close connection. Nothing in the statute suggests that Congress intended to provide a remedy for any foreseeable result of

an FHA violation, which may " 'cause ripples of harm to flow' " far beyond the defendant's misconduct, *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 534, 103 S.Ct. 897, 74 L.Ed.2d 723; and doing so would risk "massive and complex damages litigation," *id.,* at 545, 103 S.Ct. 897. Rather, proximate cause under the FHA requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532. The Court has repeatedly applied directness principles to statutes with "common-law foundations." *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 457, 126 S.Ct. 1991, 164 L.Ed.2d 720. " 'The general tendency' " in these cases, " 'in regard to damages at least, is not to go beyond the first step.' " *Hemi Group, LLC v. City of New York,* 559 U.S. 1, 10, 130 S.Ct. 983, 175 L.Ed.2d 943. What falls within that step depends in part on the "nature of the statutory cause of action," *Lexmark, supra,* at ——, 134 S.Ct., at 1390 and an assessment 'of what is administratively possible and convenient,' " *Holmes, supra,* at 268, 112 S.Ct. 1311.

The Court declines to draw the precise boundaries of proximate cause under the FHA, particularly where neither the Eleventh Circuit nor other courts of appeals have weighed in on the issue. Instead, the lower courts should define, in **\*1300** the first instance, the contours of proximate cause under the FHA and decide how that standard applies to the City's claims for lost property-tax revenue and increased municipal expenses. Pp. 1305 – 1306.

800 F.3d 1262, and 801 F.3d 1258, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C.J., and GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which KENNEDY and ALITO, JJ., joined. GORSUCH, J., took no part in the consideration or decision of the cases.

### Attorneys and Law Firms

Neal K. Katyal, Washington, DC, for Petitioners.

Robert S. Peck, for Respondents.

Curtis E. Gannon, for the United States as amicus curiae, by special leave of the Court, supporting the respondents.

197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

David J. Zimmer, Goodwin Procter LLP, San Francisco, CA, William M. Jay, Thomas M. Hefferon, Matthew S. Sheldon, Andrew Kim, David S. Norris, Goodwin Procter LLP, Washington, DC, for Petitioners.

Victoria Méndez, Henry J. Hunnefeld, City of Miami, Office of the City Attorney, Miami, FL, Robert S. Peck, Center for Constitutional Litigation, P.C., Fairfax Station, VA, Erwin Chemerinsky, University of California, Irvine, CA, Rachel Geman, Daniel E. Seltz, Lieff Cabraser Heimann & Bernstein, L.L.P., New York, NY, Joel Liberson, Howard Liberson, Trial & Appellate Resources, P.C., El Segundo, CA, Sherrie R. Savett, Sarah R. Schalman–Bergen, Patrick F. Madden, Berger & Montague, P.C., Philadelphia, PA, for Respondent.

Paul F. Hancock, Olivia Kelman, K&L Gates LLP, Miami, FL, Andrew C. Glass, K&L Gates LLP, Boston, MA, Neal Kumar Katyal, Frederick Liu, Colleen E. Roh Sinzdak, Morgan L. Goodspeed, Daniel J.T. Schuker, Hogan Lovells US LLP, Washington, DC, Carol A. Licko, John F. O'Sullivan, Hogan Lovells US LLP, Miami, FL, for Petitioners.

**Opinion**

Justice BREYER delivered the opinion of the Court.

The Fair Housing Act (FHA or Act) forbids

> "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race...." 42 U.S.C. § 3604(b).

It further makes it unlawful for

> "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race...." § 3605(a).

The statute allows any "aggrieved person" to file a civil action seeking damages for a violation of the statute. §§ 3613(a)(1)(A), 3613(c)(1). And it defines an "aggrieved person" to include "any person who ... claims to have been injured by a discriminatory housing practice." § 3602(i).

The City of Miami claims that two banks, Bank of America and Wells Fargo, **\*1301** intentionally

issued riskier mortgages on less favorable terms to African–American and Latino customers than they issued to similarly situated white, non-Latino customers, in violation of §§ 3604(b) and 3605(a). App. 185–197, 244–245, 350–362, 428. The City, in amended complaints, alleges that these discriminatory practices have (1) "adversely impacted the racial composition of the City," *id.,* at 232, 416; (2) "impaired the City's goals to assure racial integration and desegregation," *ibid.*; (3) "frustrate[d] the City's longstanding and active interest in promoting fair housing and securing the benefits of an integrated community," *id.,* at 232–233, 416–417; and (4) disproportionately "cause[d] foreclosures and vacancies in minority communities in Miami," *id.,* at 229, 413. Those foreclosures and vacancies have harmed the City by decreasing "the property value of the foreclosed home as well as the values of other homes in the neighborhood," thereby (a) "reduc[ing] property tax revenues to the City," *id.,* at 234, 418, and (b) forcing the City to spend more on "municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of [the Banks'] illegal lending practices," *id.,* at 233–234, 417. The City claims that those practices violate the FHA and that it is entitled to damages for the listed injuries.

