UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EARL CROSBY, individually and as successor-in-interest
of the ESTATE OF TEVIN EUGENE CROSBY, LISA
CROSBY, SHENETRA PARKER-HARRIS, CHAVIS
CROSBY, CELIA RUIZ, individually and as successor-
in-interest of the ESTATE OF JUAN RAMON GUERRERO,
JR., JUAN RAMON GUERRERO, MAYA GUERRERO,
ARYAM GUERRERO, OSVALDO VAZQUEZ, YAZMIN
REYES, individually and as successor-in-interest of the
ESTATE OF JAVIER JORGE-REYES, PEDRO JORGE
DIAZ, IRIS REYES SANTIAGO, PEDRO JORGE REYES,
GABRIEL JORGE REYES, and LIZ M. JORGE-REYES,
CHRIS LITTLESTAR, MARIA C. SANFELIZ-MENDOZA,
individually and as successor-in-interest of the ESTATE OF
CHRISTOPHER JOSEPH SANFELIZ, NICHOLAS PEREZ,
ANGEL MENDEZ, CHRISTINE LEINONEN, individually
and as Successor-in-interest of the ESTATE OF CHRISTOPHER
LEINONEN, JILLIAN AMADOR, STANLEY ALMODOVAR,
individually and as successor-in-interest of the ESTATE OF
STANLEY ALMODOVAR, III, ASAEL ABAD, LYDIA
PEREZ, individually and as successor-in-interest of the ESTATE
OF JEAN CARLOS MENDEZ PEREZ, ALVIN MENDEZ,
JOSE LUIS VIELMA, individually and as successor-in-interest
of the ESTATE OF LUIS SERGIO VIELMA, JACKSON J.
JOSAPHAT, individually and as successor-in-interest of the
ESTATE OF JASON B. JOSAPHAT, and CARLOS SANFELIZ,
individually and as successor-in-interest of the ESTATE OF
CHRISTOPHER JOSEPH SANFELIZ,

Case Number 16-14406
Honorable David M. Lawson

**OPINION AND ORDER
GRANTING MOTION
TO DISMISS AND
DISMISSING CASE
WITH PREJUDICE**

       Plaintiffs,

v.

TWITTER, INC., GOOGLE, INC., and
FACEBOOK, INC.,

       Defendants.

_____/

## OPINION AND ORDER GRANTING MOTION TO DISMISS
## AND DISMISSING CASE WITH PREJUDICE

The plaintiffs in this case are victims and family members of deceased victims of the mass shooting at the Pulse Night Club in Orlando, Florida perpetrated by Omar Mateen on June 12, 2016. They have sued the three defendants, which provide social media platforms used by terrorist groups to spread their messages of violence and hatred. The plaintiffs believe that the access that the defendants furnished to the Islamic State of Iraq and Syria (ISIS), which apparently allowed Mateen to hear its messages via the Internet and become radicalized, triggers liability for the shooting. The plaintiffs bring claims under federal statutes that create causes of action for aiding acts of international terrorism and providing material support to terrorists and foreign terrorist organizations. They also have alleged claims under state law.

The defendants have filed a joint motion to dismiss, arguing that the claims are barred by the immunity granted to online service providers under the Communications Decency Act, 42 U.S.C. § 230, and that the pleaded facts do not support the causes of action. There are many conclusions that can be drawn from the facts alleged in the amended complaint about the ethics and moral responsibility of those maintaining social media sites, including the defendants. But because the plaintiffs have not pleaded facts that plausibly establish *legal* claims for which relief can be granted, the Court will grant the motion and dismiss the case.

I.

The facts are taken from the amended complaint, as read favorably to the plaintiffs for this motion to dismiss.

Omar Mateen killed 49 people and injured 53 during the June 12, 2016 shooting at the Pulse Night Club. The plaintiffs (and their decedents) are included in those numbers. They posit that the

defendants are accountable for those deaths and injuries under the civil remedy allowances Congress added to the federal Anti-Terrorism Act (ATA), found in Chapter 113B of the federal criminal code. In particular, 18 U.S.C. § 2333(a) establishes a cause of action for damages for "[a]ny national of the United States" who is killed or injured by "an act of international terrorism." Liability extends to "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." *Id.* § 2333(d). The plaintiffs assert claims against these defendants under that section, and also for providing material support to international terrorists, 18 U.S.C. § 2339A, and for providing material support to international terrorist organizations, 18 U.S.C. § 2339B.

The plaintiffs contend that by allowing ISIS to post proselytizing videos on their sites, and by deriving revenue from targeted advertising on those sites, the defendants have engaged in conduct subjecting them to liability for Mateen's terrorist act. Although certain organizations, most notably banks, occasionally have been found liable under these federal statutes for aiding international terrorists, *see, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010), *aff'd on other grounds*, 714 F.3d 109 (2d Cir. 2013), there is not a single case in which social media providers have been held responsible. And in several other cases, attempts to make out such a case have failed. *See Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018); *Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 2017 WL 5992143 (N.D. Cal. 2017).