The Banks respond that the complaints do not set forth a cause of action for two basic reasons. First, they contend that the City's claimed harms do not "arguably" fall within the "zone of interests" that the statute seeks to protect, *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); hence, the City is not an "aggrieved person" entitled to sue under the Act, § 3602(i). Second, they say that the complaint fails to draw a "proximate-cause" connection between the violation claimed and the harm allegedly suffered. In their view, even if the City proves the violations it charges, the distance between those violations and the harms the City claims to have suffered is simply too great to entitle the City to collect damages.

We hold that the City's claimed injuries fall within the zone of interests that the FHA arguably protects. Hence, the City is an "aggrieved person" able to bring suit under the statute. We also hold that, to establish proximate cause under the FHA, a plaintiff must do more than show that its injuries foreseeably flowed from the alleged statutory violation. The lower court decided these cases on the

197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

theory that foreseeability is all that the statute requires, so we vacate and remand for further proceedings.

## I

In 2013, the City of Miami brought lawsuits in federal court against two banks, Bank of America and Wells Fargo. The City's complaints charge that the Banks discriminatorily imposed more onerous, and indeed "predatory," conditions on loans made to minority borrowers than to similarly situated nonminority borrowers. App. 185–197, 350–362. Those "predatory" practices included, among others, excessively high interest rates, unjustified fees, teaser low-rate loans that overstated refinancing opportunities, large prepayment penalties, and—when default loomed—unjustified refusals to refinance or modify the loans. *Id.,* at 225, 402. Due to the discriminatory nature of the Banks' practices, default and foreclosure rates among minority borrowers were higher than among otherwise similar white borrowers and were concentrated in minority neighborhoods. *Id.,* at 225–232, 408–415. Higher foreclosure rates lowered property **\*1302** values and diminished property-tax revenue. *Id.,* at 234, 418. Higher foreclosure rates—especially when accompanied by vacancies—also increased demand for municipal services, such as police, fire, and building and code enforcement services, all needed "to remedy blight and unsafe and dangerous conditions" that the foreclosures and vacancies generate. *Id.,* at 238–240, 421–423. The complaints describe statistical analyses that trace the City's financial losses to the Banks' discriminatory practices. *Id.,* at 235–237; 419–420.

The District Court dismissed the complaints on the grounds that (1) the harms alleged, being economic and not discriminatory, fell outside the zone of interests the FHA protects; (2) the complaints fail to show a sufficient causal connection between the City's injuries and the Banks' discriminatory conduct; and (3) the complaints fail to allege unlawful activity occurring within the Act's 2–year statute of limitations. The City then filed amended complaints (the complaints now before us) and sought reconsideration. The District Court held that the amended complaints could solve only the statute of limitations problem. It consequently declined to reconsider the dismissals.

The Court of Appeals reversed the District Court. 800 F.3d 1262 (C.A.11 2015); 801 F.3d 1258 (C.A.11 2015). It held that the City's injuries fall within the "zone of interests," *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. ——, ——, 134 S.Ct. 1377, 1388, 188 L.Ed.2d 392 (2014), that the FHA protects. 800 F.3d, at 1274–1275, 1277 (relying on *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); and *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)); 801 F.3d, at 1266–1267 (similar). It added that the complaints adequately allege proximate cause. 800 F.3d, at 1278, 801 F.3d, at 1267. And it remanded the cases while ordering the District Court to accept the City's complaints as amended. 800 F.3d, at 1286, 801 F.3d, at 1267.

The Banks filed petitions for certiorari, asking us to decide whether, as the Court of Appeals had in effect held, the amended complaints satisfied the FHA's zone-of-interests and proximate-cause requirements. We agreed to do so.

## II

**[1]** **[2]** **[3]** To satisfy the Constitution's restriction of this Court's jurisdiction to "Cases" and "Controversies," Art. III, § 2, a plaintiff must demonstrate constitutional standing. To do so, the plaintiff must show an "injury in fact" that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. ——, ——, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). This Court has also referred to a plaintiff's need to satisfy "prudential" or "statutory" standing requirements. See *Lexmark,* 572 U.S., at —— – ——, and n. 4, 134 S.Ct., at 1387, and n. 4. In *Lexmark,* we said that the label " 'prudential standing' " was misleading, for the requirement at issue is in reality tied to a particular statute. *Ibid.* The question is whether the statute grants the plaintiff the cause of action that he asserts. In answering that question, we presume that a statute ordinarily provides a cause of action "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.,* at ——, 134 S.Ct., at 1388 (internal quotation marks omitted). We have added that "[w]hether a plaintiff **\*1303** comes within 'the zone

Bank of America Corp. v. City of Miami, Fla., 137 S.Ct. 1296 (2017)
197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...
2:16-cv-14406-DML-DRG    Doc # 46    Filed 10/05/17    Pg 43 of 50    Pg ID 839

of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.,* at ——, 134 S.Ct., at 1387 (some internal quotation marks omitted).