To establish their claims, the plaintiffs must plead facts that plausibly suggest the likelihood that the Orlando night club shooting was "an act of international terrorism," and that the defendants aided and abetted or conspired to commit that act, or that they provided material support directly to

Mateen, or material support to ISIS *and* that ISIS perpetrated the attack. Here is what they allege in their amended complaint.

## A. ISIS

The amended complaint devotes considerable space to general allegations describing the well-known public persona of the organization popularly known as ISIS, and in particular its heavy use of the Internet and various social media facilities, including those maintained by the defendants, to spread the organization's message promoting the establishment of an Islamic State governed by Sharia law. *See* Am. Compl. ¶¶ 1-103. The defendants do not appear seriously to contest those general background allegations, mostly coming from published news reports, suggesting that elements of ISIS operate (or have operated) numerous Internet accounts on the defendants' services, some with thousands or tens of thousands of followers, which actively publish media and messages encouraging those who might view them to commit violent acts of terrorism, and which also publish messages claiming responsibility for violent terrorist acts around the world. The amended complaint also alleges that ISIS uses the defendants' platforms actively to solicit sympathetic funders to donate to its cause. It appears to be undisputed that as far back as December 2004, the United States designated ISIS as a Foreign Terrorist Organization.

The plaintiffs allege that all of the defendants place targeted ads on web pages featuring content posted by ISIS accounts, and that they derive revenue from views of those ads. Additionally, defendant Google, Inc., through its YouTube platform, places ads on pages where ISIS videos are displayed and shares revenue from those ads with the account holders who post videos. That results in direct payments to the ISIS affiliates that operate those accounts. Am. Compl. ¶¶ 59-60, 137-42. Despite public appeals to the defendants to take action to disable known ISIS-affiliated

-4-

accounts on their services, the defendants have been unable or unwilling to do so. *Id.* ¶¶ 104-133. Any ISIS accounts that the defendants do disable rapidly reappear within hours or days under simple reiterations of the same formulaic account handles used by previous accounts that were banned (e.g., accounts named "DriftOne00147" through "DriftOne00151" serially created, posting substantially the same messages, after accounts "DriftOne00146" through "DriftOne00150" were deleted). Am. Compl. ¶¶ 121-24.

## B. The Orlando Night Club Shooting

On Friday, June 12, 2016, Omar Mateen entered the Pulse Night Club in Orlando, Florida, and began shooting. By the time Mateen's shooting rampage ended, 49 persons attending the club that night were dead, and 53 were injured. The attack was widely reported by local, national, and international news outlets.

The plaintiffs allege that, shortly after the shooting, the ISIS official news agency, known as "Amaq," issued a "flash bulletin" stating that, "The attack that targeted a nightclub for homosexuals in Orlando, Florida, and left more than one hundred dead and wounded was carried out by an Islamic State fighter." The ISIS official radio station, al-Bayan, also reported on the shooting with a statement as follows:

> Allah has enabled brother Omar Mateen, one of the soldiers of the Caliphate in America, to carry out a raid where he was able to infiltrate a Crusaders' gathering at a gay nightclub in Orlando, Florida. Allah enabled him to inflict heavy casualties amongst the filthy Crusaders. He killed and injured over a hundred of them. This is the biggest raid to be carried [out] in America after the raid of Manhattan 16 years ago.

Am. Compl. ¶ 175. During the investigation of the shooting, FBI analysts concluded that Mateen viewed Internet sites over several years and became "self-radicalized." But he decided only recently before the attack to embrace the Islamic State. Mateen supposedly watched online "jihadist

sermons" since 2012. He also had downloaded "jihadist material" to his computer, which included videos of beheadings of militants' captives. Omar Mateen's spouse, Noor Salman, was arrested. During the arrest, the FBI learned that Mateen viewed ISIS YouTube videos, which presumably contributed to his recruitment and radicalization. (Noor Salman was charged with providing material support to an international terrorist organization and obstruction of justice in connection with the Orlando shooting, and was acquitted by a jury earlier today.)

The plaintiffs allege that the Orlando night club shooting was an act of "international terrorism," based on the following chain of inferences, as set forth in the amended complaint:

> One of the state[d] goals of ISIS is to use social media including Defendants platforms to radicalize individuals to conduct attacks throughout the world, including the United States.

> By radicalizing individuals through social media, this allowed ISIS to exert its influence without the necessity of direct physical contact with these individuals. Furthermore, this allows ISIS to incite or participate in attacks without the necessity of sending its own operatives.

> Thus, an attack in the United States to which ISIS' use of social media caused or contributed is an action by ISIS. Given that ISIS has been declared an international terrorist organization, such an action is an act of international terrorism.