**[4]** Here, we conclude that the City's claims of financial injury in their amended complaints—specifically, lost tax revenue and extra municipal expenses—satisfy the "cause-of-action" (or "prudential standing") requirement. To use the language of *Data Processing,* the City's claims of injury it suffered as a result of the statutory violations are, at the least, "*arguably within the zone of interests*" that the FHA protects. 397 U.S., at 153, 90 S.Ct. 827 (emphasis added).

The FHA permits any "aggrieved person" to bring a housing-discrimination lawsuit. 42 U.S.C. § 3613(a). The statute defines "aggrieved person" as "any person who" either "claims to have been injured by a discriminatory housing practice" or believes that such an injury "is about to occur." § 3602(i).

**[5]** This Court has repeatedly written that the FHA's definition of person "aggrieved" reflects a congressional intent to confer standing broadly. We have said that the definition of "person aggrieved" in the original version of the FHA, § 810(a), 82 Stat. 85, "showed 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution.' " *Trafficante, supra,* at 209, 93 S.Ct. 364 (quoting *Hackett v. McGuire Brothers, Inc.,* 445 F.2d 442, 446 (C.A.3 1971)); see *Gladstone, supra,* at 109, 99 S.Ct. 1601 (similar); *Havens Realty, supra,* at 372, 375–376, 102 S.Ct. 1114 (similar); see also *Thompson v. North American Stainless, LP,* 562 U.S. 170, 176, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011) ("Later opinions, we must acknowledge, reiterate that the term 'aggrieved' [in the FHA] reaches as far as Article III permits"); *Bennett v. Spear,* 520 U.S. 154, 165–166, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("[*Trafficante* ] held that standing was expanded to the full extent permitted under Article III by § 810(a) of the Civil Rights Act of 1968").

Thus, we have held that the Act allows suits by white tenants claiming that they were deprived benefits from interracial associations when discriminatory rental practices kept minorities out of their apartment complex, *Trafficante,* 409 U.S., at 209–212, 93 S.Ct. 364; a village alleging that it lost tax revenue and had the racial balance of its community undermined by racial-steering practices,

*Gladstone,* 441 U.S., at 110–111, 99 S.Ct. 1601; and a nonprofit organization that spent money to combat housing discrimination, *Havens Realty,* 455 U.S., at 379, 102 S.Ct. 1114. Contrary to the dissent's view, those cases did more than "sugges[t]" that plaintiffs similarly situated to the City have a cause of action under the FHA. *Post,* at 1308. They held as much. And the dissent is wrong to say that we characterized those cases as resting on "ill-considered dictum." *Post,* at 1308 (quoting *Thompson, supra,* at 176, 131 S.Ct. 863). The "dictum" we cast doubt on in *Thompson* addressed who may sue under Title VII, the employment discrimination statute, not under the FHA.

Finally, in 1988, when Congress amended the FHA, it retained without significant change the definition of "person aggrieved" that this Court had broadly construed. Compare § 810(a), 82 Stat. 85, with § 5(b), 102 Stat. 1619–1620 (codified at 42 U.S.C. § 3602(i)) (changing "person aggrieved" to "aggrieved person" and making other minor changes to the definition). Indeed, Congress "was aware of" our precedent and "made a considered judgment to retain the relevant statutory **\*1304** text," *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. ——, ——, 135 S.Ct. 2507, 2519, 192 L.Ed.2d 514 (2015). See H.R. Rep. No. 100–711, p. 23 (1988) (stating that the "bill adopts as its definition language similar to that contained in Section 810 of existing law, as modified to reaffirm the broad holdings of these cases" and discussing *Gladstone* and *Havens Realty* ); cf. *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (Congress normally adopts our interpretations of statutes when it reenacts those statute without change).