> Omar Mateen was radicalized by ISIS' use of social media. This was the stated goal of ISIS. Mateen then carried out the deadly attacks in Orlando. Conducting terrorist acts via radicalized individuals is a stated goal of ISIS.

> Mateen's attack on the Pulse nightclub was a violent act causing death and injury and constitutes numerous criminal acts under the laws of the United States.

> ISIS intended to intimidate and coerce western populations and governments through a pattern of intimidation and coercion as discussed throughout Plaintiff's First Amended Complaint.

> ISIS acts from outside the United States using Defendants' platforms in a manner [that] transcend[s] national boundaries because of the international usage of Defendants' platforms.

-6-

But for ISIS' postings using Defendants' social media platforms, Mateen would not have engaged in his attack on the Pulse nightclub.

Mateen's terrorist actions were a direct result of ISIS' actions and given that ISIS is an international terrorist organization, Mateen's actions were also an act of international terrorism.

Am. Compl. ¶¶ 206-214.

The plaintiffs also allege that the defendants know (1) that ISIS is designated as a Foreign Terrorist Organization; (2) that ISIS members and its official news outlets use numerous accounts on the defendants' platforms to publish the organization's messages and to recruit and "radicalize" persons such as Mateen; (3) that ISIS raises significant amounts of money and recruits numerous individuals to its cause through the organization's use of the defendants' social media platforms; and (4) without that funding and widespread global messaging, the organization's capacity to carry out terrorist acts "would essentially evaporate."

The plaintiffs allege that the defendants "provided [their] services and equipment to ISIS, knowing that they were to be used in preparation for, or in carrying out, criminal acts including the acts that injured the Plaintiffs," and that "but for the material support and resources provided by ISIS, the attack that injured the Plaintiffs would have been substantially more difficult to implement." Am. Compl. ¶¶ 234-35. They also allege that by providing their services to ISIS, the defendants "aided and abetted" the organization's accomplishment of its goals, and "conspired" with ISIS to achieve those goals. *Id.* ¶¶ 221-22, 227-29.

## C. Procedural History

The plaintiffs filed their complaint in this case on December 19, 2016, and they later filed an amended complaint. The amended complaint pleads four counts under federal law for (1) aiding and abetting acts of international terrorism, contrary to 18 U.S.C. § 2333(a), (d) (Count One); (2)

conspiracy in furtherance of acts of international terrorism (same) (Count Two); (3) provision of material support to terrorists, 18 U.S.C. § 2333, 2339a (Count Three); and (4) provision of material support to a designated foreign terrorist organization, 18 U.S.C. § 2333, 23339b (Count Four). The complaint also pleads state law counts for negligent infliction of emotional distress (Count Five), and "wrongful death" (Count Six). The defendants jointly filed a motion to dismiss all of those claims.

## II.

The motion to dismiss has been brought under Federal Rule of Civil Procedure 12(b)(6). The defendants open with the argument that all of the claims premised on the defendants' complicity in the publication of content created by third parties are barred by the blanket grant of immunity to online service providers against such liability in Section 230 of the Communications Decency Act, 42 U.S.C. § 230. They follow with the contention that the amended complaint does not establish any cause of action because it does not allege facts to show that "ISIS" committed the Orlando night club shooting, or that the defendants had any association with or provided any support or assistance to the shooter, Omar Mateen; it does not allege any facts to show that the shooting was "an act of international terrorism"; and the plaintiffs have not pleaded any facts that establish that the defendants' conduct was the proximate cause of their injuries.

Because the amended complaint does not plead facts that plausibly support any viable claims against these defendants, the Court need not address the defendants' first argument. *See Fields v. Twitter, Inc.*, 881 F.3d 739, 750 (9th Cir. 2018).

The standards under Rule 12(b)(6) are well known to the parties: the purpose of the motion is to allow a defendant to test whether, as a matter of law, the plaintiffs are entitled to legal relief if

all the factual allegations in the complaint are taken as true. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). The complaint is viewed in the light most favorable to the plaintiffs, the factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). To survive the motion, the plaintiffs "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010).

When deciding a motion under Rule 12(b)(6), the Court looks only to the pleadings, *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008), the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), and matters of public record, *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010). However, beyond that, assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).

A.  Federal Claims

To make out a claim under the civil remedy provision of the ATA, the plaintiffs must plead three things: (1) commission of an international act of terrorism; (2) harm to the plaintiffs as a result of that violation; and (3) a proximate causal link between the violation and the harm.  *See* 18 U.S.C. § 2333(a).  "Like a civil RICO claim, a suit for damages under the ATA 'is akin to a Russian matryoshka doll, with statutes nested inside of statutes.'"  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012) (quoting *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1032 (E.D.N.Y. 2006), *rev'd on other grounds sub nom. McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008)).  As discussed below, many of the statutory definitions link to other statutes.