The Banks do not deny the broad reach of the words "aggrieved person" as defined in the FHA. But they do contend that those words nonetheless set boundaries that fall short of those the Constitution sets. Brief for Petitioners in No. 15–1112, p. 12 (Brief for Wells Fargo); Brief for Petitioners in No. 15–1111, pp. 19–20 (Brief for Bank of America). The Court's language in *Trafficante, Gladstone,* and *Havens Realty,* they argue, was exaggerated and unnecessary to decide the cases then before the Court. See Brief for Wells Fargo 19–23; Brief for Bank of America 27–33. Moreover, they warn that taking the Court's words literally—providing everyone with constitutional standing a cause of action under the FHA—would produce a legal anomaly. After

all, in *Thompson,* 562 U.S., at 175–177, 131 S.Ct. 863 we held that the words " 'person claiming to be aggrieved' " in Title VII of the Civil Rights Act of 1964, the employment discrimination statute, did not stretch that statute's zone of interest to the limits of Article III. We reasoned that such an interpretation would produce farfetched results, for example, a shareholder in a company could bring a Title VII suit against the company for discriminatorily firing an employee. *Ibid.* The Banks say it would be similarly farfetched if restaurants, plumbers, utility companies, or any other participant in the local economy could sue the Banks to recover business they lost when people had to give up their homes and leave the neighborhood as a result of the Banks' discriminatory lending practices. Brief for Wells Fargo 18–19; Brief for Bank of America 22, 24–25. That, they believe, cannot have been the intent of the Congress that enacted or amended the FHA.

We need not discuss the Banks' argument at length, for even if we assume for argument's sake that some form of it is valid, we nonetheless conclude that the City's financial injuries fall within the zone of interests that the FHA protects. Our case law with respect to the FHA drives that conclusion. The City's complaints allege that the Banks "intentionally targeted predatory practices at African–American and Latino neighborhoods and residents," App. 225; *id.,* at 409 (similar). That unlawful conduct led to a "concentration" of "foreclosures and vacancies" in those neighborhoods. *Id.,* at 226, 229, 410, 413. Those concentrated "foreclosures and vacancies" caused "stagnation and decline in African–American and Latino neighborhoods." *Id.,* at 225, 409. They hindered the City's efforts to create integrated, stable neighborhoods. *Id.,* at 186, 351. And, highly relevant here, they reduced property values, diminishing the City's property-tax revenue and increasing demand for municipal services. *Id.,* at 233–234, 417.

Those claims are similar in kind to the claims the Village of Bellwood raised in *Gladstone.* There, the plaintiff village had alleged that it was " 'injured by having [its] housing market ... wrongfully and illegally manipulated to the economic and social detriment of the citizens of [the] village.' " 441 U.S., at 95, 99 S.Ct. 1601 (quoting the complaint; alterations in original). We held that the village could bring **\*1305** suit. We wrote that the complaint in effect alleged that the defendant-realtors' racial steering "affect[ed] the village's racial composition," "reduce[d] the

total number of buyers in the Bellwood housing market," "precipitate[d] an exodus of white residents," and caused "prices [to] be deflected downward." *Id.,* at 110, 99 S.Ct. 1601. Those circumstances adversely affected the village by, among other things, *producing a "significant reduction in property values [that] directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services."* Id., *at 110–111, 99 S.Ct. 1601 (emphasis added).*

The upshot is that the City alleges economic injuries that arguably fall within the FHA's zone of interests, as we have previously interpreted that statute. Principles of *stare decisis* compel our adherence to those precedents in this context. And principles of statutory interpretation require us to respect Congress' decision to ratify those precedents when it reenacted the relevant statutory text. See *supra,* at 1302 – 1305.

## III

[6]    The remaining question is one of causation: Did the Banks' allegedly discriminatory lending practices proximately cause the City to lose property-tax revenue and spend more on municipal services? The Eleventh Circuit concluded that the answer is "yes" because the City plausibly alleged that its financial injuries were foreseeable results of the Banks' misconduct. We conclude that foreseeability alone is not sufficient to establish proximate cause under the FHA, and therefore vacate the judgment below.

[7]    [8]    [9]    It is a " 'well established principle of [the common] law that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause.' " *Lexmark,* 572 U.S., at ——, 134 S.Ct., at 1390. We assume Congress "is familiar with the common-law rule and does not mean to displace it *sub silentio* " in federal causes of action. *Ibid.* A claim for damages under the FHA —which is akin to a "tort action," *Meyer v. Holley,* 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003)—is no exception to this traditional requirement. "Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark, supra,* at ——, 134 S.Ct., at 1390.

Bank of America Corp. v. City of Miami, Fla., 137 S.Ct. 1296 (2017)
2:16-cv-14406-DMM-DRG   Doc #: 46   Filed: 10/05/17   Pg 45 of 50   Pg ID 841
197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

In these cases, the "conduct the statute prohibits" consists of intentionally lending to minority borrowers on worse terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms. The City alleges that the Banks' misconduct led to a disproportionate number of foreclosures and vacancies in specific Miami neighborhoods. These foreclosures and vacancies purportedly harmed the City, which lost property-tax revenue when the value of the properties in those neighborhoods fell and was forced to spend more on municipal services in the affected areas.