1.  International Terrorism

One of the elements of the federal claims asserted by the plaintiffs is that their injuries resulted from "an act of international terrorism."  18 U.S.C. § 2333(a). Satisfying that element requires pleaded facts showing a life-threatening violent act that (A) violates a federal or state criminal law; (B) was intended to intimidate civilian populations, or influence a government policy through intimidation, or affected governmental operations by "mass destruction, assassination, or kidnapping"; and (C) occurred mostly outside United States territory or "transcend[ed] national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1).  The plaintiffs have not alleged facts establishing that element.

It is useful to pause at this point to review the pleading standards now in effect.  Certainly, a pleader must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  But for ten years now, we have been taught that those words

-10-

mean more than meet the eye. For instance, a pleader must allege hard facts; unsupported conclusions "will not do." *Twombly*, 550 U.S. at 555. Facts that show the mere "possibility" of a claim for relief are not enough; only "plausibility" will suffice. *Id.* at 557. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Accepting for the moment that Mateen's shooting spree satisfied parts A and B of the "international terrorism" definition, the amended complaint falls short of plausibly suggesting it fits within part C. It appears to be undisputed that the Pulse Night Club attack was carried out by a single shooter — Omar Mateen — and that both Mateen and his victims were, at the time of the attack, all located and resident in Orlando, Florida, within the United States. The plaintiffs have not pointed to any "means by which [the shooting] was accomplished" that involved acts crossing any national border; nor do they point to any persons outside the United States whom the shooting was "intended to intimidate or coerce"; and they have not pointed to any international "locale in which [the] perpetrator[] operate[d] or [sought] asylum." The only allegations of the complaint even hinting at some trans-national connection are those concerning Mateen's viewing of videos and Internet content that the plaintiffs contend were posted by agents of ISIS. But the complaint fails to assert any facts plausibly suggesting that the substance of those videos and other messages, or the posting of them, had anything at all directly to do with the shooting, other than that the principles espoused in them motivated Mateen to carry out the dreadful act.

The plaintiffs plainly have attempted to characterize Mateen as ISIS's "cat" in a "cat's paw" scenario. *Cf. Mys v. Michigan Dep't of State Police*, --- F.3d ---, No. 17-1445, 2018 WL 1514581, at *6 (6th Cir. Mar. 28, 2018) (noting that the so-called cat's paw theory of liability in employment cases refers "to one of Aesop's Fables in which a monkey tricks a cat into pulling chestnuts out of a fire for him"). And their attempt consists of the following syllogism: "ISIS acts from outside the United States using Defendants' platforms in a manner [that] transcend[s] national boundaries because of the international usage of Defendants' platforms. But for ISIS's postings using Defendants' social media platforms, Mateen would not have engaged in his attack on the Pulse nightclub. Mateen's terrorist actions were a direct result of ISIS' actions and given that ISIS is an international terrorist organization, Mateen's actions were also an act of international terrorism." Am. Compl. ¶¶ 212-214.

Those statements suggest, at most, nothing more than that ISIS posts information on the Internet, which might be communicated over international borders. But nothing in those statements points to any element of Mateen's conduct in carrying out the attack that had any transnational component. And the terminal allegation is nothing more than an unsupported legal conclusion, devoid of any specific factual support. Together, the allegations merely assert that because some acts of ISIS are "international," and because Mateen may have viewed Internet postings or videos sympathetic to ISIS's cause, Mateen is an "international terrorist," and any violent act he committed therefore comprised "international terrorism."

There are no pleaded facts that tend to show that Mateen carried out *this act* under ISIS's express direction. To be sure, even ISIS never claimed that it had any contact with Mateen or instructed him to shoot up the Pulse Night Club. And the heaps of relatively concrete facts that the

amended complaint does offer — despite the immense emotional gravity of the violent and tragic global events to which they allude — do not bridge the gap between ISIS's violent screeds and Mateen's shooting spree.  In their attempts to span the separate streams of events described in the pleadings, the plaintiffs have shown little beyond mere happenstance and possibility.

## 2. Aiding and Abetting

The plaintiffs also have not alleged any facts that plausibly suggest that any of the defendants "aided or abetted" the person (Mateen) who committed the night club attack.  The "aiding and abetting" and "conspiracy" provisions of section 2333 (18 U.S.C. § 2333(d)), was added to the statute just eighteen months ago.  The Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. 114-222, 130 Stat. 852 (Sept. 28, 2016), did not alter any existing provisions of section 2333, but it expanded the scope of potentially liable actors by adding a new subsection (d).  Now, liability extends to anyone "who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed [] an act of international terrorism" that resulted in harm to a plaintiff.  *Id.* § 4(d)(2) ("Aiding and Abetting Liability for Civil Actions Regarding Terrorist Acts") (codified at 18 U.S.C. § 2333(d)).