The Eleventh Circuit concluded that the City adequately pleaded that the Banks' misconduct proximately caused these financial injuries. 800 F.3d, at 1282. The court held that in the context of the FHA "the proper standard" for proximate cause "is based on foreseeability." *Id.,* at 1279, 1282. The City, it continued, satisfied that element: Although there are "several links in the causal chain" between the charged discriminatory lending practices and the claimed losses, the City plausibly alleged **\*1306** that "none are unforeseeable." *Id.,* at 1282.

We conclude that the Eleventh Circuit erred in holding that foreseeability is sufficient to establish proximate cause under the FHA. As we have explained, proximate cause "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark, supra,* at ——, 134 S.Ct., at 1390. In the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires. The housing market is interconnected with economic and social life. A violation of the FHA may, therefore, " 'be expected to cause ripples of harm to flow' " far beyond the defendant's misconduct. *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 534, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel. And entertaining suits to recover damages for any foreseeable result of an FHA violation would risk "massive and complex damages litigation." *Id.,* at 545, 103 S.Ct. 897.

Rather, proximate cause under the FHA requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). A damages claim under

the statute "is analogous to a number of tort actions recognized at common law," *Curtis v. Loether,* 415 U.S. 189, 195, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), and we have repeatedly applied directness principles to statutes with "common-law foundations," *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 457, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006). " 'The general tendency' " in these cases, " 'in regard to damages at least, is not to go beyond the first step.' " *Hemi Group, LLC v. City of New York,* 559 U.S. 1, 10, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010). What falls within that "first step" depends in part on the "nature of the statutory cause of action," *Lexmark, supra,* at ——, 134 S.Ct., at 1390, and an assessment " 'of what is administratively possible and convenient,' " *Holmes, supra,* at 268, 112 S.Ct. 1311.

**[10]** The parties have asked us to draw the precise boundaries of proximate cause under the FHA and to determine on which side of the line the City's financial injuries fall. We decline to do so. The Eleventh Circuit grounded its decision on the theory that proximate cause under the FHA is "based on foreseeability" alone. 800 F.3d, at 1282. We therefore lack the benefit of its judgment on how the contrary principles we have just stated apply to the FHA. Nor has any other court of appeals weighed in on the issue. The lower courts should define, in the first instance, the contours of proximate cause under the FHA and decide how that standard applies to the City's claims for lost property-tax revenue and increased municipal expenses.

## IV

The judgments of the Court of Appeals for the Eleventh Circuit are vacated, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice GORSUCH took no part in the consideration or decision of these cases.

Justice THOMAS, with whom Justice KENNEDY and Justice ALITO join, concurring in part and dissenting in part.

Bank of America Corp. v. City of Miami, Fla., 137 S.Ct. 1296 (2017)

197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

These cases arise from lawsuits filed by the city of Miami alleging that residential mortgage lenders engaged in discriminatory lending practices in violation of the Fair Housing Act (FHA). The FHA prohibits "discrimination" against "any person" because **\*1307** of "race, color, religion, sex, handicap, familial status, or national origin" with respect to the "sale or rental" of "a dwelling." 42 U.S.C. § 3604; accord, § 3605(a); § 3606. Miami's complaints do not allege that any defendant discriminated against it within the meaning of the FHA. Neither is Miami attempting to bring a lawsuit on behalf of its residents against whom petitioners allegedly discriminated. Rather, Miami's theory is that, between 2004 and 2012, petitioners' allegedly discriminatory mortgage-lending practices led to defaulted loans, which led to foreclosures, which led to vacant houses, which led to decreased property values, which led to reduced property taxes and urban blight. See 800 F.3d 1262, 1268 (C.A.11 2015); 801 F.3d 1258, 1266 (C.A.11 2015). Miami seeks damages from the lenders for reduced property tax revenues and for the cost of increased municipal services—"police, firefighters, building inspectors, debris collectors, and others"—deployed to attend to the blighted areas. 800 F.3d, at 1269, 801 F.3d, at 1263.

The Court today holds that Congress intended to remedy those kinds of injuries when it enacted the FHA, but leaves open the question whether Miami sufficiently alleged that the discriminatory lending practices caused its injuries. For the reasons explained below, I would hold that Miami's injuries fall outside the FHA's zone of interests. I would also hold that, in any event, Miami's alleged injuries are too remote to satisfy the FHA's proximate-cause requirement.

I

A plaintiff seeking to bring suit under a federal statute must show not only that he has standing under Article III, *ante,* at 1302, but also that his "complaint fall[s] within the zone of interests protected by the law" he invokes, *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. ——, ——, 134 S.Ct. 1377, 1386, 188 L.Ed.2d 392 (2014) (internal quotation marks omitted). The zone-of-interests requirement is "root[ed]" in the "common-law rule" providing that a plaintiff may "recover under the law of negligence for injuries caused by violation of a statute" only if "the statute 'is interpreted as designed to protect the

class of persons in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation.' " *Id.,* at ——, n. 5, 134 S.Ct., at 1389, n. 5 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 36, pp. 229–230 (5th ed. 1984)).