Not many cases have discussed JASTA's aiding and abetting provision.  However, it has been noted that Congress, "in enacting JASTA, instructed that the 'proper legal framework for how [aiding and abetting] liability should function' under the ATA is that identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)."  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (quoting 18 U.S.C. § 2333 Statutory Note (Findings and Purpose § 5)).  The *Halberstam* court stated that a civil plaintiff asserting aiding and abetting liability must prove three things: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant

must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 487. *Halberstam* suggested six factors bearing on "'how much encouragement or assistance is substantial enough' to satisfy the third element: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483-84).

What have the plaintiffs pleaded here? That the defendants maintained social media platforms that enabled ISIS to spread its radicalizing message of violence and hatred of western cultures, and that those platforms allowed ISIS's message to reach Mateen. After the enactment of JASTA, it is sufficient for a plaintiff to plead either (1) that a defendant "aided or abetted" in the first instance "an act of international terrorism"; or (2) that a defendant "aided or abetted" a violation of some underlying criminal provision of the statute. *See Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 175, 2017 WL 395210 (S.D.N.Y. 2017). The plaintiffs rely on two underlying violations in this case, for (1) providing material support to a terrorist; and (2) providing material support to a designated terrorist organization. However, the plaintiffs have failed to allege any facts to show plausibly that the defendants knowingly supplied support or encouragement *to Mateen* in any way that aided his commission of the shooting. (The claim relating to material support of a designated foreign terrorist organization is discussed further below.)

There are no facts that suggest that the defendants "encouraged" Mateen to commit his crimes. Likewise, the plaintiffs do not allege that the defendants provided him with any assistance,

such as instructions on how to build a bomb or obtain an assault rifle. Certainly, no one suggests that any of the defendants' representatives were present at the scene, that they had any "relationship" with Mateen, or that they were of a mind to see this horrible event take place. As the court explained in *Linde*, aiding and abetting liability for a specific act of terrorist violence cannot be premised merely on a finding that the defendant knowingly provided support to a designated terrorist organization, as might suffice for a "material support" liability theory (more on that later). "[A]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist organization. Aiding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde*, PLC, 882 F.3d at 329.

Some cases pre-dating the enactment of JASTA countenanced, even if they did not explicitly uphold, the theory that "liability under 2333(a) may be premised upon a theory of civil 'aiding and abetting' of a tort . . . created by the Anti-Terrorism Act." *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 613 (E.D.N.Y. 2006). Under that theory, a plaintiff generally must allege that the aider or abettor "'(a) [did] a tortious act in concert with the other or pursuant to a common design with him; or (b) [knew] that the other['s] conduct constitute[d] a breach of duty and [gave] substantial assistance or encouragement to the other to so conduct himself; or (c) [gave] substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitute[d] a breach of duty to the third person.'" *Id.* at 613-14 (quoting Restatement (Second) of Torts § 876 (1979)). Here, the plaintiffs have not pointed to any tortious act committed by any of the defendants while handling Internet postings to their social media services that was taken "in concert with" Mateen's attack. Similarly, they have not pointed to anything the defendants did

"pursuant to a common design" related to the shooting; nor have they alleged any facts plausibly to show that any of the defendants knew that Mateen's "conduct constitute[d] a breach of duty" to any of the plaintiffs and "[gave] substantial assistance to [Mateen]" in accomplishing the supposed breach. So far as the facts alleged in the amended complaint suggest, it appears to be undisputed that none of the defendants, or any of their employees or agents, knew anything at all about Mateen or his plans before he carried out the horrific attack in Florida.

The amended complaint falls far short of the requirements outlined by these cases: there are no plausible allegations at all that there was any tangible connection between ISIS and the Pulse Night Club shooting attack, or between Mateen and the defendants.

### 3. Conspiracy

Similarly, the plaintiffs have not alleged any viable conspiracy claim, because they have not stated any facts that plausibly suggest that any of the defendants, or any persons affiliated with them, made any agreement with Mateen (or, for that matter, with ISIS, or any identified person or entity associated with its cause of promoting international terrorism). The sufficiency of allegations of conspiracy was the proximal issue before the Supreme Court when in *Twombly* it overhauled the pleading standard in federal courts and ushered in the sea change to our modern regime of plausibility pleading. And *Twombly* held that something more than coincidental — even knowingly coincidental — action must be shown in order to plead a claim of conspiracy. *Twombly*, 550 U.S. at 556 ("In applying these general standards to a [Sherman Act] § 1 claim, we hold that stating *such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made*. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; *it simply calls for enough fact to raise a reasonable*

*expectation that discovery will reveal evidence of illegal agreement*." (emphasis added)).  As the

Court explained, when confronting allegations of an anti-trust conspiracy:

> A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.  An allegation of parallel conduct is thus much *like a naked assertion of conspiracy* in a § 1 complaint: *it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility.*

*Twombly*, 550 U.S. at 557 (emphasis added); *see also Gill v. Arab Bank*, 893 F. Supp. 2d at 556-57

("There is no evidence regarding any agreement entered into by the Bank explicitly or implicitly or

steps taken by it in furtherance of such a conspiracy. . . .  A jury could not conclude that defendant

agreed to any common plan with or took substantial steps in furtherance of that plan.").