We have "made clear" that "Congress is presumed to legislate against the background" of that common-law rule. *Lexmark,* 572 U.S., at ——, 134 S.Ct., at 1388 (internal quotation marks omitted). We thus apply it "to all statutorily created causes of action ... unless it is *expressly* negated." *Ibid.* (emphasis added; internal quotation marks omitted). "Whether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.,* at ——, 134 S.Ct., at 1387 (internal quotation marks omitted).

A

Nothing in the text of the FHA suggests that Congress intended to deviate from the zone-of-interests limitation. The statute's private-enforcement provision provides that only an "aggrieved person" may sue, § 3613(a) (1)(A), and the statute defines "aggrieved person" to mean someone who "claims to have been injured by a discriminatory housing practice" or who believes he "will be injured by a discriminatory housing practice that is about to occur," **\*1308** §§ 3602(i)(1), (2). That language does not hint—much less expressly provide— that Congress sought to depart from the common-law rule.

We have considered similar language in other statutes and reached the same conclusion. In *Thompson v. North American Stainless, LP,* 562 U.S. 170, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011), for example, we considered Title VII's private-enforcement provision, which provides that " 'a person claiming to be aggrieved' " may file an employment discrimination charge with the Equal Employment Opportunity Commission. *Id.,* at 173, 131 S.Ct. 863 (quoting § 2000e–5(b)). We unanimously concluded that Congress did not depart from the zone-of-interests limitation in Title VII by using that language. *Id.,* at 175–178, 131 S.Ct. 863. And in *Lexmark,* we interpreted

a provision of the Lanham Act that permitted "any person who believes that he or she is likely to be damaged by a defendant's false advertising" to sue. 572 U.S., at ——, 134 S.Ct., at 1388 (internal quotation marks omitted). Even when faced with the broader "any person" language, we expressly rejected the argument that the statute conferred a cause of action upon anyone claiming an Article III injury in fact. We observed that it was unlikely that "Congress meant to allow all factually injured plaintiffs to recover," and we concluded that the zone-of-interests test was the "appropriate tool for determining who may invoke the cause of action" under the statute. *Id.,* at ——, ——, 134 S.Ct., at 1388, 1388–1389 (internal quotation marks omitted).

To be sure, some language in our older precedents suggests that the FHA's zone of interests extends to the limits of Article III. See *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). But we have since described that language as "ill-considered" dictum leading to "absurd consequences." *Thompson,* 562 U.S., at 176, 131 S.Ct. 863. And we have observed that the "holdings of those cases are compatible with the 'zone of interests' limitation" described in *Thompson. Ibid.* That limitation provides that a plaintiff may not sue when his "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be assumed that Congress intended to permit the suit." *Id.,* at 178, 131 S.Ct. 863 (internal quotation marks omitted). It thus "exclud[es] plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions." *Ibid.*

### B

In my view, Miami's asserted injuries are "so marginally related to or inconsistent with the purposes" of the FHA that they fall outside the zone of interests. Here, as in any other case, the text of the FHA defines the zone of interests that the statute protects. See *Lexmark, supra,* at ——, 134 S.Ct., at 1389. The FHA permits "[a]n aggrieved person" to sue, § 3613(a)(1)(A), if he "claims to have been injured by a *discriminatory housing practice* " or believes that he "will be injured by a *discriminatory housing practice* that

is about to occur," §§ 3602(i)(1), (2) (emphasis added). Specifically, the FHA makes it unlawful to do any of the following on the basis of "race, color, religion, sex, handicap, familial status, or national origin": "refuse to sell or rent ... a dwelling," § 3604(a); discriminate in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," § 3604(b); "make, print, or publish **\*1309** ... any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination," § 3604(c); "represent to any person ... that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available," § 3604(d); "induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of" certain characteristics, § 3604(e); or discriminate in the provision of real estate or brokerage services, §§ 3605, 3606. The quintessential "aggrieved person" in cases involving violations of the FHA is a prospective home buyer or lessee discriminated against during the home-buying or leasing process. Our cases have also suggested that the interests of a person who lives in a neighborhood or apartment complex that remains segregated (or that risks becoming segregated) as a result of a discriminatory housing practice may be arguably within the outer limit of the interests the FHA protects. See *Trafficante, supra,* at 211, 93 S.Ct. 364 (concluding that one purpose of the FHA was to promote "truly integrated and balanced living patterns" (internal quotation marks omitted)).