In this case, "naked assertions of conspiracy" are all the plaintiffs have offered; and, as to

any common plan or scheme between the defendants and Mateen, they have not even offered that.

Instead, they simply allege isolated facts, leaving to the Court to imagine what conspiratorial scheme

may have animated them.  *E.g.*, Am. Compl. ¶ 209 ("Omar Mateen was radicalized by ISIS' use of

social media.  This was the stated goal of ISIS. Mateen then carried out the deadly attacks in

Orlando.  Conducting terrorist acts via radicalized individuals is a stated goal of ISIS.").  None of

those facts identify any discernible common plan or scheme that led to the Orlando attack, or any

persons (other than Mateen) who may have agreed to carry out such a plan.  The only conduct

involved with the attacks that is described with any particularity is Mateen's, which, so far as the

allegations of the amended complaint suggest, he undertook in isolation, when he "*self*-radicalized"

by perusing Internet postings, and then acted on his self-informed radical sentiments by carrying out

a shooting rampage at a crowded night club.

### 4. Material Support

None of the facts in the amended complaint plausibly suggest that any of the defendants knowingly provided any "material support" to Mateen that facilitated his commission of the night club shooting, sufficient to make out a violation of 18 U.S.C. § 2339B. That section punishes a defendant who provides "material support or resources," and who does so "knowing or intending that they are to be used in preparation for, or in carrying out [a terrorist act], . . . or in preparation for, or in carrying out, the concealment of an escape from the commission of any" act of terrorism, or who aids and abets or conspires in the provision of such support. 18 U.S.C. § 2339a(a); 18 U.S.C. § 2332b(g)(5)(B). "[T]he term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339a(b)(1). The complaint contains no discernible facts to sustain any plausible claim that any of the defendants offered or delivered any such things to Mateen that facilitated the attack.

The plaintiffs contend that it is enough that the defendants provided "material support" to ISIS, and that ISIS had some connection with the attack because (1) Mateen viewed the organization's literature and videos online at some point before the attack; and (2) the organization "claimed responsibility" for the attack via its official news outlets after the attack. Even if the Court assumes that something the defendants did could have constituted some form of "material support" for ISIS, the allegations of the complaint do not establish that there is any tangible connection, about

which the defendants knew anything, between ISIS, Mateen, and Mateen's shooting spree. In fact, so far as the amended complaint suggests, it appears that no entity or agent of ISIS knew anything about the attack before it occurred, since the organization only claimed responsibility *after* the attack was public knowledge, due to the news coverage of it, and the plaintiffs apparently concede that Mateen never had direct contact with any agent or entity directly connected to ISIS. *E.g.*, Am. Compl. ¶¶ 193-95 ("The FBI believes that the Orlando shooter Omar Mateen was self-radicalized on the Internet and social media. . . . Even if Mateen had never been directly in contact with ISIS, ISIS' use of social media directly influenced his actions on the night of the Orlando massacre.").

The plaintiffs argue that giving ISIS a voice to spread its ideology and message of violent jihad was akin to leaving a loaded gun in a children's playground. The *Linde* court debunked that analogy in a case where the defendant, Arab Bank, was accused of providing material support to Hamas, a known terrorist organization.: "We conclude only that providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to excuse the charging error here and compel a finding that as a matter of law, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Linde*, 882 F.3d at 327 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 124 (2d Cir. 2013)).

Nothing in the amended complaint plausibly suggests either (1) that the defendants knew that any "services" they provided to ISIS were destined to aid the person responsible for the Orlando attack (Mateen), or (2) that the defendants knew of any terrorist activities of ISIS that could be facilitated by the specific use of their services by any identified member or affiliate of ISIS. Because the defendants must "knowingly" provide support with some discernible apprehension that

it could be used to facilitate terrorism, the failure to allege facts to show knowledge of a foreseeable connection to terrorist acts is fatal to the material support claims, particularly where the only allegations of the amended complaint are that the defendants provided "routine" services knowing only generally that some (unidentified) users could be affiliated with terrorism. *Hussein*, 230 F. Supp. 3d at 176-77 (holding that although "[p]roviding unusual services that are not part of the defendant's ordinary course of business might . . . raise red flags," "an inference of knowing or deliberately-indifferent support is generally implausible when the only allegations are that the defendants provided 'routine' banking services unaccompanied by any allegations tending to show that the defendants had reason to believe that their customers were terrorists or were assisting terrorists").