Miami's asserted injuries are not arguably related to the interests the statute protects. Miami asserts that it received "reduced property tax revenues," App. 233, 417, and that it was forced to spend more money on "municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions," *id.,* at 417; see also *ante,* at 1301. The city blames these expenditures on the falling property values and vacant homes that resulted from foreclosures. But nothing in the text of the FHA suggests that Congress was concerned about decreased property values, foreclosures, and urban blight, much less about strains on municipal budgets that might follow.

Miami's interests are markedly distinct from the interests this Court confronted in *Trafficante, Gladstone,* and *Havens.* In *Trafficante,* one white and one black tenant of an apartment complex sued on the ground that the

Bank of America Corp. v. City of Miami, Fla., 137 S.Ct. 1296 (2017)

197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

complex discriminated against nonwhite rental applicants. 409 U.S., at 206–208, 93 S.Ct. 364. They argued that this discrimination deprived them of the social and economic benefits of living in an integrated community. *Id.,* at 208, 93 S.Ct. 364. In *Gladstone,* residents in a village sued based on alleged discrimination in the home-buying process. 441 U.S., at 93–95, 99 S.Ct. 1601. They contended that white home buyers were steered away from a racially integrated neighborhood and toward an all-white neighborhood, whereas black home buyers were steered away from the all-white neighborhood and toward the integrated neighborhood. *Id.,* at 95, 99 S.Ct. 1601. The plaintiffs thus alleged that they were "denied their right to select housing without regard to race." *Ibid.* (internal quotation marks omitted). The village also sued, alleging that the FHA violations were affecting its "racial composition, replacing what is presently an integrated neighborhood with a segregated one" and that its budget was strained from resulting lost tax revenues. *Id.,* at 110, 99 S.Ct. 1601. Finally, in *Havens,* one white and one black plaintiff sued after having posed as "testers," for the purpose of "collecting evidence of unlawful steering practices." 455 U.S., at 373, 102 S.Ct. 1114. According to their complaint, the owner of an apartment complex had told the white plaintiff that apartments were available, but had told the black plaintiff that apartments were not. *Id.,* at 368, 102 S.Ct. 1114. The Court held that the white plaintiff could *not* sue, because he had been provided truthful information, but that the **\*1310** black plaintiff *could* sue, because the FHA requires truthful information about housing without regard to race. *Id.,* at 374–375, 102 S.Ct. 1114. In all three of these cases, the plaintiffs claimed injuries based on racial steering and segregation —interests that, under this Court's precedents, at least arguably fall within the zone of interests that the FHA protects.

Miami's asserted injuries implicate none of those interests. Miami does not assert that it was injured based on efforts by the lenders to steer certain residents into one neighborhood rather than another. Miami does not even assert that it was injured because its neighborhoods were segregated. Miami therefore is not, as the majority describes, "similarly situated" to the plaintiffs in *Trafficante, Gladstone,* and *Havens. Ante,* at 1303. Rather, Miami asserts injuries allegedly resulting from foreclosed-upon and then vacant homes. The FHA's zone of interests is not so expansive as to include those kinds of injuries.

## C

The Court today reaches the opposite conclusion, resting entirely on the brief mention in *Gladstone* of the village's asserted injury of reduced tax revenues, and on principles of *stare decisis.* See *ante,* at 1304. I do not think *Gladstone* compels the conclusion the majority reaches. Unlike these cases, *Gladstone* involved injuries to interests in "racial balance and stability," 441 U.S., at 111, 99 S.Ct. 1601 which, our cases have suggested, arguably fall within the zone of interests protected by the FHA, see *supra,* at 1303. The fact that the village plaintiff asserted a budget-related injury *in addition to* its racial-steering injury does not mean that a city alleging *only* a budget-related injury is authorized to sue. A budget-related injury might be necessary to establish a sufficiently concrete and particularized injury for purposes of Article III, but it is not sufficient to satisfy the FHA's zone-of-interests limitation.

Although the Court's reliance on *Gladstone* is misplaced, its opinion today is notable primarily for what it does not say. First, the Court conspicuously does not reaffirm the broad language from *Trafficante, Gladstone,* and *Havens* suggesting that Congress intended to permit any person with Article III standing to sue under the FHA. The Court of Appeals felt bound by that language, see 800 F.3d, at 1277, 801 F.3d, at 1266, and we granted review, despite the absence of a circuit conflict, to decide whether the language survived *Thompson* and *Lexmark,* see Brief for Petitioner in No. 15–1111, p. i ("By limiting suit to 'aggrieved person[s],' did Congress require that an FHA plaintiff plead more than just Article III injury-in-fact?"); Brief for Petitioner in No. 15–1112, p. i ("Whether the term 'aggrieved' in the Fair Housing Act imposes a zone-of-interests requirement more stringent than the injury-in-fact requirement of Article III"). Today's opinion avoids those questions presented and thus cannot be read as retreating from our more recent precedents on the zone-of-interests limitation.