The facts alleged here contrast sharply with those where federal courts have found that the plaintiffs plausibly made out material support claims against a service provider. *See In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d at 489 ("The claimed wrongdoing of DIB . . . does not relate to the performance of routine banking and financial services, or its use as a passive conduit through which monies were indirectly channeled to and from al Qaeda. Rather, the allegations indicate that DIB was an intentional, knowing and direct participant in providing money laundering services to al Qaeda, which allowed for direct funding of terrorist attacks. . . . DIB allegedly continued to provide banking and other financial services directly to Osama bin Laden and al Qaeda, in violation of accepted international banking standards adopted to prevent the illicit movement of funds to terrorists."); *see also Gill*, 893 F. Supp. 2d at 486 ("The Bank beginning in the late 1990s knowingly maintained accounts for — and accepted wire transfers on behalf of — Hamas (or its proxies), well-known Hamas leaders, and other Hamas operatives, despite the facts that (1) Hamas

was named as a beneficiary of wire transfers made, (2) the United States government determined that some individual account holders to whom transfers were made were Hamas-affiliated terrorists, and (3) some account holders to whom transfers were made were prominent members of the paramilitary side of Hamas."). In this case, although the plaintiffs have alleged that the defendants provided routine social media services to ISIS, they have not pointed to any individual or cognizable entity that the defendants plausibly knew to be facilitating or carrying out any acts of terrorism, and to whom the defendants nevertheless knowingly continued to provide services or support to in any form.

### 5. Causation

Finally, even if the amended complaint could be viewed as setting forth some plausible claim that the defendants "aided" or "conspired" with or "supported" ISIS — although it certainly sets forth no plausible allegations that they did so with Mateen individually — the allegations still are insufficient to sustain any viable claim, because there are no facts pleaded that support any plausible conclusion that any of the defendants' conduct proximately caused the deaths and injuries that resulted from the shooting in Orlando. "Congress intended [the ATA civil remedy] provisions to impose, 'liability at any point along the causal chain of terrorism.' In enacting the material support statute Congress made an express finding of fact that, 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *Weiss*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006) (citing S. Rep. No. 102-342 at 22; Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-32, § 301(a)(7), 110 Stat. 1214, 1247 (1996)). However, it is well understood that a plaintiff cannot merely plead that the defendants have aided some terrorist organization; they must plead that the aid was supplied

to the particular person or entity responsible for the attack. *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 585 (E.D.N.Y. 2005), *rev'd on other grounds*, 882 F.3d 314 ("As to plaintiffs' claims premised on their second factual theory — i.e., that the Bank's provision of financial services constitutes material support to, or financing of, foreign terrorist organizations — plaintiffs acknowledge that they will have to prove that the Bank provided these services *to the particular group responsible for the attacks giving rise to their injuries*." (emphasis added)).

"Congress did not 'intend [] to permit recovery under § 2333 on a showing of less than proximate cause,' based on the Supreme Court's interpretation of the 'well-understood meaning' of the phrase 'by reason of' across multiple statutes." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 123 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013) ("We are not persuaded that Congress intended to permit recovery under § 2333 on a showing of less than proximate cause or that the Complaint contains plausible allegations that UBS's transfers of U.S. currency to Iran proximately caused plaintiffs' injuries.")); *see also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992) ("We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words ['by reason of'] earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them. Proximate cause is thus required." (citations omitted)). "At bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" *Holmes*, 503 U.S. at 268-69 (quoting Prosser & Keeton, Torts § 41, p. 264 (5th ed. 1984)). "Accordingly, among the many shapes this concept took at common law, was a demand for some direct relation between the injury asserted and the injurious conduct alleged." *Ibid.* (citations

omitted). "Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Ibid.* "Although such directness of relationship is not the sole requirement of [proximate] causation, it has been one of its central elements." *Id.* at 269.

In this case, the allegations that Mateen viewed some literature and videos produced by ISIS is not sufficient to sustain any inference that either the defendants, or ISIS, or any individual or entity directly associated with ISIS, had any discernible direct involvement in the Orlando attack. Instead, the complaint suggests, at most, that the defendants merely were aware of a generalized risk that persons associated with or sympathetic to ISIS's cause could, at some point, derive some benefit from their services, and that, at some point (by all accounts only after the attack) ISIS became aware of and expressed its approval of the attack. Those tenuous connections do not suffice to sustain the required inference of proximate cause. *Linde*, 882 F.3d at 327 ("That conclusion [that the provision of routine services does not amount to "material support"] is only reinforced by our holding, in the context of a challenge to proof of the causation element of an ATA claim, that the mere provision of 'routine banking services to organizations and individuals said to be affiliated with' terrorists does not necessarily establish causation.") (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 124).