Second, the Court does not reject the lenders' arguments about many other kinds of injuries that fall outside of the FHA's zone of interests. We explained in *Thompson* that an expansive reading of Title VII's zone of interests would allow a shareholder "to sue a company for firing a valuable employee for racially discriminatory reasons,

Bank of America Corp. v. City of Miami, Fla., 137 S.Ct. 1296 (2017)

197 L.Ed.2d 678, 85 USLW 4227, 17 Cal. Daily Op. Serv. 4050...

so long as he could show that the value of his stock decreased as a consequence." 562 U.S., at 177, 131 S.Ct. 863. Petitioners similarly argue that, if Miami can sue for lost tax revenues under the FHA, then "plumbers, utility companies, or any other participant in the local economy **\*1311** could sue the Banks to recover business they lost when people had to give up their homes and leave the neighborhood as a result of the Banks' discriminatory lending practices." *Ante,* at 1304 (citing petitioners' briefs). The Court today decides that it "need not discuss" this argument because *Gladstone* and *stare decisis* compel the conclusion that Miami can sue. *Ante,* at 1304. That conclusion is wrong, but at least it is narrow. Accordingly, it should not be read to authorize suits by local businesses alleging the same injuries that Miami alleges here.

II

Although I disagree with its zone-of-interests holding, I agree with the Court's conclusions about proximate cause, as far as they go. The Court correctly holds that "foreseeability alone is not sufficient to establish proximate cause under the FHA." *Ante,* at 1305. Instead, the statute requires " 'some direct relation between the injury asserted and the injurious conduct alleged.' " *Ante,* at 1305 (quoting *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)).

After articulating this test for proximate cause, the Court remands to the Court of Appeals because it "decline[s]" to "draw the precise boundaries of proximate cause under the FHA" or to "determine on which side of the line the City's financial injuries fall." *Ante,* at 1306. But these cases come to the Court on a motion to dismiss, and the Court of Appeals has no advantage over us in evaluating the complaint's proximate-cause theory. Moreover, the majority opinion leaves little doubt that neither Miami nor any similarly situated plaintiff can satisfy the rigorous standard for proximate cause that the Court adopts and leaves to the Court of Appeals to apply. See *ante,* at 1305 ("The general tendency in these cases, in regard to damages at least, is not to go beyond the first step" (internal quotation marks omitted)).

Miami's own account of causation shows that the link between the alleged FHA violation and its asserted injuries is exceedingly attenuated. According to Miami,

the lenders' injurious conduct was "target[ing] black and Latino customers in Miami for predatory loans." Brief for Respondent in No. 15–1111, p. 4 (internal quotation marks omitted). And according to Miami, the injuries asserted are its "loss of tax revenues" and its expenditure of "additional monies on municipal services to address" the consequences of urban blight. *Id.,* at 6.

As Miami describes it, the chain of causation between the injurious conduct and its asserted injuries proceeds as follows: As a result of the lenders' discriminatory loan practices, borrowers from predominantly minority neighborhoods were likely to default on their home loans, leading to foreclosures. *Id.,* at 5–6. The foreclosures led to vacant houses. *Id.,* at 6. The vacant houses, in turn, led to decreased property values for the surrounding homes. *Ibid.* Finally, those decreased property values resulted in homeowners paying lower property taxes to the city government. *Ibid.* Also, Miami explains, the foreclosed-upon, vacant homes eventually led to "vagrancy, criminal activity, and threats to public health and safety," which the city had to address through the expenditures of municipal resources. *Ibid.* And all this occurred, according to Miami, between 2004 and 2012. See *ibid.* The Court of Appeals will not need to look far to discern other, independent events that might well have caused the injuries Miami alleges in these cases.

In light of this attenuated chain of causation, Miami's asserted injuries are too **\*1312** remote from the injurious conduct it has alleged. See *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 532, n. 25, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Indeed, any other conclusion would lead to disquieting consequences. Under Miami's own theory of causation, its injuries are one step further removed from the allegedly discriminatory lending practices than the injuries suffered by the neighboring homeowners whose houses declined in value. No one suggests that those homeowners could sue under the FHA, and I think it is clear that they cannot. Accordingly, I would hold that Miami has failed to sufficiently plead proximate cause under the FHA.

III

For the foregoing reasons, I would reverse the Court of Appeals.

**All Citations**

137 S.Ct. 1296, 197 L.Ed.2d 678, 85 USLW 4227, 17 Cal.
Daily Op. Serv. 4050, 2017 Daily Journal D.A.R. 4067, 26
Fla. L. Weekly Fed. S 552

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.