To plead proximate cause, the plaintiffs must point to facts that tend to establish that (1) ISIS perpetrated the attack that injured them, and (2) the defendants' furnishing their social media platforms to ISIS caused the attack. *See Gill*, 893 F. Supp. 2d at 567. They have not alleged facts for which either proposition can be inferred in any plausible way. The plaintiffs have not asserted sufficient facts either to suggest any probability that the Orlando attack was carried out by ISIS, or

to demonstrate that the defendants' alleged inaction in permitting ISIS operatives to use their facilities had any proximate effect of facilitating the Orlando shooting. *See* 18 U.S.C. § 2333(d)(2) (imposing liability for "an injury arising from an act of international terrorism *committed, planned, or authorized* by [a foreign terrorist organization]" (emphasis added)). In fact, so far as the allegations of the amended complaint suggest, the only communications between anyone that could have remotely involved the defendants' services and that even arguably related directly to the shooting were claims of responsibility by ISIS news sources *after the attack was completed*; nothing in the amended complaint even alludes to any contacts or communications between anyone — let alone between ISIS and Mateen — that directly concerned the attack beforehand.

Confronting strikingly similar allegations, the district court in *Fields v. Twitter, Inc. (Fields II)*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016), *aff'd* 881 F.3d 739 (9th Cir. 2018), held that the plaintiffs had not presented any viable claims under a material support theory, due to the absence of any plausible inference of proximate cause. *Id.* at 1127 ("Plaintiffs have not alleged any facts linking Twitter's provision of accounts to ISIS to Abu Zaid's attack. Instead they assert that they have demonstrated proximate cause by alleging that Twitter provided ISIS with material support in the form of a powerful communication tool and that ISIS has claimed responsibility for Abu Zaid's actions. These allegations do not plausibly suggest the necessary causal connection between Twitter's provision of accounts and the attack that killed Lloyd Fields, Jr. and James Damon Creach."). "While courts have not required plaintiffs bringing ATA claims based on material support theories to 'trace specific dollars to specific attacks,' they have nevertheless rejected alleged causal connections that are too speculative or attenuated to raise a plausible inference of proximate causation." *Fields v. Twitter, Inc. (Fields I)*, 200 F. Supp. 3d 964, 974 n.4 (N.D. Cal. 2016), *aff'd*

881 F.3d 739 (9th Cir. 2018) (quoting *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013)) (collecting cases); *see also Gill*, 893 F. Supp. 2d at 557 ("There is no evidence that the Bank willfully, knowingly, or intentionally provided material support to the shooter or any organization he might have been affiliated with in violation of the criminal material support statutes codified at 18 U.S.C. §§ 2339A, 2339B, or 2339C. The acts of the Bank relied on by plaintiff are so remote in time and attenuated in their inferential value as proof of an element of any cause of action as to constitute less than a scintilla.").

Those same conclusions were affirmed just two months ago, where the Ninth Circuit affirmed the district court's dismissal, after concluding that the plaintiffs' amended complaint failed plausibly to allege that providing Twitter accounts to known ISIS elements was a proximate cause of the shooting of the plaintiffs' decedents by a man who later was identified as a member of an ISIS terrorist cell. The court explained:

> Plaintiffs-Appellants have not pleaded that Twitter's provision of communication equipment to ISIS, in the form of Twitter accounts and direct messaging services, had any direct relationship with the injuries that Plaintiffs-Appellants suffered. At most, the SAC establishes that Twitter's alleged provision of material support to ISIS facilitated the organization's growth and ability to plan and execute terrorist acts. But the SAC does not articulate any connection between Twitter's provision of this aid and Plaintiffs–Appellants' injuries.

*Fields*, 881 F.3d at 749-50.

* * * * * * * * * *

The amended complaint  does not contain sufficient facts to support all of the essential elements of the federal claims the plaintiffs attempt to present.

## B. State Law Claims

The amended complaint also includes claims for negligent infliction of emotional distress and "wrongful death." Under Michigan law, both of those causes of action require the pleader to offer facts establishing proximate cause. *Lavin v. Conte*, 2017 WL 3159682, at *7 (Mich. Ct. App. July 25, 2017) ("[I]n order to sustain a claim for negligent infliction of emotional distress, the alleged physical injury must be 'proximately caused by defendant's negligent conduct.'") ((quoting *Daley v. LaCroix*, 384 Mich. 4, 12, 179 N.W.2d 390, 395 (1970)); *Vo v. United States*, No. 15-420, 2017 WL 6523541, at *5 (W.D. Mich. Dec. 21, 2017) (observing that under Michigan law, a claim of wrongful death takes on the elements of the underlying tort, which generally requires a showing that the wrongful act "was a proximate cause of the damages suffered" (citations and quotations omitted)). And the plaintiffs do not appear to dispute the defendants' position that such is the case. For the same reasons noted above, it must be concluded that the amended complaint's state law counts fall short on that element.

## III.

"Because the plaintiffs . . . have not nudged their claims across the line from conceivable to plausible, their [amended] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss [dkt. #37] is **GRANTED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 30, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 30, 2018.

s/Susan Pinkowski
SUSAN PINKOWSKI